# 19-2423(L)

**19-3164 (Con)**

## UNITED STATES COURT OF APPEALS
## for the
## SECOND CIRCUIT

UNITED STATES OF AMERICA,
*Appellee,*

versus

SCOTT BRETTSCHNEIDER and JOHN A. SCARPA, JR.,
*Appellants,*

CHARLES GALLMAN, a/k/a TA, RICHARD MARSHALL, a/k/a LOVE,
and REGINALD SHABAZZ-MUHAMMAD, a/k/a REGGIE,
*Defendants*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

## APPELLANT SCOTT BRETTSCHNEIDER'S APPENDIX
## VOLUME I

JAIME T. HALSCOTT, ESQ.
1300 North Semoran Boulevard, Suite 195
Orlando, Florida 32807
Office 407-255-2164
Fax 855-225-1671
Email: jhalscott@halscottmegaro.com
Counsel for Appellant Scott Brettschneider

| DOCKET ENTRY # | DESCRIPTION | APPENDIX PAGE # |
|---|---|---|
| | **Volume I** | |
| N/A | District Court Docket Sheet | 1-13 |
| 1 | Indictment filed 3-13-2018 | 14-19 |
| 74 | Superseding Indictment filed 9-24-2018 | 20-27 |
| 106 | Motion to Suppress Wiretap and to sever defendants by Scott Brettschneider filed 11-16-2018 | 28-52 |
| 118 | Memorandum in Opposition re 106 motion to Suppress Wiretap and to sever defendants filed 12-6-2018 | 53-87 |
| 124 | Reply to Response to Motion re 106 Motion to Suppress Wiretap and to sever defendants filed 12-20-2018 | 88-97 |
| 138 | Memorandum and Order re 106 Motion to Suppress as to Scott Brettschneider filed 1-30-2019 | 98-113 |
| 157 | Proposed Jury Instructions and Verdict Form by Scott Brettschneider | 114-168 |
| 159 | The Government's Requested Jury Instructions | 169-198 |
| 177-3 | Transcripts of Sentencing in Case # 12-CR-14 dated 8-8-2014 | 199-210 |
| 183 | Draft Jury Instructions | 211-236 |
| 200 | Final Jury Instructions | 237-262 |
| 215 | First Motion to Set Aside Verdict by Scott Brettschneider filed 5-15-2019 | 263-279 |
| | **Volume II** | |
| 225 | Memorandum in Opposition re 215 First Motion to Set Aside Verdict filed 6-17-2019 | 280-427 |
| 229 | Letter Requesting Permission to Supplement and for Oral Argument as to Scott Brettschneider filed 6-28-2019 | 428-483 |
| 230 | Letter re 229 defendant's request to supplement post-trial motions as to Scott Brettschneider filed 7-1-2019 | 484-486 |
| 231 | Letter (corrected) re 229 defendant's request to supplement post-trial motions as to Scott Brettschneider filed 7-1-2019 | 487-489 |
| 242 | Judgment of Conviction filed 7-29-2019 | 490-494 |
| 247 | Notice of Appeal filed 8-5-2019 | 495 |
| N/A | Defense Trial Exhibit A – Bureau of Prisons Program Statement, Psychology Treatment Programs | 496-533 |
| N/A | Government's Trial Exhibit # 4 – Bureau of Prisons Psychology Services Group Participation Report of Richard Marshall (redacted) and Letter from Reginald Shabazz-Muhammad to Diana Banks dated November 6, 2014 | 534-540 |
| 281 | Transcripts of Hearing 1-7-2019 | 541-570 |
| | **Volume III** | |
| N/A | Transcripts of Trial – 4-1-2019 | 571-682 |
| | **Volume IV** | |
| N/A | Transcripts of Trial – 4-2-2019 | 683-966 |

| | | |
|---|---|---|
| | **Volume V** | |
| N/A | Transcripts of Trial – 4-3-2019 | 967-1159 |
| | **Volume VI** | |
| N/A | Transcripts of Trial – 4-4-2019 | 1160-1347 |
| | **Volume VII** | |
| N/A | Transcripts of Trial – 4-5-2019 | 1348-1465 |
| 280 | Transcript of Sentencing 7-26-19 | 1466-1500 |

CLOSED,APPEAL

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:18-cr-00123-CBA-1

Case title: USA v. Brettschneider et al

Date Filed: 03/13/2018
Date Terminated: 07/29/2019

Assigned to: Judge Carol Bagley Amon

### Defendant (1)

**Scott Brettschneider**
*TERMINATED: 07/29/2019*
*also known as*
Mighty Whitey
*TERMINATED: 07/29/2019*

represented by **Patrick J. Joyce**
Patrick J. Joyce
70 Lafayette Street
New York, Ny 10013
212-285-2299
Fax: 212-513-1989
Email: pjoyce13@juno.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Sarita Kedia**
Law Offices of Sarita Kedia
5 East 22nd Street
Suite 7B
New York, NY 10010
212-681-0202
Fax: 212-614-0202
Email: skedia@kedialaw.com
*TERMINATED: 06/25/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jonathan Savella**
Jonathan Savella
Attorney At Law
810 7th Avenue, Suite 620
New York, NY 10019
646-801-2184
Email: jonathan.savella@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Raymond G. Perini**
Perini & Hoerger
1770 Motor Parkway, Suite 300
Hauppauge, NY 11749

631-232-2224
Fax: 631-232-2344
Email: perinihoerger@aol.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| Conspiracy to Make False Statements - Title 18, United States Code, Sections 371 and 3551 et seq. (1s) | PROBATION: 4 Years with special conditions; A fine of $2,000.00 imposed. Payments to be made of over 1st year of probation. SPECIAL ASSESSMENT: $100.00. AMENDED JUDGMENT: Judgment amended to modify Supervision Conditions. SECOND AMENDED JUDGMENT: Judgment amended to modify Supervision Conditions, For a period of 60 days, the defendant shall reside in the Brooklyn CCC (see jgm for details) |
| Title 18, United States Code, Sections 1001(a)(2), 2 and 3551 et seg. - STATEMENTS OR ENTRIES GENERALLY (2) | Dismissed on Govt motion. |
| Making False Statements - Title 18, United States Code, Sections 1001(a)(2), 2 and 3551 et seq. (2s) | PROBATION: 4 Years with special conditions; A fine of $2,000.00 imposed. Payments to be made of over 1st year of probation. SPECIAL ASSESSMENT: $100.00. AMENDED JUDGMENT: Judgment amended to modify Supervision Conditions. SECOND AMENDED JUDGMENT: Judgment amended to modify Supervision Conditions, For a period of 60 days, the defendant shall reside in the Brooklyn CCC (see jgm for details) |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| Title 18, United States Code, Sections 371 and 3551 et seq. - CONSPIRACY TO DEFRAUD THE UNITED STATES (1) | Dismissed on Govt motion. |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

USA                      represented by    **Andrey Spektor**
U.S. Attorney's Office, EDNY
271-A Cadman Plaza East
Brooklyn, NY 11201
718-254-6475
Fax: 718-254-6605
Email: andrey.spektor@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Lindsay K. Gerdes**
U.S. Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6155
Fax: 718-250-6076
Email: lindsay.gerdes@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Keith Daniel Edelman**
U.S. Attorney's Office, Eastern District of
New York
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6328
Fax: 718-254-6605
Email: keith.edelman@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Margaret Gandy**
United States Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6213
Fax: 718-254-6076
Email: margaret.gandy@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|-----|-------------|
| 03/13/2018 | 1 | SEALED INDICTMENT as to Scott Brettschneider (1) count(s) 1, 2, Charles Gallman (2) count(s) 1, 2, Richard Marshall (3) count(s) 1, 2, Reginald Shabazz-Muhammad (4) count(s) 1, 2. (Attachments: # 1 Indictment Sealing Form, # 2 Criminal Information Sheet, # 3 Sealing Cover Sheet) (Fernandez, Erica) (Entered: 03/14/2018) |
| 03/26/2018 | 18 | Arrest Warrant Returned Executed on 3/26/18 in case as to Scott Brettschneider. (Fernandez, Erica) (Entered: 03/29/2018) |

| | | |
|---|---|---|
| 03/26/2018 | 19 | NOTICE OF ATTORNEY APPEARANCE: Raymond G. Perini appearing for Scott Brettschneider (Fernandez, Erica) (Entered: 03/29/2018) |
| 03/26/2018 | 20 | Minute Entry for proceedings held before Magistrate Judge Steven M. Gold:Arraignment as to Scott Brettschneider (1) Count 1,2 held on 3/26/2018. Counsel for parties present. Bond set at $500,000.00, Deft released. Plea entered by Scott Brettschneider (1) Count not guilty on all counts. Order of excludable delay/speedy trial entered, start 3/26/18 and stop 4/6/18. Status Conference set for 4/6/2018 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (FTR Log #2:51-2:59.) (Fernandez, Erica) (Entered: 03/29/2018) |
| 03/26/2018 | 21 | ORDER TO CONTINUE - Ends of Justice as to Scott Brettschneider Time excluded from 3/26/18 until 4/6/18. Ordered by Magistrate Judge Steven M. Gold on 3/26/2018. (Fernandez, Erica) (Entered: 03/29/2018) |
| 03/26/2018 | 25 | ORDER Setting Conditions of Release as to Scott Brettschneider (1) $500,000.00. Ordered by Magistrate Judge Steven M. Gold on 3/26/2018. (Fernandez, Erica) (Entered: 03/30/2018) |
| 03/26/2018 | 26 | REDACTION by Scott Brettschneider to 25 1 - Sealed Document CR, Order Setting Conditions of Release (Fernandez, Erica) (Entered: 03/30/2018) |
| 03/29/2018 | 17 | Order to Unseal Indictment as to Scott Brettschneider, Reginald Shabazz-Muhammad.. Ordered by Magistrate Judge Steven M. Gold on 3/26/2018. (Marziliano, August) (Additional attachment(s) added on 3/29/2018: # 1 Letter) (Fernandez, Erica). (Entered: 03/29/2018) |
| 03/29/2018 | 23 | Letter *In Support of Pretrial Detention* as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad (Gerdes, Lindsay) (Entered: 03/29/2018) |
| 03/29/2018 | 24 | First MOTION for Protective Order *with the consent of counsel for Brettschnieder, Gallman and Shabazz-Muhammad* by USA as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad. (Attachments: # 1 Proposed Order) (Gerdes, Lindsay) (Entered: 03/29/2018) |
| 04/06/2018 | 35 | Letter *Providing Rule 16 Discovery* as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad (Gerdes, Lindsay) (Entered: 04/06/2018) |
| 04/06/2018 | 36 | Letter *Providing Individual Rule 16 Discovery* as to Scott Brettschneider (Gerdes, Lindsay) (Entered: 04/06/2018) |
| 04/06/2018 | 40 | Letter *Providing Rule 16 Discovery (as discussed at the April 6 status conference)* as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad (Gerdes, Lindsay) (Entered: 04/06/2018) |
| 04/06/2018 | 41 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Status Conference as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad held on 4/6/2018 Counsel for parties present. Dft Brettschneider: Bail modified to expand deft's travel to now include ALL of New York; Dft Marshall: CJA Attorney James Branden appointed. Voucher executed in open court. Dft arraigned & enters plea of not guilty; Dft Shavazz-Muhammad: Court addresses concerns detailed in PTS Memo regarding deft's use of marijuana. Dft directed to abide by conditions of release. All defts: Govt directed to provide discovery as follows: 1) 75 phone calls; 2) draft transcripts; and 3) wiretap applications by 4/13/18, Protective Order executed in open court. Further conference set for 5/11/18 at 9:30. OED ent'd (plea discussions; complex case). Status Conference set for 5/11/2018 at 09:30 AM in Courtroom 10D |

| | | |
|---|---|---|
| | | South before Judge Carol Bagley Amon. (Court Reporter Linda Danelczyk.) (Fernandez, Erica) (Entered: 04/09/2018) |
| 04/06/2018 | 42 | ORDER TO CONTINUE - Ends of Justice as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad Time excluded from 4/6/18 until 5/11/18. Ordered by Judge Carol Bagley Amon on 4/6/2018. (Fernandez, Erica) (Entered: 04/09/2018) |
| 04/09/2018 | | ORDER granting 24 Motion for Protective Order as to Scott Brettschneider (1), Charles Gallman (2), Richard Marshall (3), Reginald Shabazz-Muhammad (4). So Ordered by Judge Carol Bagley Amon on 4/6/2018. (Holley, Vanessa) (Entered: 04/09/2018) |
| 04/19/2018 | 44 | Letter *Requesting Defendant Marshall's PSR Be Covered by Protective Order - with the Consent of the Defendants* as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad (Attachments: # 1 Exhibit Government's Request to Disclosue PSR and Judge's Order) (Gerdes, Lindsay) (Entered: 04/19/2018) |
| 04/25/2018 | | ORDER as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad re 44 Letter: Application to have redacted Marshall PSR subject to the Protective Order is granted. So Ordered by Judge Carol Bagley Amon on 4/24/2018. (Holley, Vanessa) (Entered: 04/25/2018) |
| 04/25/2018 | 47 | Letter *Providing Rule 16 Discovery* as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad (Gerdes, Lindsay) (Entered: 04/25/2018) |
| 05/11/2018 | 51 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Status Conference as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad held on 5/11/2018. Counsel for parties present. Conference held. Protective Order regarding dft Brettschneider granted in open court. Parties indicate that no motions are ready to be submitted at this time.Govt directed to advise Court in 30 days regarding possible additional charges related to wiretaps. Regarding dft Marshall: Electronic monitoring condition lifted by the Court. Further Conference set for 6/22/2018 at 11:00 AM in Courtroom 10D South before Judge Carol Bagley Amon. OED cont'd (complex case) (Court Reporter Rivka Teich.) (Fernandez, Erica) (Entered: 05/21/2018) |
| 05/11/2018 | 52 | ORDER TO CONTINUE - Ends of Justice as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad Time excluded from 5/11/18 until 6/22/18. Ordered by Judge Carol Bagley Amon on 5/11/2018. (Fernandez, Erica) (Entered: 05/21/2018) |
| 05/15/2018 | 50 | MOTION to Amend/Correct *Protective Order* by Scott Brettschneider. (Perini, Raymond) (Entered: 05/15/2018) |
| 05/22/2018 | 53 | ORDER as to Scott Brettschneider; Deft request the Court to amend the protective order; Application granted. Ordered by Judge Carol Bagley Amon on 5/11/2018. (Fernandez, Erica) (Additional attachment(s) added on 5/22/2018: # 1 Affirmation) (Fernandez, Erica). (Entered: 05/22/2018) |
| 05/22/2018 | 54 | AMENDED Protective Order as to Scott Brettschneider: ORDERED, RAYMOND PERINI may mail a copy of the protected material directly to defendant BRETTSCHNEIDER'S home in North Carolina for his exclusive use in reviewing the discovery material. ORDERED, defendant BRETTSCHNEIDER will not permit anyone but himself to review the material and he will not share it or copy it with anyone (See order for details). Ordered by Judge Carol Bagley Amon on 5/22/2018. (Fernandez, Erica) (Entered: 05/22/2018) |
| 06/22/2018 | 58 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Status Conference as to Scott Brettschneider, Charles Gallman, Reginald Shabazz-Muhammad held on |

A.5

| | | |
|---|---|---|
| | | 6/22/2018. Counsel for parties present. Discovery still being reviewed. J/S & trial set for 11/26/18 (approximately 2 weeks).Further conference set for 8/2/18 at 11:00. OED cont'd (complex; plea discussions). Dft Shabazz-Muhammad will likely plead guilty before 8/2/18.Govt to assist defense counsel regarding the transfer of dft Gallman from MCC to MDC. Status Conference set for 8/2/2018 11:00 AM in Courtroom 10D South before Judge Carol Bagley Amon.) (Court Reporter Holly Driscoll.) (Fernandez, Erica) (Entered: 06/27/2018) |
| 07/05/2018 | 59 | NOTICE OF ATTORNEY APPEARANCE: Sarita Kedia appearing for Scott Brettschneider (Kedia, Sarita) (Entered: 07/05/2018) |
| 08/02/2018 | 60 | Letter *Providing Discovery* as to Scott Brettschneider (Gerdes, Lindsay) (Entered: 08/02/2018) |
| 08/02/2018 | 61 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Status Conference as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad held on 8/2/2018. Counsel for parties present. Dft Gallman & Dft Shabazz-Muhammad: guilty pleas expected before next status conference. Dft Brettschneider: Issues raised by new counsel regarding 11/26/18 trial date set by the Court 6/22/18. Court decline to reset trial date. Status Conference set for 9/6/2018 at 02:00 PM in Courtroom 10D South before Judge Carol Bagley Amon. OED cont'd (new counsel re dft Brettschneider); plea discussions re dfts Gallman & Shabazz-Muhammad. (Court Reporter Victoria Torres-Butler.) (Fernandez, Erica) (Entered: 08/06/2018) |
| 08/02/2018 | 62 | ORDER TO CONTINUE - Ends of Justice as to Scott Brettschneider Time excluded from 8/2/18 until 9/6/18. Ordered by Judge Carol Bagley Amon on 8/2/2018. (Fernandez, Erica) (Entered: 08/06/2018) |
| 09/06/2018 | 66 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Status Conference as to Scott Brettschneider, Charles Gallman, Reginald Shabazz-Muhammad held on 9/6/2018. Counsel for parties present. Dfts Gallman & Shabazz-Muhammad: guilty pleas set for 9/25/18; Dft Brettschneider: Motion schedule set as follows: dft's wiretap motion due 11/16/18; govt's response due 12/6/18; dft's reply due 12/20/18; oral argument set for 1/7/19 at 9:30. OED cont'd (complex case). Jury Selection & trial adjourned to 3/18/19(1 week). Dft consents to jury selection before USMJ. (Court Reporter Michele Lucchesi.) (Fernandez, Erica) (Entered: 09/14/2018) |
| 09/06/2018 | 68 | ORDER TO CONTINUE - Ends of Justice as to Scott Brettschneider Time excluded from 9/6/18 until 1/7/19. Ordered by Judge Carol Bagley Amon on 9/6/2018. (Fernandez, Erica) (Entered: 09/14/2018) |
| 09/24/2018 | 74 | SEALED INDICTMENT (S-1) as to Scott Brettschneider (1) count(s) 1s, 2s, Charles Gallman (2) count(s) 1s, 2s, 3s, 4s, John Scarpa, Jr (5) count(s) 3, 4. (Attachments: # 1 Sealing Form, # 2 Sealing Cover Sheet) (Marziliano, August) (Attachment 2 replaced on 9/25/2018) (Marziliano, August). (Entered: 09/25/2018) |
| 09/25/2018 | 76 | Order to Unseal Indictment and case as to Scott Brettschneider, Charles Gallman, John Scarpa, Jr.. Ordered by Magistrate Judge Steven Tiscione on 9/25/2018. (Attachments: # 1 Application) (Marziliano, August) (Main Document 76 replaced on 9/25/2018) (Marziliano, August). (Entered: 09/25/2018) |
| 09/26/2018 | | SCHEDULING NOTICE as to Scott Brettschneider and Charles Gallman: Please be advised that an Arraignment on the Superseding Indictment & a Status Conference have been set for 10/2/18 at 4:00 PM in Courtroom 10D South before Judge Carol Bagley Amon. (Holley, Vanessa) (Entered: 09/26/2018) |
| 10/02/2018 | 93 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Arraignment as to Scott Brettschneider (1) Count 1s,2s and Charles Gallman (2) Count 2s,3s,4s and John |

**A.6**

| | | |
|---|---|---|
| | | Scarpa Jr. (5) Count 3,4 held on 10/2/2018. Counsel for parties present. Dft Brettschneider: Dft waives formal & public reading of SS Indictment. Not guilty plea accepted by the Court. Dft position to proceed to trial as previously scheduled for 3/18/19 remains the same. Dft Gallman:Dft waives formal & public reading of SS Indictment. Not guilty plea accepted by the Court. OED con'td (ongoing plea discussions). Guilty Plea set for 11/8/18 at noon. Dft Scarpa: Conference held. Govt directed to complete discovery in 1 week. OED ent'd (complex case). Further conference set for 11/27/18 at 2:00PM. (Court Reporter David Roy.) (Fernandez, Erica) (Entered: 10/04/2018) |
| 11/16/2018 | 106 | MOTION to Suppress *Wiretap and to sever defendants* by Scott Brettschneider. (Attachments: # 1 Declaration, # 2 Memorandum in Support, # 3 Exhibit A, # 4 Exhibit B - Part I, # 5 Exhibit B - Part II) (Kedia, Sarita) (Entered: 11/16/2018) |
| 12/01/2018 | 114 | Letter *requesting that exhibits be filed under seal* as to Scott Brettschneider (Kedia, Sarita) (Entered: 12/01/2018) |
| 12/03/2018 | | ORDER as to Scott Brettschneider re 114 Letter: The defendant is directed to explain why these exhibits should be sealed. So Ordered by Judge Carol Bagley Amon on 12/3/2018. (Holley, Vanessa) (Entered: 12/03/2018) |
| 12/04/2018 | 115 | Letter *regarding sealing of exhibits to pretrial motions* as to Scott Brettschneider (Kedia, Sarita) (Entered: 12/04/2018) |
| 12/04/2018 | 116 | Letter *in response to defendant Brettschneider's letter "regarding sealing of exhibits to pretrial motions"* as to Scott Brettschneider (Gerdes, Lindsay) (Entered: 12/04/2018) |
| 12/04/2018 | 117 | Letter *replying to government's sealing/redaction request* as to Scott Brettschneider (Attachments: # 1 Exhibit A) (Kedia, Sarita) (Entered: 12/04/2018) |
| 12/06/2018 | 118 | MEMORANDUM in Opposition re 106 MOTION to Suppress *Wiretap and to sever defendants* (Spektor, Andrey) (Entered: 12/06/2018) |
| 12/20/2018 | 124 | REPLY TO RESPONSE to Motion re 106 MOTION to Suppress *Wiretap and to sever defendants* (Kedia, Sarita) (Entered: 12/20/2018) |
| 01/07/2019 | 127 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Oral Argument as to Scott Brettschneider held on 1/7/2019. Counsel for parties present. Oral Argument heard; Decision reserved; Deft's motion in limine to be submitted 1/28/19. Govt's response due 2/11/19. Oral Argument set for 2/28/2019 at 02:00 PM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Victoria Torres Butler.) (Fernandez, Erica) (Entered: 01/08/2019) |
| 01/28/2019 | 134 | Letter *Notifying the Court that the Government Does Not Intend to Admit Any Evidence Pursuant to Rule 404(b)* as to Scott Brettschneider (Gerdes, Lindsay) (Entered: 01/28/2019) |
| 01/30/2019 | 138 | MEMORANDUM AND ORDER re 106 Motion to Suppress as to Scott Brettschneider (1): For the reasons stated above, Brettschneider's motion to suppress the wiretap evidence is denied.Ordered by Judge Carol Bagley Amon on 1/28/2019. (Fernandez, Erica) (Entered: 01/30/2019) |
| 02/11/2019 | 140 | Letter *requesting bond modification and responding to govt's 1/28/19 letter* as to Scott Brettschneider (Kedia, Sarita) (Entered: 02/11/2019) |
| 02/13/2019 | 142 | ORDER as to Scott Brettschneider: It is hereby ORDERED that the conditions of release on bond for the defendant SCOTT BRETTSCHNEIDER are modified such that his residence in North Carolina is released as security on the bond.. Ordered by Judge Carol Bagley Amon on 2/12/2019. (Fernandez, Erica) (Entered: 02/13/2019) |

**A.7**

| | | |
|---|---|---|
| 02/14/2019 | 144 | NOTICE OF ATTORNEY APPEARANCE Keith Daniel Edelman appearing for USA. (Edelman, Keith) (Entered: 02/14/2019) |
| 02/28/2019 | 150 | Minute Entry: Status Conference as to Scott Brettschneider held on 2/28/2019 before Judge Carol Bagley Amon. AUSA Lindsay Gerdes and Andrey Spektor appeared on behalf of the government. Retained counsel Sarita Kedia appeared for defendant Mr. Brettschneider. As per discussion held on the record both parties are to submit all materials regarding the wiretap on or before March 8,2019 and Jury Instruction on or before March 11,2019. This matter is adjourned for Status Conference on 3/12/2019 at 11:00 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Michele Lucchese.) (Almonte, Giselle) (Entered: 02/28/2019) |
| 03/01/2019 | 152 | NOTICE OF ATTORNEY APPEARANCE: Jonathan Savella appearing for Scott Brettschneider (Savella, Jonathan) (Entered: 03/01/2019) |
| 03/10/2019 | 154 | Letter *in advance of the Final Pretrial Conference outlining outstanding issues* as to Scott Brettschneider (Spektor, Andrey) (Entered: 03/10/2019) |
| 03/11/2019 | 155 | Proposed Voir Dire by USA as to Scott Brettschneider (Gerdes, Lindsay) (Entered: 03/11/2019) |
| 03/11/2019 | 156 | Letter *regarding trial date and various issues* as to Scott Brettschneider (Kedia, Sarita) (Entered: 03/11/2019) |
| 03/11/2019 | 157 | Proposed Jury Instructions/Verdict Form by Scott Brettschneider (Kedia, Sarita) (Entered: 03/11/2019) |
| 03/11/2019 | 158 | Proposed Voir Dire by Scott Brettschneider (Kedia, Sarita) (Entered: 03/11/2019) |
| 03/11/2019 | 159 | Proposed Jury Instructions/Verdict Form by USA as to Scott Brettschneider (Attachments: # 1 Proposed Verdict Sheet) (Spektor, Andrey) (Entered: 03/11/2019) |
| 03/12/2019 | 161 | Letter *in Reponse to Defendant's Exhibit* as to Scott Brettschneider (Gerdes, Lindsay) (Entered: 03/12/2019) |
| 03/12/2019 | 169 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Pretrial Conference as to Scott Brettschneider held on 3/12/2019. Counsel for parties present. Deft's request for trial adjournment granted. Jury Selection and Jury Trial set for 4/1/2019 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. Dft to provide govt with RDAP transcripts by 3/18/19. Dft to provide letter to Court re 17 other exhibits by 3/20/19. Dft to provide additional transcripts by 3/25/19. Pretrial Conference set for 3/26/2019 at 10:00 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Holly Driscoll.) (Fernandez, Erica) (Entered: 03/19/2019) |
| 03/14/2019 | 166 | Letter *requesting subpoena to Queens DA's Office* as to Scott Brettschneider (Attachments: # 1 Subpoena) (Kedia, Sarita) (Entered: 03/14/2019) |
| 03/15/2019 | 167 | Letter *in Opposition to Request for Rule 17 Subpoena to the Queens County DA's Office* as to Scott Brettschneider (Gerdes, Lindsay) (Entered: 03/15/2019) |
| 03/15/2019 | 168 | Letter *withdrawing subpoena request* as to Scott Brettschneider (Kedia, Sarita) (Entered: 03/15/2019) |
| 03/19/2019 | 175 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Status Conference as to Scott Brettschneider held on 3/19/2019. Counsel for parties present. Atty Kedia waives her clients appearance. Court advises parties that it has reviewed in-camera 2 recommendations by USPO from Northern District regarding co-dft Marshall and has had follow-up discussions with the Chief Judge. The parties will be granted permission to |

| | | |
|---|---|---|
| | | review said documents by proving the appropriate subpoena(s) to the N/D. (Court Reporter Anthony Frisolone.) (Fernandez, Erica) (Entered: 03/21/2019) |
| 03/20/2019 | [174](#) | Letter *motion to preclude certain recordings* as to Scott Brettschneider (Kedia, Sarita) (Entered: 03/20/2019) |
| 03/22/2019 | [176](#) | MOTION in Limine by Charles Gallman as to Scott Brettschneider. (Savella, Jonathan) (Entered: 03/22/2019) |
| 03/25/2019 | [177](#) | RESPONSE in Opposition re [176](#) MOTION in Limine *and re* [174](#) *Motion to Preclude* (Attachments: # [1](#) BOP Screening Summary, # [2](#) Expert Report Submitted by Brettschneider, # [3](#) Marshall's Sentencing Transcript, # [4](#) Brettschneider's Sentencing Ltr. on Behalf of Marshall, # [5](#) Excerpts 1 and 2 of RDAP Calls to Which Gov't Objects) (Spektor, Andrey) (Entered: 03/25/2019) |
| 03/25/2019 | [178](#) | Letter *in further support of motion to preclude certain govt exhibits* as to Scott Brettschneider (Kedia, Sarita) (Entered: 03/25/2019) |
| 03/26/2019 | [180](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Scott Brettschneider held on March 12, 2019, before Judge Amon. Court Reporter/Transcriber H. Driscoll, Telephone number 7186132274. Email address: hdrisc@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/16/2019. Redacted Transcript Deadline set for 4/26/2019. Release of Transcript Restriction set for 6/24/2019. (Driscoll, Holly) (Entered: 03/26/2019) |
| 03/26/2019 | [182](#) | NOTICE OF ATTORNEY APPEARANCE Margaret Gandy appearing for USA. (Gandy, Margaret) (Entered: 03/26/2019) |
| 03/26/2019 | [196](#) | Minute Entry for proceedings held before Judge Carol Bagley Amon: Pretrial Conference held as to Scott Brettschneider held on 3/26/2019. Counsel for parties present. (Court Reporter Lisa Schmid.) (Fernandez, Erica) (Entered: 04/11/2019) |
| 03/28/2019 | [183](#) | DRAFT Jury Instructions/Verdict SHEET by Scott Brettschneider (Attachments: # [1](#) Draft Verdict Sheet) (Fernandez, Erica) (Entered: 03/28/2019) |
| 03/29/2019 | [184](#) | Letter *re:* [183](#) *the Court's draft jury instructions* as to Scott Brettschneider (Spektor, Andrey) (Entered: 03/29/2019) |
| 04/01/2019 | [187](#) | Letter *re: Giglio disclosure* as to Scott Brettschneider (Spektor, Andrey) (Entered: 04/01/2019) |
| 04/01/2019 | [192](#) | Minute Entry for proceedings held before Judge Carol Bagley Amon: Jury Selection as to Scott Brettschneider held on 4/1/2019. Counsel for parties present. Jury Trial adjourned to 4/2/2019 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Annette Montalvo.) (Fernandez, Erica) (Entered: 04/10/2019) |
| 04/02/2019 | [193](#) | Minute Entry for proceedings held before Judge Carol Bagley Amon: Jury Trial as to Scott Brettschneider held on 4/2/2019. Counsel for parties present. Jury Trial adjourned to 4/3/2019 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Annette Montalvo.) (Fernandez, Erica) (Entered: 04/10/2019) |
| 04/03/2019 | [194](#) | Minute Entry for proceedings held before Judge Carol Bagley Amon: Jury Trial as to Scott Brettschneider held on 4/3/2019. Counsel for parties present. Jury Trial adjourned to 4/4/2019 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Annette Montalvo.) (Fernandez, Erica) (Entered: 04/10/2019) |



A.9

| | | |
|---|---|---|
| 04/04/2019 | 195 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Jury Trial as to Scott Brettschneider held on 4/4/2019. Counsel for parties present. Jury Trial set for 4/5/2019 at 09:30 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Annette Montalvo.) (Fernandez, Erica) (Entered: 04/10/2019) |
| 04/05/2019 | 197 | Minute Entry for proceedings held before Judge Carol Bagley Amon: Jury Trial as to Scott Brettschneider held on 4/5/2019. Counsel for parties present. Summations cont'd (defense & rebuttal). Jury Charged. Guilty Verdicts on Count(s) 1 & 2. Jury trial ends. Post motion schedule set as follows: dft's brief due 5/3/19; govt's brief due 6/3/19; dft's reply due 6/14/19. Sentencing schedule set as follows: PSI report to be disclosed 6/28/19; dft's sentencing letter due 7/12/19; govt's response due 7/19/19. Sentencing set for 7/26/2019 at 10:00 AM in Courtroom 10D South before Judge Carol Bagley Amon. (Court Reporter Annette Montalvo.) (Fernandez, Erica) (Entered: 04/11/2019) |
| 04/05/2019 | 198 | COURT EXHIBITS 3 AND 4: JURY VERDICT as to Scott Brettschneider (1) Guilty on Count 1s, 2s; Scott Brettschneider (1) Not Guilty on Count 1,2. Jury Notes as to Scott Brettschneider attached. (Fernandez, Erica) (Entered: 04/11/2019) |
| 04/15/2019 | 200 | COURT EXHIBIT 2: Jury Instructions as to deft Scott Brettschneider. (Fernandez, Erica) (Entered: 04/15/2019) |
| 04/29/2019 | 207 | Letter *requesting additional time for Rule 29/33 motions* as to Scott Brettschneider (Kedia, Sarita) (Entered: 04/29/2019) |
| 05/02/2019 | | ORDER GRANTING modification of post motions schedule as to Scott Brettschneider re 207 Letter: Defense motions due 5/15/19; Government's response due 6/17/19; Defense reply due 7/1/19. So Ordered by Judge Carol Bagley Amon on 5/2/2019. (Holley, Vanessa) (Entered: 05/02/2019) |
| 05/15/2019 | 215 | First MOTION to Set Aside Verdict by Scott Brettschneider. (Attachments: # 1 Appendix BOP Program Statement) (Savella, Jonathan) (Entered: 05/15/2019) |
| 06/17/2019 | 225 | MEMORANDUM in Opposition re 215 First MOTION to Set Aside Verdict (Attachments: # 1 Compendium of Transcripts of Admitted Wiretap Calls) (Spektor, Andrey) (Entered: 06/17/2019) |
| 06/17/2019 | 226 | NOTICE OF ATTORNEY APPEARANCE: Patrick J. Joyce appearing for Scott Brettschneider *Consent Order Granting Substitution of Attorney* (Attachments: # 1 Proposed Consent Order Granting Substitution of Attorney) (Joyce, Patrick) (Entered: 06/17/2019) |
| 06/25/2019 | 228 | Order re Notice of Consent to Change Attorney as to Scott Brettschneider 226 : Attorney Patrick J. Joyce for Scott Brettschneider added. Attorney Sarita Kedia terminated. Ordered by Judge Carol Bagley Amon on 6/20/2019. (Fernandez, Erica) (Entered: 06/25/2019) |
| 06/28/2019 | 229 | Letter *Requesting Permission to Supplement and for Oral Argument* as to Scott Brettschneider (Attachments: # 1 Psychology Treatment Program Rules, # 2 BOP Psychology Services Group Participation) (Joyce, Patrick) (Entered: 06/28/2019) |
| 07/01/2019 | 230 | Letter *re: 229 defendant's request to supplement post-trial motions* as to Scott Brettschneider (Spektor, Andrey) (Entered: 07/01/2019) |
| 07/01/2019 | 231 | Letter *(corrected) re: 229 defendant's request to supplement post-trial motions* as to Scott Brettschneider (Spektor, Andrey) (Entered: 07/01/2019) |
| 07/10/2019 | 233 | ORDER as to Scott Brettschneider re 229 : The Court accepts this letter in lieu of a more formal supplemental brief. It will consider the arguments made herein as well as the |

A.10

| | | |
|---|---|---|
| | | Government's response of July 1, 2019. Ordered by Judge Carol Bagley Amon on 7/3/2019. (Fernandez, Erica) (Entered: 07/10/2019) |
| 07/12/2019 | 234 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Scott Brettschneider, Charles Gallman, John Scarpa, Jr held on October 2, 2018, before Judge Carol Bagley Amon. Court Reporter/Transcriber David R. Roy, Telephone number (718) 613-2609. Email address: drroyofcr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 8/2/2019. Redacted Transcript Deadline set for 8/12/2019. Release of Transcript Restriction set for 10/10/2019. (Roy, David) (Entered: 07/12/2019) |
| 07/12/2019 | 235 | SENTENCING MEMORANDUM by Scott Brettschneider (Attachments: # 1 Exhibit Exhibit D) (Joyce, Patrick) (Entered: 07/12/2019) |
| 07/19/2019 | 240 | SENTENCING MEMORANDUM by USA as to Scott Brettschneider (Attachments: # 1 Sentencing Exhibit 1T, # 2 Sentencing Exhibit 2T) (Spektor, Andrey) (Entered: 07/19/2019) |
| 07/26/2019 | 241 | *AMENDED* Minute Entry for proceedings held before Judge Carol Bagley Amon:Sentencing held on 7/26/2019 for Scott Brettschneider (1), Count(s) 1, 2, Dismissed on Govt motion.; Count(s) 1s, 2s, Deft sentenced to 4 years Probation and special conditions as follow: Deft shall serve 60 days in a community confinement center in North Carolina as directed by the USPD. Deft shall reside in the community confinement center during the week. Deft allowed to leave on Fridays by 9:00 am and return on Mondays by 10:00 am for the purpose of caring for his daughter. Deft shall surrender to the confinement center by Monday, 8/26/19; 2) upon completion of community confinement, dft shall perform 80 hrs of community service as directed by USPD. A fine of $2,000 imposed. Payments to be made over 1 yr of Probation. Dft required to pay $100 s/a as to each Ct to run consecutively for a total of $200 pursuant to 18:3013.(Court Reporter Holly Driscoll.) (Fernandez, Erica) (Main Document 241 amended and replaced on 7/30/2019 as per chambers to include special conditions on minute entry) (Entered: 07/29/2019) |
| 07/29/2019 | 242 | JUDGMENT as to Scott Brettschneider (1), Count(s) 1, 2, Dismissed on Govt motion.; Count(s) 1s, 2s, PROBATION: 4 Years with special conditions; A fine of $2,000.00 imposed. Payments to be made of over 1st year of probation. SPECIAL ASSESSMENT: $100.00. Ordered by Judge Carol Bagley Amon on 7/26/2019. (Fernandez, Erica) (Entered: 07/29/2019) |
| 08/02/2019 | 245 | SENTENCING MEMORANDUM SUPPLEMENT by Scott Brettschneider (Joyce, Patrick) (Entered: 08/02/2019) |
| 08/02/2019 | 246 | SENTENCING MEMORANDUM SUPPLEMENT by Scott Brettschneider (Joyce, Patrick) (Entered: 08/02/2019) |
| 08/05/2019 | 247 | NOTICE OF APPEAL by Scott Brettschneider re 242 Judgment, Filing fee $ 505, receipt number ANYEDC-11729870. (Joyce, Patrick) (Entered: 08/05/2019) |
| 08/05/2019 | | Electronic Index to Record on Appeal as to Scott Brettschneider sent to US Court of Appeals 247 Notice of Appeal - Final Judgment Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 08/05/2019) |
| 08/16/2019 | 248 | Letter dated August 1, 2019 to Judge Carol Bagley Amon from Lea M. Simpson as to |

**A.11**

| | | Scott Brettschneider regarding this matter. (Fernandez, Erica) (Entered: 08/16/2019) |
|---|---|---|
| 08/16/2019 | 249 | Letter dated August 9, 2019 from Judge Carol Bagley Amon to Ms. Lea M. Simpson re Scott Brettschneider and informing her that the Court has sentenced the deft and no longer has jurisdiction over this case, and there will be no further court appearances before Judge Amon. (Fernandez, Erica) (Entered: 08/16/2019) |
| 08/22/2019 | 251 | MOTION to Continue *Stay of Sentence* by Scott Brettschneider. (Joyce, Patrick) (Entered: 08/22/2019) |
| 08/22/2019 | 252 | Order on Report of Offender Under Supervision as to Scott Brettschneider: The Court orders: Amend Special Condition for CCC Placement as Requested. Ordered by Judge Carol Bagley Amon on 8/22/2019. (Fernandez, Erica) (Entered: 08/22/2019) |
| 08/22/2019 | 253 | MOTION to Continue *Stay Execution of Sentence or Request for Hearing* by Scott Brettschneider. (Joyce, Patrick) (Entered: 08/22/2019) |
| 08/22/2019 | 254 | AMENDED JUDGMENT as to Scott Brettschneider (1): Judgment amended to modify Supervision Conditions. Ordered by Judge Carol Bagley Amon on 8/22/2019. (Fernandez, Erica) (Entered: 08/22/2019) |
| 08/23/2019 | | ORDER granting defendant's motions 251 and 253 to stay execution of sentence. The stay is not to exceed 30 days and will be lifted earlier if placement in North Carolina is arranged in fewer than 30 days. If no suitable placement in North Carolina can be arranged within 30 days, placement will be in Brooklyn. So Ordered by Judge Carol Bagley Amon on 8/23/2019. (Phillips, Alice) (Entered: 08/23/2019) |
| 09/13/2019 | 258 | Second MOTION to Continue *Stay Re: Community Confinement Center Placement* by Scott Brettschneider. (Joyce, Patrick) (Entered: 09/13/2019) |
| 09/13/2019 | | ORDER as to Scott Brettschneider re 258 Second MOTION to Continue Stay Re: Community Confinement Center Placement: Please be advised that a status conference has been set for 9/16/19 at 9:30 to address the defendant's application. So Ordered by Judge Carol Bagley Amon on 9/13/2019. (Holley, Vanessa) (Entered: 09/13/2019) |
| 09/17/2019 | 260 | MOTION to Modify Conditions of Release by Scott Brettschneider. (Joyce, Patrick) (Entered: 09/17/2019) |
| 09/19/2019 | | ORDER 260 Motion to Modify Conditions of Release as to Scott Brettschneider (1): The Court has entered a Second Amended Judgment & Conviction to permit the defendant to leave the Gold Street facility on Thursday at 4 pm and to return on Monday by 5 pm. Surrender is 9/23/19 at 5 pm. So Ordered by Judge Carol Bagley Amon on 9/19/2019. (Holley, Vanessa) (Entered: 09/19/2019) |
| 09/20/2019 | 262 | SECOND AMENDED JUDGMENT as to Scott Brettschneider (1), Count(s) 1, 2, Dismissed on Govt motion.; Count(s) 1s, Count(s) 2s; PROBATION: 4 Years with special conditions; A fine of $2,000.00 imposed. Second modification: For a period of 60 days, the defendant shall reside in the Brooklyn CCC (see jgm for details). Ordered by Judge Carol Bagley Amon on 9/19/2019. (Fernandez, Erica) (Entered: 09/20/2019) |
| 12/09/2019 | 273 | MOTION for Extension of Time to File *Notice of Appeal* by Scott Brettschneider. (Joyce, Patrick) (Entered: 12/09/2019) |
| 12/12/2019 | 274 | ORDER re 273 as to Scott Brettschneider: Unless the defendant is appealing the change in the location of his sentence, he is directed to advise this Court why in light of FRAP 4(b)(2) ad Manrique v. US, 137 S.Ct 1266 (2017) he needs an extension to file a notice of appeal. Ordered by Judge Carol Bagley Amon on 12/10/2019. (Fernandez, Erica) (Entered: 12/12/2019) |

# A.12

| | | |
|---|---|---|
| 12/13/2019 | [275](#) | Letter *Supplement to Doc. No. 273* as to Scott Brettschneider (Joyce, Patrick) (Entered: 12/13/2019) |
| 12/17/2019 | [276](#) | MEMORANDUM AND ORDER re [273](#) Motion for Extension of Time to File as to Scott Brettschneider (1): Accordingly, if defendant needs an extension of his time to appeal, it is denied. As to his request for a "certification" of timeliness, although the first notice of appeal may have been sufficient to have secured his right to appeal, the defendant provides no legal authority for this Court to issue a certificate to that effect. Ordered by Judge Carol Bagley Amon on 12/16/2019. (Fernandez, Erica) (Entered: 12/17/2019) |
| 12/26/2019 | [278](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Scott Brettschneider, Charles Gallman, Richard Marshall, Reginald Shabazz-Muhammad, John Scarpa, Jr held on 09/23/2019, before Judge Amon. Court Reporter/Transcriber Anthony Mancuso, Telephone number 718-613-2419. Email address: anthonymancuso65@msn.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 1/16/2020. Redacted Transcript Deadline set for 1/27/2020. Release of Transcript Restriction set for 3/25/2020. (Mancuso, Anthony) (Entered: 12/26/2019) |
| 01/02/2020 | [280](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Scott Brettschneider held on July 26, 2019, before Judge Amon. Court Reporter/Transcriber H. Driscoll, Telephone number 7186132274. Email address: hdrisc@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 1/23/2020. Redacted Transcript Deadline set for 2/3/2020. Release of Transcript Restriction set for 4/1/2020. (Driscoll, Holly) (Entered: 01/02/2020) |
| 01/02/2020 | [281](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Scott Brettschneider held on January 7, 2019, before Judge Amon. Court Reporter/Transcriber V. Torres Butler, Telephone number 718-613-2607. Email address: vbutlerrpr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 1/23/2020. Redacted Transcript Deadline set for 2/3/2020. Release of Transcript Restriction set for 4/1/2020. (Driscoll, Holly) (Entered: 01/02/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/03/2020 13:38:39 | | | |
| **PACER Login:** | pmmegaro464 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cr-00123-CBA |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

MEG:LKG/AS
F.#2015R01691

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – –X

UNITED STATES OF AMERICA

- against -

SCOTT BRETTSCHNEIDER,
    also known as "Mighty Whitey,"
CHARLES GALLMAN,
    also known as "T.A.,"
RICHARD MARSHALL,
    also known as "Love," and
REGINALD SHABAZZ-MUHAMMAD,
    also known as "Reggie,"

            Defendants.

– – – – – – – – – – –X

FILED
CLERK

2018 MAR 13  PM 3: 35

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

<u>I N D I C T M E N T</u>

Cr. No. **CR   18        123**
(T. 18, U.S.C., §§ 371, 1001(a)(2), 2
 and 3551 <u>et</u> <u>seq</u>.)

AMON, J.

REYES, M.J.

THE GRAND JURY CHARGES:

<u>COUNT ONE</u>
(Conspiracy to Make False Statements)

      1.    In or about and between October 2014 and January 2015, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants SCOTT BRETTSCHNEIDER, also known as "Mighty Whitey," CHARLES

GALLMAN, also known as "T.A.," RICHARD MARSHALL, also known as "Love," and

REGINALD SHABAZZ-MUHAMMAD, also known as "Reggie," together with others, did

knowingly and willfully conspire to make one or more materially false, fictitious and

fraudulent statements and representations, in a matter within the jurisdiction of the executive

branch of the Government of the United States, to wit: the Bureau of Prisons ("BOP"), in that

**A.14**

the defendants agreed to make false statements and representations regarding MARSHALL's

history of substance and alcohol abuse and treatment history in a letter to a BOP employee in

an effort to assist MARSHALL in fraudulently gaining entry into the Residential Drug

Abuse Program ("RDAP") at United States Penitentiary Lewisburg ("USP Lewisburg") (the

"Letter"), when, in fact, as the defendants then and there well knew and believed, such

statements and representations were false, contrary to Title 18, United States Code, Section

1001(a)(2).

2.      In furtherance of the conspiracy and to effect its objects, within the

Eastern District of New York and elsewhere, the defendants SCOTT BRETTSCHNEIDER,

also known as "Mighty Whitey," CHARLES GALLMAN, also known as "T.A.," RICHARD

MARSHALL, also known as "Love," and REGINALD SHABAZZ-MUHAMMAD, also

known as "Reggie," together with others, did commit and cause to be committed, among

others, the following:

## OVERT ACTS

(a)      On or about October 16, 2014, GALLMAN and MARSHALL

discussed the Letter during a telephone call;

(b)      On or about October 24, 2016, BRETTSCHNEIDER,

GALLMAN and MARSHALL discussed the Letter during a telephone call;

(c)      On or about November 1, 2014, BRETTSCHNEIDER,

GALLMAN and MARSHALL discussed the Letter during two telephone calls;

(d)      On or about November 6, 2014, SHABAZZ-MUHAMMAD

falsely stated in the Letter that MARSHALL had been enrolled in a treatment program

through Muhammad Mosque No. 7 between October 2003 and January 2010;

2

**A.15**

(e)     On or about November 6, 2014, SHABAZZ-MUHAMMAD falsely stated in the Letter that MARSHALL was suffering from "active drug dependence, namely alcohol and marijuana" when he enrolled in RDAP;

(f)     On or about November 6, 2014, SHABAZZ-MUHAMMAD falsely stated in the Letter that while enrolled in the treatment program, MARSHALL was "gradually reducing his active substance dependence";

(g)     On or about November 6, 2014, SHABAZZ-MUHAMMAD signed the Letter falsely purporting to be the Director of Program Services at the Ministry of Health and Human Services, Muhammad Mosque No. 7;

(h)     On or about November 14, 2014, BRETTSCHNEIDER and MARSHALL discussed the Letter during a telephone call;

(i)     On or about November 14, 2014, SHABAZZ-MUHAMMAD caused the Letter to be deposited in the mail and sent to a BOP employee at USP Lewisburg;

(j)     On or about November 23, 2014, BRETTSCHNEIDER and MARSHALL discussed the Letter during a telephone call;

(k)     On or about December 6, 2014, BRETTSCHNEIDER, GALLMAN and MARSHALL discussed the Letter during a telephone call; and

(l)     On or about December 6, 2014, BRETTSCHNEIDER, GALLMAN, SHABAZZ-MUHAMMAD and MARSHALL, during a telephone call, discussed creating false treatment program progress reports to supplement the Letter.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

3

**A.16**

COUNT TWO
(Making False Statements)

3.      On or about November 6, 2014, within the Eastern District of New

York and elsewhere, the defendants SCOTT BRETTSCHNEIDER, also known as "Mighty

Whitey," CHARLES GALLMAN, also known as "T.A.," RICHARD MARSHALL, also

known as "Love," and REGINALD SHABAZZ-MUHAMMAD, also known as "Reggie,"

did knowingly and willfully make one or more materially false, fictitious and fraudulent

statements and representations, in a matter within the jurisdiction of the executive branch of

the Government of the United States, to wit: the BOP, in that the defendants falsely stated

that (a) MARSHALL had been enrolled in a treatment program through Muhammad Mosque

No. 7 between October 2003 and January 2010; (b) MARSHALL was suffering from "active

drug dependence, namely alcohol and marijuana" when he enrolled in that program; and (c)

while enrolled in the program, MARSHALL was "gradually reducing his active substance

dependence," when, in fact, as the defendants then and there well knew and believed,

MARSHALL had never been enrolled in a treatment program through Muhammad Mosque

4

**A.17**

No. 7, MARSHALL was not suffering from "active drug dependence" in October 2003, and

MARSHALL was not abusing drugs or alcohol during the time period stated in the Letter.

(Title 18, United States Code, Sections 1001(a)(2), 2 and 3551 <u>et seq.</u>)

A TRUE BILL

_____
FOREPERSON

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

5

**A.18**

F. # 2015R01691

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

SCOTT BRETTSCHNEIDER, also known as "Mighty Whitey," CHARLES GALLMAN, also known as "T.A.,"
RICHARD MARSHALL, also known as "Love," and
REGINALD SHABAZZ-MUHAMMAD, also known as "Reggie,"

Defendants.

# INDICTMENT

(T. 18, U.S.C., §§ 371, 1001(a)(2), 2 and 3551 et seq.)

*A true bill.*

_____   3/12/18
                                                     *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                                              *Clerk*

*Bail, $* _____

_____

*Lindsay K. Gerdes, Assistant U.S. Attorney (718) 254-6155*
*Andrey Spektor, Assistant United States Attorney (718) 254-6475*

# A.19

MEG:LKG/AS
F.#2015R01691

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   SEP 2 4 2018   ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

SCOTT BRETTSCHNEIDER,
     also known as "Mighty Whitey,"
CHARLES GALLMAN,
     also known as "T.A.," and
JOHN SCARPA, JR.,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 18-123 (S-1) (CBA)
(T. 18, U.S.C., §§ 371, 1001(a)(2),
1952(a)(3)(A), 2 and 3551 et seq.)

THE GRAND JURY CHARGES:

<u>COUNT ONE</u>
(Conspiracy to Make False Statements)

1.      In or about and between October 2014 and January 2015, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants SCOTT BRETTSCHNEIDER, also known as "Mighty Whitey," and CHARLES

GALLMAN, also known as "T.A.," together with others, did knowingly and willfully

conspire to make one or more materially false, fictitious and fraudulent statements and

representations, in a matter within the jurisdiction of the executive branch of the Government

of the United States, to wit: the Bureau of Prisons ("BOP"), in that the defendants agreed to

make false statements and representations regarding Richard Marshall's ("Marshall") history

of substance and alcohol abuse and treatment history in a letter to a BOP employee in an

effort to assist Marshall in fraudulently gaining entry into the Residential Drug Abuse

**A.20**

Program ("RDAP") at United States Penitentiary Lewisburg ("USP Lewisburg") (the "Letter"), when, in fact, as the defendants then and there well knew and believed, such statements and representations were false, contrary to Title 18, United States Code, Section 1001(a)(2).

       2.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants SCOTT BRETTSCHNEIDER, also known as "Mighty Whitey," and CHARLES GALLMAN, also known as "T.A.," together with others, did commit and cause to be committed, among others, the following:

OVERT ACTS

      (a)    On or about October 16, 2014, GALLMAN and Marshall discussed the Letter during a telephone call;

      (b)    On or about October 24, 2016, BRETTSCHNEIDER, GALLMAN and Marshall discussed the Letter during a telephone call;

      (c)    On or about November 1, 2014, BRETTSCHNEIDER, GALLMAN and Marshall discussed the Letter during two telephone calls;

      (d)    On or about November 6, 2014, Reginald Shabazz-Muhammad ("Shabazz-Muhammad") falsely stated in the Letter that Marshall had been enrolled in a treatment program through Muhammad Mosque No. 7 between October 2003 and January 2010;

      (e)    On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that Marshall was suffering from "active drug dependence, namely alcohol and marijuana" when he enrolled in RDAP;

**A.21**

(f)      On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that while enrolled in the treatment program, Marshall was "gradually reducing his active substance dependence";

(g)      On or about November 6, 2014, Shabazz-Muhammad signed the Letter falsely purporting to be the Director of Program Services at the Ministry of Health and Human Services, Muhammad Mosque No. 7;

(h)      On or about November 14, 2014, BRETTSCHNEIDER and Marshall discussed the Letter during a telephone call;

(i)      On or about November 20, 2014, Shabazz-Muhammad caused the Letter to be deposited in the mail and sent to a BOP employee at USP Lewisburg;

(j)      On or about November 23, 2014, BRETTSCHNEIDER and Marshall discussed the Letter during a telephone call;

(k)      On or about December 6, 2014, BRETTSCHNEIDER, GALLMAN and Marshall discussed the Letter during a telephone call; and

(l)      On or about December 6, 2014, BRETTSCHNEIDER, GALLMAN, Marshall and Shabazz-Muhammad, during a telephone call, discussed creating false treatment program progress reports to supplement the Letter.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Making False Statements)

3.      On or about November 20, 2014, within the Eastern District of New York and elsewhere, the defendants SCOTT BRETTSCHNEIDER, also known as "Mighty Whitey," and CHARLES GALLMAN, also known as "T.A.," together with others, did

**A.22**

knowingly and willfully make one or more materially false, fictitious and fraudulent

statements and representations, in a matter within the jurisdiction of the executive branch of

the Government of the United States, to wit: the BOP, in that the defendants falsely stated

that (a) Richard Marshall ("Marshall") had been enrolled in a treatment program through

Muhammad Mosque No. 7 between October 2003 and January 2010; (b) Marshall was

suffering from "active drug dependence, namely alcohol and marijuana" when he enrolled in

that program; and (c) while enrolled in the program, Marshall was "gradually reducing his

active substance dependence," when, in fact, as the defendants then and there well knew and

believed, Marshall had never been enrolled in a treatment program through Muhammad

Mosque No. 7, Marshall was not suffering from "active drug dependence" in October 2003,

and Marshall was not abusing drugs or alcohol during the time period stated in the Letter.

(Title 18, United States Code, Sections 1001(a)(2), 2 and 3551 et seq.)

### COUNT THREE
(Conspiracy to Use Interstate Facilities in Aid of Racketeering)

4.      In or about and between January 2015 and March 2015, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants CHARLES GALLMAN, also known as "T.A.," and JOHN SCARPA, JR.,

together with others, did knowingly and intentionally conspire to use one or more facilities in

interstate commerce, to wit: one or more cellular telephones, with intent to promote, manage,

establish, carry on and facilitate the promotion, management, establishment and carrying on

of an unlawful activity, to wit: bribery, in violation of New York Penal Law Sections 215.00

and 20.00, and thereafter did perform and attempt to perform such promotion, management,

establishment, carrying on and facilitation of the promotion, management, establishment and

**A.23**

carrying on of such unlawful activity, contrary to Title 18, United States Code, Section 1952(a)(3)(A).

5.      In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants CHARLES GALLMAN, also known as "T.A.," and JOHN SCARPA, JR., together with others, did commit and cause to be committed, among others, the following:

OVERT ACTS

(a)      On or about January 12, 2015, during a telephone call, GALLMAN discussed, in sum and substance, his intention to visit a potential witness in the trial captioned People of the State of New York v. Reginald Ross, Suffolk County Indictment Number 558-A/B-11 (the "Ross Case"), an individual whose identity is known to the Grand Jury ("Witness-1");

(b)      On or about January 12, 2015, during a telephone call, GALLMAN and a co-conspirator discussed, in sum and substance, conferring a benefit on Witness-1 in return for his testimony in the Ross Case;

(c)      On or about January 13, 2015, GALLMAN visited Witness-1 at a correctional facility (the "Visit");

(d)      On or about January 13, 2015, during a telephone call after the Visit, GALLMAN told SCARPA, in sum and substance, that Witness-1 was willing to do "anything we need" and that Witness-1 had identified certain things that he wanted;

(e)      On or about January 13, 2015, GALLMAN sent a text message to a co-conspirator stating, "just left the visit he will do whatever we need him to do. . . . I don't trust your phone";

**A.24**

(f)     On or about February 3, 2015, during a telephone call, GALLMAN and SCARPA discussed, in sum and substance, ways to impeach one of the State's witnesses in the Ross Case (the "State's Witness"), including the possibility that GALLMAN would provide false testimony;

(g)     On or about February 3, 2015, during a telephone call, GALLMAN discussed with a co-conspirator, in sum and substance, an individual who could potentially provide false testimony to impeach the State's Witness in exchange for money;

(h)     On or about February 21, 2015, SCARPA met with Witness-1;

(i)     On or about February 23, 2015, SCARPA met with Witness-1;

(j)     On or about February 24, 2015, SCARPA called Witness-1 as a defense witness in the Ross Case;

(k)     On or about March 2, 2015, SCARPA sent a text message to GALLMAN asking, "When did u see [Witness-1] in jail.   [Witness-1] is being x examined about it"; and

(l)     On or about March 2, 2015, during a telephone call, SCARPA told GALLMAN, in sum and substance, that Witness-1 had testified that GALLMAN did not promise Witness-1 money or protection in exchange for Witness-1's testimony during the Visit; SCARPA then asked GALLMAN if the Visit had been recorded.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT FOUR
(Use of Interstate Facilities in Aid of Racketeering)

6.     In or about and between January 2015 and March 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

**A.25**

defendants CHARLES GALLMAN, also known as "T.A.," and JOHN SCARPA, JR.,

together with others, did knowingly and intentionally use one or more facilities in interstate

commerce, to wit: one or more cellular telephones, with intent to promote, manage, establish,

carry on and facilitate the promotion, management, establishment and carrying on of an

unlawful activity, to wit: bribery, in violation of New York Penal Law Sections 215.00 and

20.00, and thereafter did perform and attempt to perform such promotion, management,

establishment, carrying on and facilitation of the promotion, management, establishment and

carrying on of such unlawful activity.

(Title 18, United States Code, Sections 1952(a)(3)(A), 2 and 3551 et seq.)

A TRUE BILL

FOREPERSON

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. O.136

**A.26**

F. # 2015R01691

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

SCOTT BRETTSCHNEIDER, also known as "Mighty Whitey,"
CHARLES GALLMAN, also known as "T.A.," and JOHN SCARPA, JR.,

Defendants.

## SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 371, 1001(a)(2), 1952(a)(3)(A), 2 and 3551 et seq.)

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

_____

**Lindsay K. Gerdes and Andrey Spektor, Assistant U.S. Attorneys**
**(718) 254-6155/6475**

# A.27

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**UNITED STATES OF AMERICA**

           **18 CR 123 (S-1) (CBA)**

   **-against-**

           <u>**NOTICE OF MOTION**</u>

**SCOTT BRETTSCHNEIDER, et al.,**

       *Defendants.*

-------------------------------------------------------X

   **PLEASE TAKE NOTICE THAT**, upon the annexed affirmation of SARITA KEDIA, dated the 16th day of November, 2018, the defendant Scott Brettschneider will move this Court before the Honorable Carol B. Amon, United States District Judge, at the United States Courthouse for the Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York 11201, on a date fixed by this Court, for an Order:

  I.  Suppressing as unlawfully intercepted the oral and electronic communications obtained by the Queens County District Attorney's Office and any evidence derived therefrom;

  II.  Severing defendant Brettschneider from defendant Scarpa pursuant to Rules 8 and/or 14 of the Federal Rules of Criminal Procedure; and

# A.28

III.    Any such further relief this Court deems just and proper.

Dated:      New York, New York
            November 16, 2018

                              Respectfully submitted,

                                  /s/

                              Sarita Kedia
                              Sarita Kedia Law Offices, P.C.
                              5 East 22nd Street, Suite 7B
                              New York, New York 10010
                              (212) 681-0202
                              skedia@kedialaw.com

TO:    Honorable Carol B. Amon
       United States District Judge

       All Counsel

**A.29**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**UNITED STATES OF AMERICA**

                                                    **18 CR 123 (S-1) (CBA)**

       -against-

                                                    <u>**DECLARATION**</u>

**SCOTT BRETTSCHNEIDER, et al.,**

                    ***Defendants.***

-------------------------------------------------------X

STATE OF NEW YORK     )
                           ) ss.:
COUNTY OF NEW YORK   )

     SARITA KEDIA, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury:

     1.  I am an attorney duly admitted to practice in the State of New York and before this Court with offices located at 5 East 22nd Street, Suite 7B, New York, New York  10010.

     2.  I am the attorney for the defendant Scott Brettschneider in the above-captioned matter, and as such I am fully familiar with the facts and circumstances of this case.

     3.  As set forth in the accompanying memorandum of law, between October 2014 and March 2015, Mr. Brettschneider was intercepted through electronic surveillance conducted by the Queens County District Attorney's Office. In light of the

**A.30**

unlawful nature of the interception, Mr. Brettschneider moves to suppress the use of all oral and electronic communications obtained during the surveillance period as well as any evidence derived therefrom.

4.  I have requested additional information and materials from the government relating to the wiretap, including any additional recordings that may exist that have not yet been produced as well as the pen registers and telephone and cell site records referenced in the wiretap applications. The government has informed that it is awaiting receipt of these materials and/or information from the Queens County District Attorney's Office. To the extent that this information or these documents impact the legality of the wiretap, we will notify the Court and supplement the motion accordingly.

5.  Mr. Brettschneider also moves to sever his case from that of defendant John Scarpa Jr. because they are improperly joined under Rule 8 of the Federal Rules of Criminal Procedure. Additionally, Mr. Brettschneider moves for severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure as he would be unduly prejudiced if jointly tried with Mr. Scarpa. I have been informed by Assistant United States Attorney Lindsay Gerdes, who is handling this case on the government's behalf, that the government consents to severance of these defendants. At the October 2, 2018, conference, this Court also indicated its view that a severance would be appropriate in light of the distinct charges against defendants Brettschneider and Scarpa. In light of the government's consent, I make this motion without detailing in the accompany memorandum the reasons that such a severance is necessary.

2

**A.31**

6. The exhibits annexed to this affidavit and referenced in the accompanying memorandum of law are as follows:

Ex. A: Eavesdropping warrant dated 10/15/14

Ex. B: Eavesdropping warrant dated 11/10/14

WHEREFORE, I respectfully request that the Court grant the relief sought in Mr. Brettschneider's accompanying notice of motion.

Dated:      New York, New York
            November 16, 2018

                                        /s/
                        _____
                                 Sarita Kedia

**A.32**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

**UNITED STATES OF AMERICA**

                                             **18 CR 123 (S-1) (CBA)**

       -against-


**SCOTT BRETTSCHNEIDER, et al.,**

                         *Defendants.*

-----------------------------------------------------X




## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANT SCOTT BRETTSCHNEIDER'S MOTIONS</u>




Sarita Kedia Law Office, P.C.
East 22nd Street, Suite 7B
New York, New York 10010
(212) 681-0202
skedia@kedialaw.com

*Attorney for Scott Brettschneider*



# A.33

# **TABLE OF CONTENTS**

STATEMENT ....................................................................................................... 1

BACKGROUND ................................................................................................. 1

   A. THE *FREEMAN* BRIBERY INVESTIGATION ................................. 1

   B. THE WIRETAP INVESTIGATION.................................................. 3

ARGUMENT ...................................................................................................... 5

I. THE COURT SHOULD SUPPRESS EVIDENCE GATHERED FROM THE WIRETAP OF GALLMAN'S CELLULAR TELEPHONE ................................... 5

   A. THE GALLMAN WIRETAP WAS UNNECESSARY AT ITS INCEPTION .................................................................................................. 6

   B. INVESTIGATORS FAILED TO ESTABLISH PROBABLE CAUSE TO INTERCEPT COMMUNICATIONS CONCERNING "FALSE BUSINESS RECORDS" ................................................................................ 11

   C. THE NOVEMBER 2014 AMENDMENT APPLICATION CONCEALED A VIOLATION OF NEW YORK'S 10-DAY RULE............................................ 14

II. THE COURT SHOULD GRANT BRETTSCHNEIDER'S MOTION FOR SEVERANCE FROM CO-DEFENDANT JOHN SCARPA JR. ........................ 17

CONCLUSION.................................................................................................. 18

## STATEMENT

Defendant Scott Brettschneider submits this memorandum and the accompanying declaration in support of his motions for an order (1) suppressing unlawfully intercepted oral and electronic communications and the evidence derived from them and (2) severing his case from that of defendant John Scarpa Jr.

## BACKGROUND

The circuitous chain of events that led to Brettschneider's prosecution began with a botched holdup in a Queens housing project. On January 30, 2013, Frederick Freeman and Raneisha Williams appeared at the door of the Baisley Park Houses apartment of Williams' brother Roshown. After Roshown refused to admit the couple, they attempted to force their way into the apartment with a loaded handgun. Roshown rebuffed the intruders and called the police. Freeman and Williams were, in due course, arrested, indicted on weapons charges and remanded to Rikers Island in anticipation of trial. *See* Eavesdropping Warrant dated 10/15/14 (Ex. A), Bates 87.

## A.   THE *FREEMAN* BRIBERY INVESTIGATION

Williams pled guilty and began cooperating with the Queens County District Attorney's (DA) Office in May 2014. During her debriefings, prosecutors learned that Freeman's father, Frederick Hutcherson, had paid a visit to Williams at Rikers in September 2013. According to Williams, Hutcherson had urged her to claim ownership of the handgun used in the Baisley Park holdup. Ex. A, Bates 91. Although the

**A.35**

prosecutors viewed the meeting as an "attempt[] to falsely exonerate" Freeman, no charges were filed against Hutcherson. *Id.*

In the weeks leading up to Freeman's October 14, 2018, trial date, the DA's Office learned that another *Freeman* witness had been approached. Raneisha's brother/victim Roshown reported that he had received several phone calls and one in-person visit from a man named "T.A." Ex. A, Bates 106-09. T.A., it appeared, was attempting to cajole Roshown into meeting with a "lawyer[]" who would prepare a "writing" that absolved Freeman in the January 2013 holdup. Ex. A, Bates 108. T.A. had allegedly promised to "pay Roshown" for his cooperation. Ex. A, Bates 108-09.

The DA's investigators had little trouble ascertaining the nature of T.A.'s interest in *Freeman*. For months, Rikers' inmate telephone system had been recording Freeman and Hutcherson as they discussed hiring a "private investigator" named "T.A." who would "visit[]" potential witnesses." Ex. A, Bates 95-97. The Freeman-Hutcherson jail calls had informed investigators of T.A.'s business address – a Queens Boulevard law office – and the fee – $300 – T.A. had quoted for his services. Ex. A, Bates 92, 99.

Records for the cellphone number T.A. had used to contact Roshown were equally revealing. The records, which the DA's Office obtained early in the investigation, proved that Gallman had been in frequent contact with Hutcherson. Ex. A, Bates 109 n.14. They also disclosed TA's legal name, Charles Gallman, and his home address in Jamaica, Queens. *See* Eavesdropping Warrant dated 11/10/14 (Ex. B), Bates 167 n.1.

The investigators confirmed Gallman's "physical identity" at a calendar call in *Freeman*. Ex. A, Bates 117.  The ADA assigned to that case had for some time suspected that "a [] man who attended [] Freeman['s] court appearances was," in fact, "T.A." Ex. A, Bates 117-18. On October 2, 2014, after establishing physical surveillance of the man at one such appearance, investigators called Gallman's cellphone number and watched as he answered. *Id.*

On September 11, 2014, the DA's investigators arranged a telephone call between Roshown and Gallman. As the investigators listened and recorded, Gallman chastised Roshown for breaking an earlier appointment and urged him to "talk to the lawyer" in advance of Freeman's upcoming "court date." Ex. A, Bates 110-13. Roshown's response, presumably at the direction of his handlers, was noncommittal; he did not ask Gallman to name "the lawyer."

## B.   THE WIRETAP INVESTIGATION

On October 15, 2014, the DA's Office applied to a justice of the Queens County Supreme Court for permission to "intercept and record . . . [Gallman's] communications . . . concerning the crime[] of Bribing a Witness" for a period of 30 days. Ex. A, Bates 73. An Eavesdropping Warrant issued later that day. Ex. A, Bates 59-60.

Twenty-seven days later, on November 10, the DA's Office returned with the first of its several applications to "extend[] and amend[]" the wiretap. Ex. B, Bates 137. The application disclosed that the wiretap had recorded several communications that

3

# A.37

related to crimes other than witness bribery. The DA's Office requested that the court: (a) "preserve" the incidentally intercepted communications for use in future proceedings; (b) add 30 days to the surveillance period; and (c) authorize the ongoing interception of conversations related to several newly discovered "offenses." Ex. B, Bates 138-40.

One of the "recently uncovered" offenses prefigured the Superseding Indictment's false statement charges. According to the supporting affidavit of Detective Richard Santangelo, a series of calls and text messages intercepted between November 1-3 had revealed that Gallman, Brettschneider and a federal inmate named Richard Marshall were scheming to submit "a forged drug treatment letter" to BOP officials at Marshall's prison. Ex. B, Bates 228-60. The November 10 application styled the plot as a "conspiracy" to "Falsify[] Business Records in the First Degree" in violation of Section 175.10 of the Penal Law.

As requested, the November 10 warrant "retrospectively amended" the previous authorization "to include the contents of the communications specified in Detective Santangelo's" affidavit. Ex. B, Bates 126.

**A.38**

# ARGUMENT

## POINT I

### THE COURT SHOULD SUPPRESS EVIDENCE GATHERED FROM THE WIRETAP OF GALLMAN'S CELLULAR TELEPHONE

Brettschneider advances three distinct objections to the evidence gathered from the Gallman wiretap. *See* 18 U.S.C. § 2518(10)(a) (empowering "[a]ny aggrieved person" to "move to suppress the contents of any [unlawfully intercepted] wire or oral communication"). First, the initial October 2014 eavesdropping application fell short of establishing that "investigative procedures less intrusive than a wiretap" were "tried" or meaningfully "considered." *United States v. Lilla*, 699 F.2d 99, 102 (2d Cir. 1983). Second, the November 2014 application to amend the wiretap failed to establish probable cause to suspect the commission of a "'designated offense.'" *United States v. Manfredi*, 488 F.2d 588, 597 n.6 (2d Cir. 1973). Third, the DA's Office misrepresented the date on which investigators learned of the treatment letter "conspiracy" in order to conceal the untimeliness of its November 2014 amendment application. Ex. B, Bates 150; *see* CPL § 700.65(4).

The first and second points are grounded in the federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 2510 *et seq.*). Title III codifies constitutional limits on the use of "wiretapping" as a law enforcement tool (*United States v. Aloi*, 449 F. Supp. 698, 715 (E.D.N.Y. 1977)), setting "minimum standards" that apply to federal and state officials alike. *United States v. Marion*, 535 F.2d

**A.39**

697, 701 (2d Cir. 1976). Because the investigation at issue here was undertaken by New York State authorities, Brettschneider cites the State's Title III analogue, CPL § 700.00, *et seq.*, where appropriate. *Cf. United States v. Principie*, 531 F.2d 1132, 1137-40 (2d Cir. 1976) (citing both Title III and New York State law).

The final assertion, set out below in Subpoint C, arises under a provision of the New York State law that accords greater "protect[ion to] the individual right of privacy" than its counterpart in Title III. *United States v. Sotomayor*, 592 F.2d 1219, 1225 (2d Cir. 1979); *see id.* at 1225 n.13 (distinguishing "wiretap regulations" concerning the "issuance and execution of an eavesdropping warrant" from those that establish "post-interception evidentiary procedures such as sealing" on the grounds that only the former implicate "privacy [rights]"). The application of New York State law under these circumstances is consistent with Title III, which explicitly requires that state wiretap investigations "conform[]" to "any applicable [s]tate statute." 18 U.S.C. § 2516(2).

## A.   THE GALLMAN WIRETAP WAS UNNECESSARY AT ITS INCEPTION

The DA's initial wiretap application asserted "probable cause" to suspect Gallman, Hutcherson and Freeman of "attempting to bribe witnesses in a [pending] criminal matter." Ex. A, Bates 74. Detective Santangelo's affidavit supported that assertion, and then some. Traditional methods of investigation had supplied the Detective and his team with a "cooperating witness[]" (Roshown Williams) whose testimony at a criminal trial would provide a firsthand account of Gallman's effort to

falsely exonerate Freeman in the Baisley Park holdup.[1] As for Gallman's coconspirators, Freeman and Hutcherson, their role in the conspiracy was evidenced through (a) admissible jail calls in which the two men discussed hiring Gallman to "visit" potential witnesses against Freeman; (b) cellphone records establishing frequent contact between Gallman and Hutcherson; and (c) the *Freeman* ADA's observation that Gallman had regularly attended Freeman's court appearances. These successes had, by mid-October 2014, depleted the investigation's supply of unattained objectives.

Grasping for loose ends, Detective Santangelo's affidavit in support of the initial wiretap application focused on the possibility that Gallman split his $300 fee with another party. "[A]t this point," Detective Santangelo wrote, "we do not know the identity of *the lawyer* [with whom Gallman] wants Roshown to meet [] . . . and whether th[at] lawyer and/or others have knowledge of the illegal nature of [Gallman's] activity." Ex. A, Bates 119. Santangelo went on to assert that "only . . . electronic surveillance" could unmask the potentially corrupt attorney. *Id.*; *see also* Ex. A, Bates 76 (Assistant District Attorney supervising the investigation of Gallman identifies electronic surveillance as the "only" means of ascertaining "definitively which lawyers" were participating in Gallman's "scheme").

---

[1]      Roshown's testimony to this effect could be corroborated through (a) the cellphone records demonstrating that the cellphone number T.A. had used to contact Roshown was registered to Gallman and (b) testimony concerning the DA's October 2 operation, which confirmed that Gallman used the cellphone number and that he responded to the name "'T.A.'" Ex. A, Bates 118.

**A.41**

i.    **Legal Framework**

Federal and state law require the party applying for a wiretap to convincingly "show[] that investigative procedures less intrusive than a wiretap" were "tried and [] failed," appear "unlikely to succeed if tried" or are "too dangerous." *Lilla*, 699 F.2d at 102-03 (internal quotation marks omitted). Title III thus mandates that "[e]ach" wiretap application include

> (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]

18 U.S.C. § 2518(1)(c); *see also* CPL § 700.20(2) (restating the federal statute's necessity requirement in nearly identical language).

Statutory "necessity" requirements ensure "that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crimes." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974); *see Lilla*, 699 F.2d at 103 n.5 (including "standard visual or aural surveillance," "general questioning or interrogation under an immunity grant," "use of regular search warrants" and "infiltration of conspiratorial groups by undercover agent or informants" in the list of traditional investigative techniques) (internal quotation marks omitted).

The sufficiency of an applicant's necessity showing "is to be tested in a practical and commonsense fashion." *Id.* at 103 (internal quotation marks omitted).

**A.42**

ii.    **Application**

During the "controlled telephone" conversation recorded on September 11, 2014, Gallman invited Roshown to "go talk to the lawyer" the following morning. Ex. A, Bates 110-11. There is no indication that Gallman's invitation expired at some point before the court received the initial wiretap application on October 15. To the contrary, Detective Santangelo's affidavit in support of that application referred to Gallman's offer in the present tense – writing, for instance, that Gallman "*wants* Roshown to meet with [the lawyer]." Ex. A, Bates 119 (emphasis supplied). It thus appears that the Detective and his team had a ready means of ascertaining both the attorney's identity and the extent of his criminal knowledge: they could have simply instructed Roshown to call Gallman, ask for the lawyer's name and then arrange a meeting with the lawyer at his office.

Detective Santangelo's objection to this approach is buried in his affidavit's "boilerplate" discourse on the "inherent limitations of normal investigative procedures." *United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001). It consists of an unelaborated assertion that it was "*unsafe* for cooperating witnesses to accompany [Gallman] anywhere, certainly not to meet with anyone that [Gallman] has thus far refused to even identify."[2] Ex. A, Bates 120 (emphasis supplied).

---

[2]    Puzzlingly, Detective Santangelo fails to cite an instance in which Gallman actually "refused to [] identify" the lawyer. Ex. A, Bates 120. Certainly, there was no such refusal during Gallman's September 11 conversation with Roshown. *See* Ex. A,

**A.43**

A bald assertion of danger, needless to say, does not constitute a "full and complete statement." 18 U.S.C. § 2518(1)(c); *see Lilla*, 699 F.2d at 104 (invalidating wiretap because the applicant "failed to specify the facts upon which [he] based []his conclusion that other investigative procedures were [] unlikely to succeed or [] too dangerous to use"). As a technical matter, then, Detective Santangelo's affidavit falls short of the statutory standard.

Technical considerations aside, the Detective's vague assertion of peril "simply does not square with common sense." *Lilla*, 699 F.2d at 105. Gallman was, after all, under investigation for witness bribery, not witness intimidation. He had not threatened Roshown. Nor were there signs of violence on the horizon. Detective Santangelo himself had concluded that Gallman had been hired to "bribe[]" Roshown, "as opposed to [] subject[ing him] to physical intimidation or harm." Ex. A, Bates 107. Gallman's proposal – inviting Roshown to make a daytime visit to a lawyer's office – is wholly consistent with this surmise.

Under these circumstances, the Detective was obligated to "specify the facts upon which" his ostensible fears were based. *Lilla*, 699 F.2d at 104. The failure to do so invalidates the initial October 2014 eavesdropping warrant, triggering a chain

---

Bates 110-14. The transcript of that call shows that the witness never inquired about the lawyer's identity. *Id.*

reaction that ends in the suppression of the entire body of wiretap evidence in this case. *Id.* at 102.

## B.   INVESTIGATORS FAILED TO ESTABLISH PROBABLE CAUSE TO INTERCEPT COMMUNICATIONS CONCERNING "FALSE BUSINESS RECORDS"

Detective Santangelo's November 10 supporting affidavit offered no plausible basis to suspect Gallman, Brettschneider and Marshall in a conspiracy to falsify business records in the first degree. The proffered facts simply did not fit the crime, which requires, among other things, an intent to commit or conceal "*another*" offense. P.L. § 175.10 (emphasis supplied). Ignoring the elements of P.L. § 175.10, the investigation achieved an end run around Title III's central mandate: "that [] wiretap[s] [] issue only upon a showing of probable cause to believe that communications pertaining to [a] *designated* offense will be obtained." *United States v. Fury*, 554 F.2d 522, 530 (2d Cir. 1977) (emphasis supplied). The November 10 Warrant sinks under the weight of this subterfuge.

### i.   Legal Framework

Title III permits state legislatures to "'designate[]'" certain "major [state-law] offenses" for investigation by wiretap. *People v. Shapiro*, 50 N.Y.2d 747, 764 (1980) (quoting 18 U.S.C. § 2516(2)); *see* CPL § 700.05(8) (designating Penal Law offenses). New York's list of designated offenses includes "falsifying business records in the first degree as defined in [P.L. §] 175.10." CPL § 700.05(8). Falsifying business records in the second degree (P.L. § 175.05) is not a designated offense.

Every eavesdropping application – whether it seeks authority to install, extend or amend a wiretap – must specify which designated offense is the subject of the investigation. *United States v. Giordano*, 416 U.S. 505, 532-33 (1974); *Marion*, 535 F.2d at 700; *Shapiro*, 50 N.Y.2d at 763-64. The court must then "determine" whether or not "probable cause exists for believing that 'communications concerning that offense' will be obtained." *Marion*, 535 F.2d at 700 (quoting 18 U.S.C. § 2518(3)(b)); *see* CPL § 700.15(4).

### ii.   <u>Discussion</u>

Detective Santangelo's supporting affidavit centered on a pair of conference calls that were intercepted on November 1, 2014. According to Santangelo, in the first of the two conversations, Marshall "solicit[ed]" Gallman and Brettschneider "to obtain a forged letter containing false information" to the effect that Marshall had received treatment for "a substance abuse problem before he entered prison." Ex. B, Bates 241. Brettschneider responded that he would ask a "contact" to oblige Marshall's request. Ex. B, Bates 242. In a second conversation that occurred a short time later, Brettschneider informed Gallman and Marshall that the contact had agreed to prepare a letter. Ex. B, Bates 257. Marshall then identified a "doctor" at his prison as the intended recipient of the missive. Ex. B, Bates 257-58.

After he had listened to the calls, Detective Santangelo consulted with a BOP "investigator" at Marshall's facility. Ex. B, Bates 259.  The official "confirmed" that the doctor named in the November 1 call was the prison's "point person for drug

**A.46**

treatment." Ex. B, Bates 259-60. The Detective was also informed that federal inmates "often submitted" "false drug histories" in order to gain admittance to a "drug program" that could potentially "shorten[]" their sentences. Ex. B, Bates 260.

A glance at the Penal Law's text suffices to show that this conduct could not "be reasonably interpreted" as a conspiracy to falsify business records in the first degree under P.L. § 175.10. *Fury*, 554 F.2d at 530-31. That offense, an E felony, borrows its conduct element from P.L. § 175.05, which punishes "a person" with a misdemeanor if, "with intent to defraud," he or she:

> 1. Makes or causes a false entry in the business records of an enterprise; or
>
> 2. Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise; or
>
> 3. Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position; or
>
> 4. Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.

P.L. § 175.05. Section 175.10 increases the person's liability if his or her "intent to defraud includes *an intent to commit another crime* or to aid or conceal the commission thereof." P.L. § 175.10 (emphasis supplied); *see People v. Reyes*, 69 A.D.3d 537, 538 (1st Dep't 2010) (explaining that "second-degree falsifying business records is a lesser included offense of the first-degree crime, with the sole difference between the two being that the higher crime requires a specific intent to commit or conceal another crime").

**A.47**

There was no "[]other crime" in this case. *Id.* Instead, Detective Santangelo surmised that the "purpose" of "procuring [the] forged drug treatment letter" was to qualify Marshall for the BOP "drug program." Ex. B, Bates 228, 260. At best, then, Detective Santangelo and his team had "uncovered a conspiracy" to commit an *undesignated* misdemeanor violation of P.L. § 175.05.

This defect invalidates the November 10 eavesdropping warrant insofar as it authorized interception of communications "relate[d]" to the Marshall letter. It follows that all such communications must be suppressed.

## C.   THE NOVEMBER 2014 AMENDMENT APPLICATION CONCEALED A VIOLATION OF NEW YORK STATE'S 10-DAY RULE

In his affidavit in support of the November 2014 application to amend the wiretap, Detective Santangelo claimed that the first interceptions concerning the drug treatment letter "conspiracy" occurred on November 1. Ex. B, Bates 228. This account supported the DA's Office's assertion that its application, submitted on November 10, came "within ten (10) days after" the investigation established "probable cause" to suspect Gallman and his compatriots of falsifying business records. Ex. B, Bates 147. The Detective's account, however, was false.

As the government's March 29, 2018, bail letter reveals, the DA's surveillance team had, in fact, intercepted conversations concerning the drug treatment letter on October 16 and 24. Bail Ltr., ECF No. 23, at 3-4. The government's letter demonstrates that those interceptions – which contained, among other things, a "sketch[]" of the drug

treatment letter's content, references to more than one potential author and observations concerning the BOP's "crack[] down" on RDAP-related "fraud" (*id.*)[3] – were every bit as incriminating as those that occurred on November 1. If the November conversations established probable cause, "[c]ommon sense [would] dictate[]" that the October conversations did too. *United States v. Main Street Distributing Inc.*, 700 F. Supp. 655, 660 (E.D.N.Y. 1986). Indeed, the DA's surveillance team identified both recordings as "pertinent" when they were intercepted.

The considerations that prompted Detective Santangelo to exclude the October interceptions from his November 10 affidavit were legal, not evidentiary. Like Title III, New York State's wiretap law severely restricts the use of so-called "incidentally intercepted communications" – that is, calls and messages concerning matters unrelated to the crime "specified" in the operative warrant – in subsequent judicial proceedings. *Marion*, 535 F.2d at 700; *see* 18 U.S.C. § 2517(3), (5); CPL § 700.65(3)-(4). Under both statutes, incidentally intercepted communications are inadmissible unless an appropriate court has "retroactively" approved their seizure. *United States v. Masciarelli*, 558 F.2d 1064, 1068 (2d Cir. 1977); *see* 18 U.S.C. § 2517(5); CPL § 700.65(4).

In New York State, investigators may obtain the requisite approval through an "amendment" of the underlying warrant. CPL § 700.65(4). The CPL's amendment

---

[3]    For purposes of this motion alone, Brettschneider adopts and incorporates the government's description of the calls intercepted on October 16 and October 24, 2014.

process contains a caveat that its federal counterpart does not: when intercepted communications give rise to "probable cause [] to believe that a crime not named in the warrant has been, is being, or is about to be committed," investigators must make an application to amend the warrant "*within ten days*" of the existence of such probable cause in order to use such communications and evidence derived therefrom. CPL § 700.65(4).[4]

By omitting the October 2014 interceptions from the November 10 amendment application, Detective Santangelo and his team forestalled questions about their compliance with the CPL's "ten day[]" requirement. *Id.* In other words, the investigators pretended that the supposed business records "conspiracy" had been "uncovered" on November 1 (Ex. B, Bates 228) so that it would "**APPEAR[]**" that their "application [was] made . . . within ten (10) days after probable cause existed to believe that [the] crime [was] about to be committed." Ex. B, Bates 126. In reality, probable cause had arisen at least 17 days before the application's submission.

The DA's failure to comply with CPL § 700.65(4) rendered the November 2014 warrant invalid under New York State law. *See People v. Liberatore*, 79 N.Y.2d 208, 222 (1992) (reviewing wiretap investigations' conduct for "meticulous" and "'strict compliance with the provisions of New York's eavesdropping statute'") (quoting *People v. Schulz*, 67 N.Y.2d 144, 149 (1986)).

---

[4]    Title III requires only that the "subsequent application" be made "as soon as practicable." 18 U.S.C. § 2517(5).

The Court should apply the State law here, holding that the DA's failure to "conform[]" to the requirements of § 700.65(4) results in the suppression of communications related to the Marshall letter. 18 U.S.C. § 2516(2).

**POINT II**

**THE COURT SHOULD GRANT BRETTSCHNEIDER'S MOTION FOR SEVERANCE FROM CO-DEFENDANT JOHN SCARPA JR.**

Brettschneider respectfully moves this Court, pursuant to Rules 8 and 14 of the Federal Rules of Criminal Procedure, for a severance from defendant John Scarpa Jr. Severance is required here as these two defendants are improperly joined under Rule 8(b). Severance would also prevent Mr. Brettschneider from suffering undue prejudice at trial and is thus warranted pursuant to Rule 14.

As the government consents to severing these defendants, we do not detail the law on this issue herein.

17

**A.51**

## **<u>CONCLUSION</u>**

For the reasons set forth above, we respectfully submit that the Court should grant Mr. Brettschneider's motions for suppression and severance.

Dated:      New York, New York
              November 16, 2018

Respectfully submitted,

/s/

Sarita Kedia
Sarita Kedia Law Offices, P.C.
5 East 22nd Street, Suite 7B
New York, New York 10010
(212) 681-0202
skedia@kedialaw.com

*Attorney for Scott Brettschneider*

On the brief:

Sarita Kedia
Jonathan Savella

**A.52**

MEG:AS/LKG
F. #2015R01691

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -

SCOTT BRETTSCHNEIDER, et al.,

           Defendants.

– – – – – – – – – – – – – – – – – – X

Docket No. 18-CR-123 (S-1) (CBA)


THE GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS THE WIRETAP



RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201



Andrey Spektor
Lindsay K Gerdes
Assistant U.S. Attorneys
    (Of Counsel)

A.53

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................2

I.     Charges Against Brettschneider ....................................................................................2

       A.     Brettschneider Is Indicted for Working With Others to Write a False Letter to the
              Bureau of Prisons. ..................................................................................................2

       B.     Brettschneider Is Caught Discussing the Letter with an Incarcerated Client on the
              Client's Smuggled Cell Phone ................................................................................2

       C.     Brettschneider Recruited His Legal Assistant to Write the Letter ..........................3

       D.     Wiretap Evidence Supporting the Charges Against Brettschneider ......................5

              1.     The QCDA Wiretap Uncovered Evidence of the False Letter Scheme .......5

              2.     The Inception of the QCDA Wiretap ...........................................................6

ARGUMENT ...........................................................................................................................8

I.     Applicable Law...............................................................................................................9

       A.     Deference to Decision of the Issuing Judge ...........................................................9

       B.     Necessity Requirement ..........................................................................................10

       C.     Probable Cause Requirement.................................................................................11

II.    The QCDA's Initial Wiretap Application Was More Than Adequate to Show That Other
       Investigative Techniques Would Likely Be Unsuccessful ...............................................12

       A.     The Goal of the Investigation Was to Identify All of Gallman's Co-Conspirators,
              Not Just One ..........................................................................................................12

       B.     Even the More Limited Investigation Suggested by Brettschneider Could Not
              Have Been Completed Without a Wiretap .............................................................15

III.   The QCDA Properly Notified the Issuing Judge That It Intercepted Communication of an
       Offense Not Specified in the Initial Application..............................................................18

       A.     Criminal Communication Need Not Always Relate to a Designated Offense ......19

1

B.    The QCDA's Wiretap Based on Witness-Bribery and the Extension Application Were Not Subterfuge Searches ...............................................................23

C.    In Any Event, There Was Probable Cause to Believe the Incidentally-Captured Communication Constituted a Designated Offense ...............................................24

IV.   The November Application Contained No Violation .......................................................26

A.    The Wiretap Order Is Valid Under Federal Law .......................................26

B.    Federal Law Governs in Federal Court.......................................................27

C.    State Notification Requirement Does Not Safeguard a Privacy Right ......29

D.    The QCDA Complied With State Law .......................................................29

V.    The Government Does Not Oppose Severance Even Though the Defendants Were Properly Joined .............................................................................................................31

CONCLUSION............................................................................................................32

**A.55**

## **PRELIMINARY STATEMENT**

Defendant Scott Brettschneider—a criminal defense attorney—is charged with conspiring to commit fraud with his assistants, five-time felon Charles Gallman and Reginald Shabazz-Muhammad.  He did it to help a convicted drug dealer, Richard Marshall, reduce his sentence.  Gallman, Shabazz-Muhammad and Marshall have all pleaded guilty, while Brettschneider's trial is scheduled to begin on March 18, 2019.   He hopes the Court will suppress the wiretap (obtained by state authorities) and effectively end the case against him.

Brettschneider argues that (1) the wiretap was unnecessary, (2) state authorities intercepted discussion of a crime not specifically proscribed by Title III, and (3) disclosure of the newly-intercepted crime violated state law.  All three arguments share one trait—they fail for many reasons.  Brettschneider cites bad law, omits facts and ignores the governing framework.  His first argument twists the wiretap affidavit; his second ignores binding authority—dispositive and fatal to his claim; and his third argument relies on a case the Second Circuit has abrogated, for a proposition the Circuit has, in its own words, "rejected."

The liberties that Brettschneider takes with the facts and the law are revealing.  They show that the wiretap applications are impervious to fair attack; even a cursory review shows the care and detail that went into them.  The state authorities had ample reason to investigate Gallman and his co-conspirators in wide-ranging bribery schemes—an investigation that uncovered widespread unethical and criminal conduct by Brettschneider and other defense attorneys.

1

**A.56**

**STATEMENT OF FACTS**

I.      Charges Against Brettschneider

      A.      Brettschneider Is Indicted for Working With Others to Write a False Letter to the Bureau of Prisons

        This case stems from Brettschneider's relationship with Gallman and his representation of Marshall in a federal case, United States v. Wright et al., 12-CR-014 (N.D.N.Y) (FJS).   At sentencing in Wright, Brettschneider submitted a report (publicly-available) from a psychologist who evaluated Marshall.  The report stated that after recovering from depression earlier in his life, Marshall had been "clean and sober for over 20 years."  Id. Docket Entry No. 338 at 6.

        Soon after Marshall began his term of incarceration, he and his co-conspirators (Brettschneider, Gallman and Shabazz-Muhammad) began discussing how they could get Marshall admitted into the Residential Drug Abuse Program ("RDAP") through fraud.  They decided to hold out Shabazz-Muhammad—Brettschneider's legal assistant—as the director of a treatment program and to suggest that Marshall attended that program due to his substance and alcohol dependence.  The four defendants were charged in the instant case with making and conspiring to make false statements to the Bureau of Prisons ("BOP"), in violation of 18 U.S.C. §§ 1001(a)(2) and 371, respectively.

      B.      Brettschneider Is Caught Discussing the Letter with an Incarcerated Client on the Client's Smuggled Cell Phone

        Brettschneider is moving to suppress a wiretap on Gallman's cell phone obtained by the Queens County District Attorney's Office ("QCDA") because intercepted communication narrated how he and his co-conspirators planned and executed the fraud.   The calls were initiated by Marshall on his "burner" phone, which had been smuggled into a United States

2

**A.57**

penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg").  In two calls in October 2014, Marshall and Gallman discussed the idea of a false letter that would detail Marshall's purported history of substance abuse.  In one of those calls, on October 24, 2014, the two men added Brettschneider and asked him about such a letter, with Marshall detailing exactly what the letter should say for him to get admitted into RDAP.  Brettschneider—acknowledging Marshall's difficulty in talking from a smuggled cell phone in prison—promised to get back to him: "I know who to talk to."

It was not until November 1, 2014, however, that obtaining a fraudulent letter became a real possibility.  When Marshall called Gallman that day, Gallman reported that he had good news: "I just got someone [from Virginia] to put the letter together" for "$350, $400," a price Marshall hoped Brettschneider would "maybe . . . put that shit up."  The two men discussed whether the Virginia origin would set off red flags, given that Marshall was from New York. Gallman was not worried: "I doubt they going to be scrutinizing it that much."  Gallman once again added Brettschneider to the call to discuss the letter.  Gallman confirmed with Brettschneider, as Marshall was listening, that Brettschneider had someone prepared to write it. "I think I do," Brettschneider said, "I just have to ask the person."  After listening to Marshall's instructions about the contents of the letter, Brettschneider promised: "I'll take care of it when I get off the phone with you."

C.     Brettschneider Recruited His Legal Assistant to Write the Letter

Brettschneider delivered.  About thirty minutes later, he told Marshall on another three-way call that a letter from a program would be written.  "He's gonna do it," Brettschneider said, referring to the person he apparently recruited on short notice.  The person who would ultimately write about Marshall's alleged prior drug treatment was Brettschneider's own legal

3

**A.58**

assistant, Shabazz-Muhammad.[1]  With Brettschneider temporarily off the phone, Marshall and

Gallman discussed the logistics.  Gallman said that Marshall had to get a copy of the letter before

it was submitted so that he would know all about his purported substance abuse history, in case

he was "questioned about what's in the letter.  So this way you already know what's in the letter,

and you'll be able to answer whatever is asked."  Marshall worried that the prison authorities

would discover the letter and know it is "bullshit," but Gallman was not concerned because they

would send it through legal mail, presumably from Marshall's attorney, Brettschneider.  Upon

rejoining the call—still on November 1, 2014—Brettschneider caught up on the details of the

plan and confirmed that the author of the letter would be Shabazz-Muhammad.

That same month, November 2014, USP Lewisburg received a letter signed by

"Reginald Shabazz-Muhammad, CASAC CLA, Director of Program Services," detailing

Marshall's purported treatment at the "Muhammad Mosque No. 7."  The letter was dated

November 6, 2014 and postmarked November 20, 2014, though incriminating calls continued

into early 2015.  It stated that Marshall was involved in an outpatient program and was

"suffering from active drug dependence, namely alcohol and marijuana."  According to the letter,

Marshall had been "making progress gradually reducing his active substance dependence."

Nevertheless, Marshall failed to get into RDAP.  The BOP asked his treatment

provider—i.e., Brettschneider's legal assistant—for progress reports[2] from when Marshall was

treated.  Brettschneider thought he could get those too, but by that point Shabazz-Muhammad

---

[1] Brettschneider described Shabazz-Muhammad as a dependable worker, willing to do hours of grunt work: "He's a guy that he'll stand there copy 500 pages for me and put together a loose leaf, you know, for trial."

[2] Progress reports, also referred to as session notes, are contemporaneous notations made by the treatment provider documenting that the service provider delivered certain diagnostic and/or treatment services to an individual.

4

# A.59

apparently stopped returning calls.  On a December 11, 2014 call, Gallman and Brettschneider described how odd it was that the usually-dependable Shabazz-Muhammad had gone missing, though Brettschneider also recognized that what Marshall was "looking for . . . that's not really that easy to—."

    D.    <u>Wiretap Evidence Supporting the Charges Against Brettschneider</u>

        1.    <u>The QCDA Wiretap Uncovered Evidence of the False Letter Scheme</u>

The government obtained evidence of the RDAP fraud because the QCDA had a court-authorized wiretap on Gallman's cell phone.  And the QCDA only had a wiretap on Gallman's cell phone because a cooperating witness and recorded jail calls suggested that Gallman worked with criminal defense attorneys to bribe witnesses.  Those early suspicions were ultimately substantiated.

This year, Gallman pleaded guilty in Queens County Supreme Court to bribing a witness and, more recently, in the instant case, to bribing another witness in an unrelated case. One of the attorneys with whom Gallman worked (referred to as Attorney-A in the government's initial detention memorandum, <u>see</u> ECF Docket Entry No. 23) was convicted of participating in an unrelated bribery scheme.  Another attorney, John Scarpa, Jr. (referred to as Attorney-B, <u>see</u> <u>id.</u>), was charged in the instant indictment for bribing a witness in a double-homicide case. Brettschneider, for his part, schemed with Gallman on how they could sell a false recantation to a prospective client.  And another attorney (referred to as Attorney-C, <u>see</u> <u>id.</u>) dispatched Gallman to intercept a victim on the way to a lineup.  The unethical and criminal conduct by criminal defense attorneys with no apparent relationship to each other (but all working with Gallman) was uncovered only because of the wiretap on Gallman's phone.

5

**A.60**

2.      The Inception of the QCDA Wiretap

The QCDA wiretap began with a state criminal case against Frederick Freeman, who ordered the complaining witness (the "Victim"), at gunpoint, to "back the fuck up" and open the door to the Victim's apartment.  October 15, 2014 Affidavit of Detective Richard Santangelo ("Det.'s Oct. Aff.") ¶ 5.[3]  After his arrest, Freeman demanded a trial, while his father worked behind the scenes to bribe the star prosecution witness, the Victim, so that he would not testify.  Det.'s Oct. Aff. ¶ 6.  Recorded jail calls between Freeman and his father led the QCDA to Gallman.  Det.'s Oct. Aff. ¶¶ 12-19.

The QCDA also received information from the Victim, who began cooperating with the QCDA after he received a nighttime home visit from Gallman.  Det.'s Oct. Aff. ¶ 20.  According to the Victim, Gallman told him to "come with me to one of my lawyers and put stuff in writing.  I'll pay you."  Det.'s Oct. Aff. ¶ 20.

Gallman continued pressuring the Victim, including in a recorded call, to accept money and not testify.  Det.'s Oct. Aff. ¶¶ 21-22.  During that call Gallman again told the Victim that for the Victim to get paid and agree not to testify he just had to meet with Gallman and see a lawyer: "All we gotta do is go talk to the lawyer."  Det.'s Oct. Aff. ¶ 22.  Describing his job, Gallman told the Victim that, "I'm a n**** who gone and had a life in jail.  I work with a lot of lawyers.  I work with a lot of lawyers.  I had had life in jail, I'm a motherfucking homie."  Id.  Gallman added that he is a "n**** who helps n****s speak their cases."  Id.  When the Victim pressed Gallman on why he had held himself out as a lawyer, Gallman responded, "I said I

---

[3] For ease of reference and to comply with the Court's rules, see Court's Individual Rule 1F, the government has enclosed, in hard copy and as sealed exhibits to this memorandum, the QCDA's October and November 2014 wiretap orders and supporting documents.  These documents—which are subject to the Court's protective order dated April 6, 2018, see ECF Docket Entry No. 41—were also submitted (initially unsealed) by Brettschneider as Exhibits A and B to his memorandum of law.

6

**A.61**

worked with lawyers.  That's what I said to you.  I told you, you could ask anybody in the street about me."  Id.

Based on these conversations and additional investigation, the QCDA had the following information: (1) Gallman was working with an attorney who could help Freeman fix his case by bribing a witness; (2) Gallman, by his own repeated admissions "work[ed] with a lot of lawyers" to help defendants "speak their cases"; and (3) Gallman was talking in circumspect terms with other inmates about helping them with their cases.   The QCDA submitted a wiretap application on October 15, 2014 to the Honorable Robert McDonald, New York State Supreme Court Justice.  Based on these and other facts, the QCDA argued that there was reason to believe Gallman was "being paid by other criminal defendants, possibly with the knowledge and assistance of criminal defense attorneys, to fix their cases as well."  October 15, 2014 Affidavit of Assistant District Attorney Jennifer Hagan ("ADA's Oct. Aff.") ¶ 2.  Justice McDonald authorized the wiretap, agreeing that the wiretap was necessary for the QCDA to obtain information that other investigative tools could not uncover, namely "which lawyers [Gallman] may be working with, or the extent of their knowledge and involvement in the scheme."  ADA's Oct. Aff. ¶ 8.

As recounted above, Gallman's unlawful conduct with defense attorneys was not limited to just one lawyer, or just to witness bribery.   It was during the initial interception period that the QCDA intercepted Gallman, Brettschneider and Marshall discussing the fraudulent letter.  When it was time to seek reauthorization in November 2014 for continued interception, the QCDA notified the authorizing judge about this and other communications.

7

**A.62**

**ARGUMENT**

Brettschneider makes three arguments in an attempt to suppress the wiretap.[4]  He claims that: (1) other investigative techniques were not "tried or meaningfully considered" before a judge authorized the QCDA to obtain a wiretap; (2) the reauthorization for the wiretap "failed to establish probable cause to suspect the commission of a designated offense"; and (3) the QCDA "misrepresented" when exactly it learned about Brettschneider's conspiracy to submit a false letter and "concealed" this knowledge from the issuing judge, all in an effort to satisfy a disclosure requirement under New York law.  Brettschneider's Memorandum of Law in Support of Motions ("Mot.") at 5 (internal quotation marks omitted).  Each of these arguments fails for multiple, independent reasons.

Brettschneider also asks the Court to sever his case from Scarpa's, who, as discussed above, is charged along with Gallman for bribing a witness.  The government does not oppose severance but addresses briefly Brettschneider's assertion that the two defendants were improperly joined.  Mot. at 17.

---

[4] Brettschneider asserts standing by claiming that he is an "aggrieved person" under 18 U.S.C. § 2518(10)(a) because he was intercepted on the wiretap.  He did not, however, submit an affidavit stating that he was intercepted, even though he has the burden to do so.  See United States v. Montoya-Eschevarria, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) ("The law is clear that the burden on the defendant to establish standing is met only by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge."), id. (stating with approval the government's position that the "defendant should not be deemed to have standing while retaining the option, if the motion to suppress is denied, of later denying that his voice is on the tapes"); accord United States v. Loera, No. 09-cr-0466 (BMC), 2018 U.S. Dist. LEXIS 155544, at *4 (E.D.N.Y. Aug. 29, 2018); United States v. White, 2018 U.S. Dist. LEXIS 146444, at *23 (S.D.N.Y. Aug. 28, 2018) ("This Circuit has routinely rejected efforts by defendants to establish Fourth Amendment standing based on the Government's allegations or evidence.").  Because Brettschneider's attorney submitted a declaration in which she confirms that Brettschneider was intercepted, the government assumes the defendant will not make an argument to the contrary at trial.  Decl. ¶ 3.  If the government is wrong in its assumption, then it respectfully requests that Brettschneider submit an affidavit attesting that he was intercepted on the wiretap he seeks to suppress.

8

**A.63**

I.      Applicable Law

        In litigating the admissibility of intercepted communication from a state wiretap,

it is only federal law that applies in federal court.  See United States v. Amanuel, 615 F.3d 117,

122 (2d Cir. 2010) (holding that in a "federal case, federal law governs the use of a state-issued

eavesdropping warrant"; rejecting prior dicta that suggested state-issued warrants were subject to

state statutory requirements in federal court if that law more stringently protected individuals'

privacy rights).

        To obtain a wiretap, the government must provide an explanation about probable

cause and necessity—that is, a "full and complete statement of the facts and circumstances relied

upon by the application to establish probable cause," and a statement "as to whether or not other

investigative procedures have been tried and failed or why they reasonably appear to be unlikely

to succeed if tried or to be too dangerous."  United States v. Rajaratnam, 719 F.3d 139, 144 (2d

Cir. 2013) (quotations marks and internal citations omitted).

        A.      Deference to Decision of the Issuing Judge

        A district judge's review of another judge's determination to authorize a wiretap

must give "considerable deference" to the issuing judge's decision.  United States v. Bourne, No.

08-CR-888 (NGG), 2011 U.S. Dist. LEXIS 107530, at *33 (E.D.N.Y. Sept. 23, 2011); see also

United States v. Concepcion, 579 F.3d 214, 217 (2d Cir. 2009) (reversing suppression of a

wiretap because the reviewing judge failed to accord sufficient deference to the issuing judge's

decision); United States v. Wagner, 989 F.2d 69 (2d Cir. 1993) (same).  The review is also

narrow in scope:

        Where a defendant moves to suppress evidence obtained pursuant
        to a judicially authorized wiretap on the grounds that the wiretap
        application was not supported by facts sufficient to establish
        probable cause, or on the grounds that the Government failed to

9

**A.64**

> establish that traditional investigative techniques were reasonably
> likely to be unsuccessful, the trial court reviews the wiretap
> application only to determine whether the facts set forth by the
> Government were "minimally adequate" to support the issuing
> court's order.

Bourne, 2011 U.S. Dist. LEXIS 107530, at *33 (quoting Concepcion, 573 F.3d at 217).

    B.    Necessity Requirement

The necessity requirement of 18 U.S.C. §§ 2518(1)(c) and (3)(c)—that other

investigative measures must reasonably appear to be unlikely to succeed, to be too dangerous or

to have been tried and failed—is "simply designed to assure that wiretapping is not resorted to in

situations where traditional investigative techniques would suffice to expose the crime." United

States v. Kahn, 415 U.S. 143, 153 n.12 (1974).  A wiretap application must provide a practical

basis for concluding that other investigative techniques are not feasible.  See United States v.

Lilla, 699 F.2d 99, 103 (2d Cir. 1983) (citing S. Rep. No. 1097, 90th Cong., 2d Sess. 101

(1968)).

        The necessity requirement, as the Second Circuit has explained, does not mean

that the wiretap must be a tool of last resort; law enforcement need only inform the issuing court

"of the nature and progress of the investigation and of the difficulties inherent in the use of

normal law enforcement techniques." United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990)

("[T]he purpose of the statutory requirements is not to preclude resort to electronic surveillance

until after all other possible means of investigation have been exhausted by investigative agents."

(internal quotation marks omitted)), abrogated on other grounds, see United States v. Marcus,

628 F.3d 36, 41-43 (2d Cir. 2010).  "The issue of whether a normal investigative method has

been exhausted must be tested in a practical and common sense manner." United States v. Diaz,

176 F.3d 52, 111 (2d Cir. 1999).

C.     Probable Cause Requirement

"A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists. . . .  The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause."  Wagner, 989 F.2d at 72 (internal citations omitted) (reversing suppression order); United States v. Snape, 116 F. App'x 317, 319 (2d Cir. 2004) ("Courts conducting an after the fact review of a judicial officer's decision to issue a warrant based on probable cause pay great deference to the issuing judge's determination of probable cause.").

"The test for determining probable cause under 18 U.S.C. § 2518 is the same as that for a search warrant."  Wagner, 989 F.2d at 71.  "A judge's probable cause determination is not overly strict.  Presented with a warrant application, the judge must simply . . . make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability" that evidence of a crime will be uncovered.  United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005) (internal quotation marks omitted).

"The quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity . . . .'" Wagner, 989 F.2d at 72 (quoting Illinois v. Gates, 462 U.S. 213, 235 (1983)).  Moreover, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  Martin, 426 F.3d at 74.  Thus, "[i]n assessing probabilities, a judicial officer must look to 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.'"  Walczyk v. Rio, 496 F.3d 139, 156-57 (2d Cir. 2007) (quoting Gates, 462 U.S. at 231).

11

**A.66**

II.   The QCDA's Initial Wiretap Application Was More Than Adequate to Show That Other Investigative Techniques Would Likely Be Unsuccessful

Brettschneider argues that traditional methods of investigation had "supplied" the QCDA team with all the evidence it needed to show Gallman, Freeman and Freeman's father conspiring to bribe a witness.  Mot. at 6-7.  Brettschneider lists all the evidence the team had to prosecute the three men, see id., and suggests "ready means" by which the investigation could have achieved what Brettschneider suggests was the objective—to identify the fourth co-conspirator, the lawyer whom Gallman was planning to use to document the Victim's recantation.  Mot. at 9.  That objective, Brettschneider offers, could have been realized without a wiretap, by simply instructing the Victim to call Gallman, "ask for the lawyer's name and then arrange a meeting with the lawyer at his office."  Id.  Brettschneider misstates the goal of the investigation as it was articulated to Justice McDonald and fails to explain how even the limited investigation could have been completed without a wiretap.

A.   The Goal of the Investigation Was to Identify All of Gallman's Co-Conspirators, Not Just One

The goal of the investigation was not simply to identify the lawyer whom Gallman had in mind to fix Freeman's case; nor was that the reason Justice McDonald authorized the wiretap.  The goal was to "identify *all* of the participants in, and beneficiaries of, the[] attempts to bribe witnesses."  ADA's Oct. Aff. ¶ 5(a) (emphasis added).  Those participants were other defendants and lawyers who worked with Gallman.  The QCDA's application repeatedly echoed this overarching objective when referring to Gallman's statements and conduct.  See, e.g., ADA's Oct. Aff. ¶ 2 (noting that there is reason to believe Gallman was "being paid by other criminal defendants, possibly with the knowledge and assistance of criminal defense attorneys, to fix their cases as well"); Det.'s Oct. Aff. ¶ 4 (explaining that the QCDA

12

**A.67**

"discovered that Gallman's services are not limited to a single case, but are part of paid services that he provides to multiple criminal defendants[]"); Det.'s Oct. Aff. ¶ 9 ("[T]here is evidence that [Gallman] is using [his cell phone] to plan and carry out [a] witness bribery scheme[] with other criminal defendants, and possibly the criminal defense attorneys themselves."); Det.'s Oct. Aff. ¶ 25 (noting that Gallman had made it "clear that he works with multiple criminal defense attorneys[,]" and that information in the affidavit shows the "attorneys may be knowledgeable participants in the witness bribery schemes[]").

There were two primary reasons for QCDA's suspicions that underpinned its goal to identify all of Gallman's co-conspirators, beyond just Freeman's case.  *First*, the QCDA drew on Gallman's own remarks about working with other lawyers.  See, e.g., Det.'s Oct. Aff. ¶ 20 (Gallman's inviting the Victim to see "one of my lawyers"); Det.'s Oct. Aff. ¶ 23 (Gallman telling the Victim that he works with "a lot of lawyers").  The authoring detective even interpreted these statements for Justice McDonald, opining that Gallman was likely "employed by more than one attorney as a case fixer," Det.'s Oct. Aff. ¶ 20, and provided "his services for multiple defendants."  Det.'s Oct. Aff. ¶ 23.

*Second*, to substantiate the detective's interpretation of the calls supporting the probable cause finding and to preempt any suggestion that Gallman's statements were mere puffery, the affidavit cited examples of prison calls in which Gallman was recorded talking to other inmates about "work[ing]" their cases, which included trying to "beat" a case by meeting with an eyewitness.  Det.'s Oct. Aff. ¶ 24.   The QCDA informed Justice McDonald that it did not know which "lawyers" Gallman "may be working with, or the lawyers' knowledge and involvement in the scheme."  ADA's Oct. Aff. ¶ 8.  The QCDA informed Justice McDonald that it "also [did] not know how many other cases [Gallman] may be involved in [or] the identity of

13

# A.68

his accomplices[.]"  Id.  And other investigative means would not reveal all of Gallman's co-conspirators, including criminal defense attorneys.  See Det.'s Oct. Aff. ¶¶ 28-30.

Brettschneider does not argue that the "lot of lawyers" with whom Gallman worked to fix cases could have been identified through investigative means other than a wiretap. More precisely, he does not argue that Justice McDonald had an insufficient basis to find "difficulties inherent in the use of normal law enforcement techniques" to compile a list of all of Gallman's co-conspirators and to gather evidence against them.  Torres, 901 F.2d at 231.

Nor could he.  As the QCDA team explained to the justice, there was no reason to believe Gallman would offer the Victim (or an undercover officer) the names of his co-conspirators.  See Det.'s Oct. Aff. ¶ 30 (noting that Gallman had not volunteered the name of even one attorney with whom he fixed cases).  And while surveillance could show Gallman meeting with lawyers and witnesses, it would give no "insight into the nature of these meetings." Det.'s Oct. Aff. ¶ 29.   Indeed, it is difficult to conceive of an investigation where the need for a wiretap is more obvious.  The targeted crime itself—not just discussions about it—was being conducted (or at least initiated) predominantly on a cell phone.  See Det.'s Oct. Aff. ¶ 28 (noting that Gallman uses his "cell phone in his efforts to bribe witnesses"); United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir. 1975) ("[W]iretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation[.]").

That's why Brettschneider attempts to rewrite the application submitted to Justice McDonald.  If the goal of the investigation was more modest—to identify a single lawyer that Gallman had in mind for Freeman's case—then the toolkit for that investigation could be more limited too.  But Brettschneider does not get to reframe the objectives of an investigation.  He

14

**A.69**

does not get to redraft the QCDA's application.  And he does not get to delete portions of the application that are unhelpful to his argument.

The QCDA used traditional investigative tools to learn that Gallman was trying to fix one case; the task for the investigators was to uncover other cases Gallman was jeopardizing, as well as the knowledge, intent and identity of his possible co-conspirators.  See, e.g., United States v. Scala, 388 F. Supp. 2d 396, 404 (S.D.N.Y. 2005) ("[Defendant] incorrectly assumes that the purpose of the wiretaps was only to obtain evidence of the sort that the government already had succeeded in obtaining through its confidential informants, physical surveillance and other measures.  The wiretaps, in contrast, were sought and authorized in order to allow law enforcement officers to intercept conversations thought necessary to explore matters that the government had not succeeded in investigating through available means.").

For these reasons alone, his necessity argument fails—a wiretap was necessary to "identify all of the participants," ADA's Oct. Aff. ¶ 5(a), in Gallman's bribery schemes, not just his co-conspirator in a single case.

B.    Even the More Limited Investigation Suggested by Brettschneider Could Not Have Been Completed Without a Wiretap

In any event, even if Brettschneider could retroactively recast the goal of the investigation as the pursuit of a single criminal defense attorney, his argument would still fail.  Brettschneider offers his advice on how the goals of this narrower investigation could have been achieved: the Victim should have been told to "ask for the lawyer's name and then arrange a meeting with the lawyer at his office."  Mot. at 9.

But there is one problem.  Knowing the identity of the lawyer and meeting with that lawyer would have done little to reveal whether the lawyer had "knowledge of the illegal nature of this activity."  Det.'s Oct. Aff. ¶ 28.  Gallman proposed to pay the Victim and go to one

15

**A.70**

of his attorneys to "put stuff in writing."  Det.'s Oct. Aff. ¶ 20.  An attorney who welcomes the

Victim and Gallman into her office to document a recantation—which she might have no reason

to think is purchased or even false—would not necessarily be a co-conspirator.  An attorney's

knowledge and intent, as the application correctly noted to Justice McDonald, could realistically

be gleaned only through the attorney's conversations with Gallman.  Given this reality and

Gallman's testy conversation with the Victim in which he was ready to stop talking to the Victim

altogether, see Det.'s Oct. Aff. ¶ 22 ("[Y]ou want me to lose your number? Cause I'll take it out

my phone."), there was no reason for the QCDA to risk the investigation by asking Gallman for

the identity of one of his co-conspirators.  See Det.'s Oct. Aff. ¶ 30 (noting, inter alia, limitation

of informants in this investigation).  See, e.g., United States v. Trippe, 171 F. Supp. 2d 230, 236

(S.D.N.Y. 2001) (noting the targets' discovery of informant's cooperation as one intolerable risk

of traditional investigative techniques).

            And it is not only the risk of compromising the investigation that Brettschneider

ignores; he also dismisses valid concerns the QCDA articulated about the danger posed by

Gallman.  Mot. at 9-10.   According to Brettschneider, the Victim's safety did not warrant

serious consideration because the witness-bribing Gallman was not tampering with witnesses,

just buying them.  Id. at 10.  He adds that there was no "violence on the horizon," id., from this

two-time killer and five-time felon, Det.'s Oct Aff ¶ 8,[5] who described himself to the Victim as

---

[5] In 1992, Gallman pled guilty to manslaughter in the first degree and was sentenced to four to
eight years' imprisonment. That conviction stems from a shooting that occurred in June 1987 in which
Gallman shot one victim dead and a second one, who survived. Approximately one month later, in July
1987, Gallman killed again. After being convicted by a jury of murder for the July 1987 shooting,
Gallman prevailed on an appeal stemming from a discovery violation.  Instead of facing the prospect of a
retrial, Gallman plea-bargained the case to criminal possession of a weapon in the second degree and was
sentenced to four to eight years' imprisonment. In 1988, Gallman was convicted of criminal possession of
a weapon in the third degree and was sentenced to 30 months' to five years' imprisonment. In 1983,
Gallman was convicted of robbery in the second degree and sentenced to 32 months' to 8 years'
imprisonment. And in 1983, Gallman was convicted of criminal sale of a controlled substance and

**A.71**

a "motherfucking homie" who "had a life in jail" and whose reputation was apparently known to "anybody in the street," Det. Oct. Aff. ¶ 22.  So, Brettschneider concludes, the Victim should have just been let loose on the excursion with Gallman to go see his lawyer.  Brettschneider's proposal ends there, but the logical conclusion of the strategy would have led the Victim inside a law office where investigators could not follow.  There, the Victim would have likely been presented with the choice of committing perjury by signing a false affidavit or refusing—and hoping that the violent felon drew the line at paying witnesses, not hurting them.   These suggestions would have the Court cast aside the common sense with which it is required to approach the motion to suppress.  It is an invitation the Court should decline.  See, e.g. Concepcion, 579 F.3d at 218; Torres, 901 F.2d at 231; Diaz, 176 F.3d at 111.

Title III only required the QCDA to inform Justice McDonald about the progress of the investigation and the "difficulties inherent in the use of normal law enforcement methods," Concepcion, 579 F.3d at 218; "[t]here is no requirement that any particular investigative procedures be exhausted before a wiretap may be authorized," United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987) (internal quotation marks omitted).  For the reasons set forth above, the QCDA's application was, at the very least, "minimally adequate" to support Justice McDonald's determination that a wiretap was necessary.  Concepcion, 579 F.3d at 217.  See also Det.'s Oct. Aff. ¶¶ 28-34 (explaining the limitation of several investigative techniques).

Accordingly, Brettschneider's necessity argument fails because the goals of the investigation he envisioned were not the ones presented to Justice McDonald.  Even that narrower investigation, however, could not reasonably have been completed, as Brettschneider suggests, by simply asking a co-conspirator to identify his accomplice.

---

sentenced to two to six years' imprisonment. Gallman also has a series of more recent misdemeanor drug-related convictions.

**A.72**

III.    The QCDA Properly Notified the Issuing Judge That It Intercepted Communication of an
        Offense Not Specified in the Initial Application

      Moving beyond the initial application, Brettschneider argues that in its subsequent
application submitted on November 10, 2014 to extend the wiretap, the QCDA "offered no
plausible basis to suspect Gallman, Brettschneider and Marshall in a conspiracy to falsify
business records in the first degree" under New York Penal Law § 175.10.  Mot. at 11.
Brettschneider virtually concedes that the communication revealed violations of falsifying
business records in the *second* degree, but definitely not in the *first* degree (so he argues) because
the latter additionally requires an intent to commit another crime.  Mot. at 13-14.  This
distinction is critical, he asserts, because only the latter offense is enumerated—that is, an
offense that Title III proscribes (by reference to state law), as one that can be investigated
through a wiretap.  Mot. at 11-12.  And so, Brettschneider submits to the Court, "the
investigation achieved an end run around Title III's central mandate" that communication only
about a *"designated"* offense be obtained.  Mot. at 11 (emphasis in original).

      Brettschneider does not distinguish between RDAP-related conversations the
QCDA captured before it obtained the November 2014 wiretap extension—when the QCDA
informed Justice McDonald about this new crime—and communication that occurred after.[6]
Regardless of the timing of these conversations, however, as set forth below, they were
intercepted pursuant to valid wiretap orders, and can be used in federal prosecution.

---

[6] As discussed above, the co-conspirators kept talking about the RDAP fraud well into 2015.
Brettschneider appears to challenge only the November 10 application.

**A.73**

A.    <u>Criminal Communication Need Not Always Relate to a Designated Offense</u>

Brettschneider's argument is built on the premise that the government may not use communications relating to a crime not designated in Title III even if the wiretap order (or an extension thereof) was obtained because an enumerated offense was being committed.  Mot. at 11-12.  In his view, if the crime intercepted is not one listed in Title III then, as a practical matter, the crime must be ignored.  He cites no law for this proposition and withholds binding authority that says just the opposite.

The governing statute is 18 U.S.C. § 2516, which limits the offenses that can be investigated through eavesdropping.  The provision balances privacy interests against "effective control of crime[s]" deemed serious enough by federal and state legislatures.  <u>United States v. United States Dist. Court</u>, 407 U.S. 297, 302 (1972).  Section 2516(2) allows states to designate such crimes, which New York has done by, for example, proscribing witness-bribery in New York Crim. Proc. Law § 700.05(8)(f).  There is no requirement in § 2516 that post-authorization, incidentally-captured communication fit within a "designated offense"; nor is there a requirement that only the predicate offenses be the topics of anticipated interception.

Incidental interception of criminal activity triggers § 2517(5).  That provision allows the government to use incidentally-captured communication so long as the original application was made in good faith and the judicial officer supervising the wiretap was timely notified.  There is no additional requirement in the statute, despite the argument advanced by Brettschneider, that the incidentally-captured communication itself must fit within a predicate offense enumerated in § 2516.  Nor is there a requirement—either in § 2516 or § 2517(5)—that *all* the anticipated pertinent communication correspond to a designated offense.  If a wiretap

19

**A.74**

investigation is authorized because a Title III predicate offense is being committed, the authorities are under no obligation to ignore talk of other crimes.

The Second Circuit has made that clear in United States v. Goffer, 721 F.3d 113 (2d Cir. 2013). "When the government investigates insider trading for the bona fide purpose of prosecuting wire fraud, it can thereby collect evidence of securities fraud, *despite the fact that securities fraud is not itself a Title III predicate offense*." Id. at 123 (emphasis added, quotation marks omitted). If a "subsequent application" discloses this interception and shows that it was not the result of a "subterfuge search . . . but was in fact incidentally intercepted," then there is no violation of Title III. Id. Precluding evidence obtained from a wiretap just because it captures discussions of other (non-designated crimes) would, the Second Circuit observed, lead to the absurd result of immunizing a defendant because he has a "diversified criminal portfolio." Id.[7] See also In re Grand Jury Subpoena Served on John Doe, 889 F.2d 384, 388 (2d Cir.1989) ("We believe . . . that Congress intended that amended orders under Section 2517(5) could encompass federal crimes not listed in Section 2516.").

The same is true when authorities are aware ahead of time that they would be intercepting discussions of non-designated crimes and disclose as much to the authorizing judge. See Goffer, 721 F.3d at 123 ("In this case, Government investigators indicated in the wiretap applications that, in addition to wire fraud, they expected to uncover evidence of securities fraud

---

[7] In Goffer, 721 F.3d at 118-122, wiretap evidence led to the defendants' convictions for securities fraud. On appeal, the defendants argued that the district court should not have permitted the use of this evidence at trial because (1) securities fraud is not a predicate Title III offense and (2) the evidence was not incidentally intercepted. Id. at 122. The Second Circuit rejected both arguments, finding no reason that intercepted communication about a non-designated offense should be suppressed (or its use precluded at trial) when the government obtains an otherwise lawful wiretap. Id. at 122-23. Because the application set forth, in good faith, probable cause for the interception of a designated offense (wire fraud), it did not matter that evidence of a non-designated offense (securities fraud) was anticipated and in fact captured. Id. at 123.

20

# A.75

(which, they expressly noted, is 'not a predicate offense under 18 U.S.C. § 2516).'").  If the unanticipated incidental capture of non-designated offenses is permitted, the court reasoned, then the government should not be punished when it discloses the probability of such interception ahead of time.  Id.  Indeed, such communication is no less incidental to a bona fide investigation of a different crime—"something does not have to be unanticipated in order to be incidental." United States v. McKinnon, 721 F.2d 19, 22-23 (1st Cir. 1983).[8]

These observations are hardly groundbreaking.  They are in accord with the plain reading of the statute, the views of judges around the country and simple logic.  "Federal courts have made it clear that the government may use lawfully obtained wiretap evidence to prove crimes not specified in the wiretap order, and may do so even if those are crimes not specifically targeted by Title III."  United States v. Marcy, 777 F. Supp. 1400, 1403 (N.D. Ill. 1991) (collecting authority).  See also United States v. Pacheco, 489 F.2d 554, 564 (5th Cir. 1974) (holding that non-enumerated offenses can be prosecuted based on incidentally-intercepted communication); United States v. Arellano, 315 F. Supp. 3d 1207, 1213 (D.N.M. 2018) (same, where the "wiretap is properly executed and there is no bad faith or pretext"); United States v. Lanza, 341 F. Supp. 405, 413 (M.D. Fla. 1972) (observing that nothing in Title III's text or

---

[8] See also United States v. Levine, 690 F. Supp. 1165, 1171 (E.D.N.Y.  1988) ("[T]he mere fact that the prosecutors believe that the surveillance will reveal other crimes, and disclose that belief to the issuing judge, does not justify a conclusion of bad faith."); United States v. Smart, 278 F.3d 1168, 1173 (10th Cir. 2002) ("To hold otherwise would create perverse incentives for law enforcement officers to only disclose suspicion of enumerated crimes and for criminals to commit non-enumerated offenses to insulate their communications from interceptions."); McKinnon, 721 F.2d at 22 ("While an interception that is unanticipated is a fortiori incidental, the converse is not true: something does not have to be unanticipated in order to be incidental. Evidence of crimes other than those authorized in a wiretap warrant are intercepted 'incidentally' when they are the by-product of a bona fide investigation of crimes specified in a valid warrant. Congress did not intend that a suspect be insulated from evidence of one of his illegal activities gathered during the course of a bona fide investigation of another of his illegal activities merely because law enforcement agents are aware of his diversified criminal portfolio.").

# A.76

history suggests that incidentally-captured communication obtained pursuant to a valid wiretap warrant could not be used in prosecution of crimes not enumerated in Title III).

Indeed, "it would be absurd to suppose that the government could not seize evidence allegedly relating to 'non-enumerated' criminality merely because it happened to discover such evidence during the course of otherwise lawful electronic surveillance." Marcy, 777 F. Supp. at 1403.  It would be akin to ignoring crimes or leaving evidence found in plain view.  Id. (quoting United States v. Johnson, 539 F.2d 181, 188 (D.C. Cir. 1976) ("Officers attending a properly authorized, limited, and supervised wiretap have no obligation to close their ears to unexpected incriminating information on matters unrelated to their immediate investigation. . . . Like an officer who sees contraband in plain view from a vantage point where he has a right to be, one properly overhearing unexpected villainy need not ignore such evidence.").  See also United States v. Masciarelli, 558 F.2d 1064, 1067 (2d Cir. 1977) (observing that the rationale of the incidental-interception rule is derived from the "plain view" doctrine, allowing law enforcement "lawfully engaged in a search for evidence of one crime" to seize what is in plain view if it "inadvertently comes upon evidence of another crime.").  Nor would it safeguard privacy rights to limit what communication can be used in court, once eavesdropping is already sanctioned based on the commission of a designated offense.

Accordingly, contrary to Brettschneider's argument, there is no requirement that the RDAP-related communication must have fit within a designated offense.  See Goffer, 722 F.3d at 123.  To suppress this evidence, Brettschneider would have to demonstrate that the QCDA wiretap applications were "subterfuge" searches.

22

# A.77

B.    The QCDA's Wiretap Based on Witness-Bribery and the Extension Application
      Were Not Subterfuge Searches

Brettschneider does not dispute that the QCDA was, in good faith, investigating a
designated offense (witness bribery) when it obtained communication about a different crime
(falsifying business records). Mot. at 11-14.  In its subsequent application, the QCDA properly
disclosed interception of the latter offense.  To label QCDA's applications "subterfuge" searches
as Brettschneider does, see Mot. at 11, one would have to believe the QCDA had its sights set on
investigating a business-record-falsification offense related to a federal inmate—about which it
had no reason to know prior to the wiretap—and that the witness-tampering scheme
painstakingly detailed by the QCDA was just an excuse to get to the bottom of the RDAP fraud.
One would have to be untethered to reality to make that claim, not least because the investigation
resulted in state and federal indictments for witness bribery.  See Goffer, 722 F.3d at 122-23
(juxtaposing incidental interception with a subterfuge search); Masciarelli, 558 F.2d at 1068
(finding no pretext in an investigation of a crime that was ultimately indicted, even where the
incidentally-intercepted communication also led to charges); United States v. Smart, 278 F.3d
1168, 1173 (10th Cir. 2002) (in a case involving "poorly drafted" applications that
"misrepresent[ed]" that the targeted offenses were Title III predicates, finding no indication that
there was false pretext or subterfuge).

Brettschneider's argument fails for this reason alone: the RDAP fraud did not
have to correspond to any Title III predicate offense because the QCDA had a valid wiretap,
obtained in good faith, to investigate an enumerated offense.  The QCDA informed Justice
McDonald of the RDAP fraud in the November 2014 wiretap application, which properly
anticipated further discussion about this crime.

**A.78**

C.     In Any Event, There Was Probable Cause to Believe the Incidentally-Captured
       Communication Constituted a Designated Offense

Even if the law provided—as Brettschneider argues, ignoring <u>Goffer</u>—that
incidentally captured communication must itself fit within a designated offense, his argument
would still fail.  He admits that falsifying business records in the first degree is a designated
offense (by way of 18 U.S.C. § 2516(2) and New York Crim. Proc. Law § 700.05(8)), but claims
that the discovered conduct did not amount to conduct violating that provision; it could, he seems
to allow, qualify as the lesser included second-degree falsification of business records offense
because that offense does not require the commission or concealment of another crime.

This claim suffers from two flaws.  *First*, it is with some irony that
Brettschneider, standing accused of committing a federal offense under 18 U.S.C. § 1001, says
that the QCDA could not have been investigating another offense in connection with business-
records falsification.  There was also at least probable cause to believe the co-conspirators were
committing the New York crime of offering a false instrument for filing in the second degree, in
violation of New York Penal Law § 175.30 (or the aiding and abetting and conspiracy thereof).
The QCDA explained to Justice McDonald that the purpose of this falsification was for Marshall
to get into RDAP under false pretenses, and that the co-conspirators planned (from Queens
County) to send the letter to Marshall through legal mail to avoid detection, so that Marshall
could study it.  November 10, 2014 Affidavit of Detective Santagelo in Support of an
Application for an Extended and Amended Eavesdropping Warrant ¶¶ 30-31 & n. 23.  That was
all the information Justice McDonald needed to find probable cause that the crime of falsifying

24

**A.79**

business records in the first degree was afoot, and to permit the use of that communication in the grand jury or at trial.[9]

*Second*, the purpose of the application was not to prove beyond a reasonable doubt that Brettschneider and his co-conspirators committed any offense.  Even under Brettschneider's faulty framework (one that requires every incidentally-captured criminal discussion to touch on a designated offense), the wiretap application only had to set forth probable cause to believe that communication about designed-only crimes continued on the targeted cell phone.  On a motion to suppress, the inquiry is further layered with "substantial deference" to the authorizing judge and asks whether "the issuing judicial officer had a substantial basis for the finding of probable cause."  Wagner, 989 F.2d at 72.  There is no question that Justice McDonald had reason to find at least a "fair probability" (not even a "prima facie showing") that the captured discussions showed Brettschneider and his co-conspirators engaging in a conspiracy to falsify business records in the first degree.

In sum, the QCDA did not have to specify a statute within which the incidentally-captured communication fit, and that communication did not have to implicate any enumerated offense under Title III.  But the QCDA exceeded Title III requirements and, after informing the

---

[9] Notably, while the QCDA specified the statute it believed Brettschneider and his co-conspirators were violating, Title III did not require it to do so.  All that is required is to disclose the nature of the communication.  See Masciarelli, 558 F.2d at 1068-69 (approving "implicit" authorization, disagreeing with district court that § 2517(5) required the government to identify the statute when informing the court of the incidentally-captured communication); accord United States v. Ardito, 782 F.2d 358, 362 (2d Cir. 1986) ("[A]uthorization under 18 U.S.C. § 2517(5) may be inferred when a judicial officer grants a continuation of the surveillance, even though the offense was not listed in the original order, so long as he was made aware of material facts constituting or clearly related to the other offenses in the application for the continuance" (internal quotation marks omitted)); United States v. Seabrook, No. 16-CR-467 (ALC), 2017 U.S. Dist. LEXIS 146620, at *5 (S.D.N.Y. Sep. 11, 2017) ("It is of no consequence that the affidavits submitted to the courts for approval do not mention honest services fraud in the context of the allegations made here against Huberfeld (and Seabrook), because the interception was nonetheless lawful.").

25

# A.80

issuing judge of the communication, did identify a predicate offense, giving Justice McDonald more than enough reason to find probable cause that the statute was violated.

IV.     The November Application Contained No Violation

Continuing his focus on the November application, Brettschneider claims the QCDA hid from Justice McDonald two October calls about Brettschneider's and his co-conspirators' plot to defraud the BOP.  Mot. at 14-17.  He injects a nefarious motive: the QCDA wanted to make it seem like discussions about this new crime occurred within the time period proscribed by New York Criminal Procedure Law § 700.65(4).  Section 700.65(4) states that before communication of a previously unidentified crime can be used, the wiretap-issuing judge must be timely notified.  That notification, state law provides, must occur within 10 days (unless an application for an extension is made sooner), after "probable cause exists to believe that a crime not named in the warrant has been, is being, or is about to be committed."  N.Y. Crim. Proc. Law § 700.35(4).  Once again, Brettschneider overlooks binding authority fatal to his argument, and, again, loses even if that law did not exist.

A.     The Wiretap Order Is Valid Under Federal Law

As Brettschneider explains, his argument is derived exclusively from state law because that law accords "greater 'protection to the individual right of privacy'" than the corresponding Title III provision.  Mot. at 6 (quoting United States v. Sotomayor, 592 F.2d 1219, 1225 (2d Cir. 1979)).  Brettschneider concedes that there is no 10-day requirement under Title III, as it "requires only that the 'subsequent application' be made 'as soon as practicable.'"  Mot. at 16 n. 4 (quoting 18 U.S.C. § 2517(5)).  See also Mot. at 17 ("The Court should apply the State law here. . . .").

26

**A.81**

Brettschneider does not argue—for good reason—that the wiretap should be suppressed under the as-soon-as-practicable Title III standard.  Only 17 days elapsed between the first pertinent conversation about the RDAP fraud and the QCDA's subsequent application for extending the wiretap in which the crime was disclosed to Justice McDonald.  The time span is dwarfed by those routinely approved by federal courts, particularly in cases like this one, where the defendant has shown no prejudice.  See, e.g., United States v. Vario, 943 F.2d 236, 243 (2d Cir. 1991) (approving a seven-month delay, where the defendant did not "allege any prejudice from the delay or that the state wiretap was a subterfuge to generate evidence" for unauthorized charges); United States v. Arnold, 773 F.2d 823, 830-31 (7th Cir. 1985) (approving a thirty-one month delay "because the original electronic surveillance order was lawfully obtained, in good faith and not as a subterfuge").  So, if federal law governs, Brettschneider loses.

B.     Federal Law Governs in Federal Court

To apply New York's 10-day notification requirement instead of Title III's as-soon-as-practicable standard, Brettschneider relies on abrogated law.  He cites Sotomayor, 592 F.2d at 1225 for the proposition that state law controls in federal court (for state wiretap orders) if it accords greater protection to privacy rights than Title III.  See Mot. at 6 (accurately quoting Sotomayor).  Brettschneider neglects to mention, however, that Sotomayor's observation is no longer good law.  "[S]ince Sotomayor, the Second Circuit has clarified that federal law governs the admission of recordings in federal court cases even where state law applies 'more stringent' standards 'designed to protect an individual's right to privacy."  United States v. Hurt, No. 14-CR-250 (JBA), 2015 U.S. Dist. LEXIS 118544, at *2 (D. Conn. Sep. 3, 2015).

If there was any doubt about the vitality of the notion that state statutory requirements could apply in federal court, the circuit once and for all put it to rest in 2010.  In

27

**A.82**

<u>Amanuel</u>, 615 F.3d at 122, it cited the same line from <u>Sotomayor</u> that Brettschneider recycles in

his brief, and observed that it had been "rejected by this Court."  The Second Circuit concluded,

in no unclear terms, that in federal court, "federal law governs the use of a state-issued

eavesdropping warrant."  <u>Id.</u>[10]

        Nor is 18 U.S.C. § 2516(2), cited by Brettschneider, at odds with <u>Amanuel</u>.  Mot.

at 6.  That provision merely permits state authorities to seek wiretaps that conform with state

procedures.  It does not mean that in federal court, state law governs the admissibility of that

intercepted communication.  <u>See, e.g.</u>, <u>United States v. Charles</u>, 213 F.3d 10, 19 (1st Cir. 2000)

(interpreting § 2516(2) and holding that "federal law governs the admissibility of evidence in

federal prosecutions . . . . [E]vidence obtained in violation of neither the Constitution nor federal

law is admissible in federal court proceedings *without regard to state law*."  (internal citation and

quotation marks omitted, emphasis in original); <u>id.</u> (citing <u>United States v. Miller</u>, 116 F.3d 641

(2d Cir. 1997) with approval, where the court upheld a wiretap that was suppressed in state

court).

---

[10] The relevant passage provided:

> In <u>United States v. Sotomayor</u>, 592 F.2d 1219 (2d Cir. 1979), this Court
> noted in dicta that a federal court, in determining the admissibility of the
> fruits of state-issued warrants, need "apply only those more stringent
> state statutory requirements or standards that are designed to protect an
> individual's right of privacy." <u>Id.</u> at 1225. That conclusion, however, was
> later rejected by this Court in <u>United States v. Miller</u>, 116 F.3d 641 (2d
> Cir. 1997).  In declining to apply state law to the use made of the wiretap
> warrant at issue in Miller, we found that the "interpretive dicta" in
> Sotomayor "have never been applied to bar the introduction of wiretap
> evidence." <u>Id.</u> at 661. Accordingly, we agree with the district court's
> determination that in this federal case, federal law governs the use of a
> state-issued eavesdropping warrant.

<u>Amanuel</u>, 615 F.3d at 122.

# A.83

Accordingly, because federal law applies and because Brettschneider does not argue that the QCDA's November application was untimely under Title III, the analysis for this claim could end here.

C.   State Notification Requirement Does Not Safeguard a Privacy Right

Brettschneider would lose even under Sotomayor's dichotomous framework—had it not been rejected.  Another Second Circuit opinion (again absent in Brettschneider's brief) held that timely notification of newly captured communication does not guard an individual's privacy rights.   In Vario, 943 F.2d at 244—a decision issued when Sotomayor's dictum was still viable—the Second Circuit refused to apply New York's more stringent notification requirement[11] in federal court.  Citing Sotomayor, the court held that the notification rule is "procedural" and is "'essentially evidentiary in character.'"  Vario, 943 F.2d at 244 (quoting Sotomayor, 592 F.2d at 1225-26).  "Since a government delay in applying to use communications in evidence under these rules does not bear on a defendant's privacy rights, Sotomayor does not require the application of state law to the question of such delay, and we need not consider whether the government's applications complied with New York law."  Id.

In short, Brettschneider invites this Court to rely on an abrogated opinion (dictum in Sotomayor) and misapply even that law (by ignoring Vario).

D.   The QCDA Complied With State Law

Even if Brettschneider were litigating this issue in state court, the wiretap would still be upheld.  The New York statute requires notification ten days after "probable cause exists"

---

[11] At the time, New York Criminal Procedure Law § 700.65(4) did not contain the 10-day requirement but the defendant in Vario argued that state courts had interpreted the "as soon as practicable" standard in its statute more stringently than the Title III counterpart (as interpreted by federal courts).

**A.84**

that communication about another crime has been intercepted; the statute's clock is not triggered by mere discussion of a crime.  N.Y. Crim. Proc. L. § 700.65(4).

The first two pertinent calls related to the RDAP program were captured on October 16 and October 24, 2014, when Marshall, Gallman and Brettschneider discussed the idea of procuring a letter for Marshall that would detail his purported substance abuse history. But it was not until November 1, 2014—less than 10 days before the QCDA submitted the November 10 application—that Gallman reported to Marshall he had secured someone who could write the letter.  The investigators could have reasonably believed that probable cause for the commission of the new crime (falsification of business records in the first degree) had only formed then—when a false letter was more than an idea; Marshall had taken a step in furtherance of the conspiracy by apparently recruiting a co-conspirator to write the letter.[12]  Nor was it unreasonable for the QCDA to be selective in the 102-page affidavit brimming with transcripts of calls and text messages, to focus mostly on the flurry of communication on November 1, calls that were both concrete and incriminating.[13]

Hindsight always brings clarity.  The October 16 and 24 calls are significant because we now know that Brettschneider and his co-conspirators ultimately procured a fraudulent letter that was then sent to the BOP.  But the investigators were well within their rights to focus on the November 1 call as the probable-cause forming communication.  Contrary

---

[12] Under New York state law, an overt act is always required to establish a conspiracy.  See New York Penal Law § 105.20.

[13] Notably, the QCDA did not include a damning November 4, 2014 call between Gallman and Marshall's brother, in which Gallman stated that the fraudulent letter would cost $300 to procure.  This further refutes Brettschneider's suggestion that the QCDA selectively omitted only earlier relevant calls so as to make its application appear timely under New York law.

**A.85**

to Brettschneider's suggestion, not every pertinent call gives rise to probable cause of a crime. Mot. at 15.

In short, "[t]he basic error in defendant's claim involves a miscalculation of the date from which the delay in seeking the amendment is to be computed.  It is not, as defendant claims, the date when the first conversation relating to [the new crime] was intercepted.  Instead, the critical date is when 'probable cause' existed for the amendment." United States v. Aloi, 449 F. Supp. 698, 725 (E.D.N.Y. 1977) (citing People v. DiStefano, 38 N.Y.2d 640 (1976)).

Brettschneider's argument is therefore unavailing even under state law, which, in any event, the Second Circuit has held does not apply in federal court.

V.    The Government Does Not Oppose Severance Even Though the Defendants Were Properly Joined

Finally, Brettschneider has moved this Court to sever his case from Scarpa's.  As the government noted at the last status conference, in light of Gallman's guilty plea, and the charges on which the government anticipates proceeding to trial, it does not oppose severance under Rule 14(a) of the Federal Rules of Criminal Procedure.  It disagrees, however, with Brettschneider's statement that Scarpa's and Brettschneider's joinder was improper under Rule 8. See Mot. at 17; Decl. ¶ 5.

Like Brettschneider, the government does not detail the law but writes to correct the misstatement.   Gallman was charged in separate conspiracies with Scarpa and Brettschneider, both stemming from Gallman's dealings with criminal defense lawyers to fix cases.[14]  As detailed above, Brettschneider's conduct involving Gallman was not limited to the RDAP fraud, as they, for example, shopped a false recantation to a prospective client.  Joinder

---

[14] Rule 8(b) provides that "[a]ll defendants need not be charged in each count."

was appropriate, and the government could have asked for a joint trial.  Nevertheless, with

Gallman no longer proceeding to trial, the government agrees that the Court's discretion is better

exercised to sever the cases.

## **CONCLUSION**

For the reasons set forth above, the defendant's motion to suppress the wiretap

should be denied, and the Court should sever Brettschneider's trial from Scarpa's.


Dated:      Brooklyn, New York
            December 6, 2018

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                            By:     /s/_____
                                        Andrey Spektor
                                        Lindsay K. Gerdes
                                        Assistant U.S. Attorneys
                                        (718) 254-6475/6155

cc:  Sarita Kedia, Esq. (by ECF)
     Jonathan Savella, Esq. (by ECF)
     Clerk of the Court (CBA) (by ECF)

# A.87

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**UNITED STATES OF AMERICA**

            **18 CR 123 (S-1) (CBA)**

   -against-


**SCOTT BRETTSCHNEIDER, et al.,**

       *Defendants.*

-------------------------------------------------------X


**REPLY MEMORANDUM IN FURTHER SUPPORT OF**
**DEFENDANT SCOTT BRETTSCHNEIDER'S SUPPRESSION MOTION**


           Sarita Kedia
           Sarita Kedia Law Offices, P.C.
           East 22nd Street, Suite 7B
           New York, New York 10010
           (212) 681-0202
           skedia@kedialaw.com

           *Attorney for Scott Brettschneider*


**A.88**

# **TABLE OF CONTENTS**

STATEMENT ................................................................................................................. 1

ARGUMENT ................................................................................................................. 1

THE WIRETAP EVIDENCE WAS UNLAWFULLY OBTAINED AND MUST BE
SUPPRESSED ............................................................................................................... 1

    A. THE GALLMAN WIRETAP WAS AN EXPEDIENT RATHER THAN A
       NECESSITY ............................................................................................................ 1

    B. THE INCIDENTAL INTERCEPTION DOCTRINE IS CATEGORICALLY
       INAPPLICABLE   TO   THE   UNLAWFULLY   SEIZED   RDAP
       COMMUNICATIONS ............................................................................................ 4

CONCLUSION ............................................................................................................. 8

A.89

## STATEMENT

Scott Brettschneider respectfully submits this reply memorandum in further support of his motion to suppress wiretap evidence. We understand that the Court has severed defendant John Scarpa Jr.'s trial from that of Mr. Brettschneider.

## ARGUMENT

### THE WIRETAP EVIDENCE WAS UNLAWFULLY OBTAINED AND MUST BE SUPPRESSED

**A.  THE GALLMAN WIRETAP WAS AN EXPEDIENT RATHER THAN A NECESSITY**

Four years after the Gallman wiretap's inception, one attorney has been accused of conniving with Gallman to bribe a single witness.[1] Nevertheless, the government's opposition to Brettschneider's motion begins with the observation that the Gallman wiretap "ultimately substantiated" the Queens County prosecutors' "suspicion" that "Gallman worked with criminal defense *attorneys* to bribe *witnesses*." Opp'n 5 (emphasis supplied). The errant plural – and the image it evokes of a team of corrupt lawyers chiseling at the foundation of our criminal justice system – signals the government's retreat from Brettschneider's necessity objection. *See* Opening Mem. POINT I.A.

The government's maneuver centers on the so-called "*overarching* objective" of the Gallman investigation. Opp'n 12 (emphasis supplied). While the government

---

[1]     Contrary to the government's suggestion, the Gallman wiretap did not "uncover[]" an "unrelated bribery scheme" involving "Attorney-A." Opp'n 5. In fact, New Jersey indicted Attorney-A on public corruption charges in mid-2011, years before Queens prosecutors took an interest in Gallman.

appears to acknowledge that Detective Santangelo's *immediate* concern in October 2014 was identifying the "single lawyer" who may or may not have been involved in the bribery attempt in *People v. Freeman*, it argues that the investigation's ultimate "goal" was the prosecution of "*all*" the "defendants and lawyers" who hired Gallman to "bribe witnesses." *Id.* at 13-14 (internal quotation marks omitted). It then assures that "normal law enforcement techniques" were insufficient to accomplish this grander "task." *Id.* at 14-15.

In its rush to chart the aspirations of the Gallman investigation, the government misses the point. Title III permits the use of wiretaps for the "narrow and particularized purpose" of investigating "the *specific* criminal offense" for which the authorities have "probable cause." *Berger v. New York*, 388 U.S. 41, 55-57 (1967) (emphasis supplied). The October 2014 wiretap application floated the possibility that "'more than one attorney'" had "'employed'" Gallman to bribe "other" witnesses (Opp'n 13). *See, e.g.,* Ex. A, Bates 117 (Detective Santangelo hazards that "some of the calls" referenced in his affidavit "indicate[] that attorneys *may be* knowledgeable participants in [other] witness bribery schemes"). But it established "probable cause" only with respect to *one* "particular" offense: Gallman's attempt to bribe Roshown Williams in connection with *Freeman*. 18 U.S.C. § 2518(3)(a);

As such, Detective Santangelo was obliged to address the very issue identified in POINT I.A. of Brettschneider's submission: whether "traditional investigative techniques would suffice to expose" the participants in the *Freeman* bribery offense.

*United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). Unable to argue that the Detective fulfilled this obligation on the basis of his affidavit alone, the government resorts to ventriloquism. *See* Opp'n 15-18. The government's surmise that "an attorney's knowledge and intent . . . could realistically be gleaned only through the attorney's conversations with Gallman" is just that: the government's surmise. Opp'n 16. There is no basis to conclude that Detective Santangelo and his team shared that opinion.[2]

Nor is there an indication that Detective Santangelo and his team worried that Gallman – almost 30 years after his last arrest involving violence – posed a physical threat to Roshown. *See* Opp'n 17. In fact, the evidence is to the contrary: the Detective explicitly opined that Gallman was hired to "bribe" Roshown and not to "subject" him to "physical intimidation or harm." Ex. A, Bates 107.

In the end, the government's suppositions are significant only because they are suppositions. Accurate or not, they do not appear in the affidavit that Detective Santangelo submitted to the court in October 2014. Their omission alone warrants judgment in Brettschneider's favor. *United States v. Concepcion*, 579 F.3d 215, 220 (2d Cir. 2009).

---

[2] In any case, the government's concern that investigators would be unable to ascertain the knowledge and intent of the attorney who "document[ed Roshown's false] recantation" is illusory. Opp'n 16. Any ambiguity on that score would evaporate the moment that Roshown demanded payment in the attorney's presence.

**A.92**

## B. THE INCIDENTAL INTERCEPTION DOCTRINE IS CATEGORICALLY INAPPLICABLE TO THE UNLAWFULLY SEIZED RDAP COMMUNICATIONS

The government makes a fatal miscalculation in its response to POINT I.B. of the opening memorandum. On the one hand, it effectively concedes that the November 10, 2014, application for an "Extended and Amended Eavesdropping Warrant" failed to establish probable cause to suspect a P.L. § 175.10 violation. Ex. B, Bates 137. On the other, it asserts that communications intercepted *solely* on the basis that they "relate[d]" to the unsubstantiated P.L. § 175.10 violation are admissible as "incidental interception[s]" under 18 U.S.C. § 2517(5). Opp'n 19. The two propositions are, upon examination, utterly incompatible.

The root cause of the government's confusion is its superficial reading of the Second Circuit's incidental interception jurisprudence. The government miscomprehends the law in two respects.

First, the incidental interception doctrine does not, as the government suggests, create an exception to the rule that "[w]iretaps may only be authorized to investigate [the designated] offenses specified in [18 U.S.C. §] 2516." *United States v. Rajaratnam*, No. 09-cr-1184, 2010 WL 4867402, at *3 (S.D.N.Y. Nov. 24, 2010); *see* 18 U.S.C. § 2518(3)(a) (conditioning the use of wiretaps on a judicial finding of "probable cause for belief that an individual is committing, has committed, or is about to commit a *particular offense enumerated in section 2516*") (emphasis supplied). Instead, the doctrine serves to identify circumstances in which communications intercepted on the basis of their

4

**A.93**

"'relat[ionship]'" to offenses "'specified'" in a warrant application may be used as evidence of some "'other'" unspecified offense.[3] *United States v. Goffer*, 721 F.3d 113, 122 (2d Cir. 2013) (quoting 18 U.S.C. § 2517(5)).

In *Goffer*, for instance, the government used wiretaps during the investigation and subsequent prosecution of defendants involved in an insider trading scheme. 721 F.3d at 118. The government's wiretap applications described the scheme as a wire fraud but "expressly noted" that communications related to that offense would also prove "securities fraud," which was "forthrightly" identified as an undesignated offense. *Id.* at 123. After they were convicted of the latter offense at trial, the defendants appealed on the theory that the "wiretap evidence should [have been] excluded because securities fraud is not a [Title III] predicate offense." *Id.* at 122.

Rejecting this argument, the Second Circuit concluded that the incidental interception rule applied despite the fact that "'communications related to other offenses'" had been "disclosed . . . *ex ante*" in the wiretap applications, instead of *ex post*

---

[3]   Section 2517(5) provides that "[w]hen a[] . . . law enforcement officer"

> engaged in intercepting . . . communication in the manner authorized herein, intercepts . . . communications *relating to offenses other than those specified in the order of authorization or approval*, the contents thereof . . . . and any evidence derived therefrom may be used [as evidence] . . . when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

18 U.S.C. § 2517(5).

**A.94**

in an application for judicial approval. *Id.* at 123 (quoting § 2517(5)); *see* Opening Mem. at 15-16 (describing Title III's "retroactive[]" approval process). The *Goffer* panel was careful, however, to limit its holding to situations in which the *same "conduct constituted both"* the designated and undesignated offense. *Id.* at 123 n.8 (emphasis supplied).

The government's second error is even more fundamental: it incorrectly assumes that the interception of a communication unrelated to a designated offense automatically "triggers" the application of § 2517(5). Opp'n 19. But a close look at the authorities upon which the government relies shows this assumption is unjustified. Virtually every case interpreting § 2517(5) notes that the statute applies *exclusively* to communications intercepted during the course of an "*otherwise lawful*" wiretap investigation. *Goffer*, 721 F.3d at 123 (emphasis supplied); *see, e.g.*, *In re Grand Jury Subpoena Served on Doe*, 889 F.2d 384, 388 (2d Cir. 1989) (approving government's use of evidence derived from a "lawfully obtained" wiretap warrant to prosecute undesignated tax offenses); *United States v. Masciarelli*, 558 F.2d 1064, 1068 (2d Cir. 1977) (citing the legislative history of Title III for the proposition that judges may "retrospectively approv[e]" the interception of "[wiretap] evidence related to unauthorized offenses" where, among other things, "the communication [at issue] was in fact [] intercepted during the course of a lawfully executed order") (internal quotation marks and citations omitted); *United States v. McKinnon*, 721 F.2d 19, 22-23 (1st Cir. 1983) (holding that "[e]vidence of crimes other than those authorized in a wiretap warrant are

# A.95

intercepted 'incidentally' when they are the by-product of a bona fide investigation of crimes specified in a *valid* warrant") (emphasis supplied).

Once the operation of § 2517(5) is properly understood, the futility of the government's position become apparent. For starters, the government can point to no authority – much less "binding authority" (Opp'n 19) – for the proposition that § 2517(5) sanctions the use of wiretap evidence to prove conduct that is legally and factually distinct from the Title III "predicate offense" specified in the underlying warrant. *Goffer*, 721 F.3d at 123. The contemplated use of wiretap evidence in this case – where communications intercepted on the basis of their supposed relationship to a New York P.L. § 175.10 violation would be received as evidence of an 18 U.S.C. § 1001 violation – is, therefore, wholly unprecedented.

Even if the incidental interception doctrine were broad enough to encompass the wiretap evidence in this case, it still would not apply. Unlike the evidence at issue in *Goffer* et al., the communications at issue here were intercepted under the false pretense that they related to a violation of P.L. § 175.10. *See* Opening Mem. 12-14. The wiretaps, then, were "[un]lawfully obtained" and categorically ineligible for admission as "incidental" under § 2517(5). *In re Doe*, 889 F.2d at 388; 18 U.S.C. §§ 2518(3)(a), (10)(a)(i).

**** 

In the end, the government's lengthy discourse on incidental interception adds a detour to the analysis set out in POINT I.B. of the opening memorandum. Both paths

terminate at the same conclusion: the failure of the November 10, 2014, wiretap application to establish "probable cause" renders wiretap communications concerning the RDAP letter inadmissible. *United States v. Fury*, 554 F.2d 522, 530 (2d Cir. 1977). The wiretaps must, therefore, be suppressed.

## <u>CONCLUSION</u>

The motion to suppress should be granted.

Dated:      New York, New York
            December 20, 2018

                                        Respectfully submitted,

                                            /s/

                                        Sarita Kedia
                                        Sarita Kedia Law Offices, P.C.
                                        5 East 22nd Street, Suite 7B
                                        New York, New York 10010
                                        (212) 681-0202
                                        skedia@kedialaw.com

                                        *Attorney for Scott Brettschneider*

On the brief:

        Sarita Kedia, Esq.
        Jonathan Savella, Esq.

8

# A.97

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 30 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,

       -against-

SCOTT BRETTSCHNEIDER et al.,

                Defendants.
------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
18-CR-123-1 (CBA)

**AMON, United States District Judge:**

Defendant Scott Brettschneider has been indicted for fraud and conspiracy to commit fraud related to false statements made to the United States Bureau of Prisons ("BOP"). (D.E. # 74 ("Indictment").) A significant portion of the government's evidence was secured through a wiretap obtained by the Queens County District Attorney's Office ("QCDA") on co-conspirator Charles Gallman's cell phone. Brettschneider has moved to suppress the wiretap evidence derived from that interception. For the reasons stated below, Brettschneider's motion is denied.

## BACKGROUND

### I. Proposed Trial Evidence

The government proffers that it will prove the following facts at trial. From 2012 until 2014, Brettschneider represented Richard Marshall in a criminal proceeding in United States v. Wright, et al., No. 12-CR-014 (FJS) (N.D.N.Y.). During the sentencing proceedings, Brettschneider submitted a psychological evaluation that stated that Marshall had been "clean and sober for over 20 years." (Id. D.E. # 338 at 2–3.) Marshall was sentenced and incarcerated at a federal penitentiary in Lewisburg, Pennsylvania. In October 2014, Brettschneider began working with co-conspirators Gallman and Reginald Shabazz-Muhammed to get Marshall admitted into the Residential Drug Abuse Program ("RDAP"), which they believed would help reduce Marshall's

1

**A.98**

prison sentence.  Brettschneider, Marshall, and Gallman had several phone conversations where they discussed creating a false letter to send to the BOP that would detail Marshall's purported history of substance abuse. These conversations began in October 2014 and were intercepted by the QCDA due to a wiretap previously initiated on Gallman's cell phone.

Of note are two conversations that took place on November 1, 2014.  In the first conversation, prior to Brettschneider joining a three-way call, Gallman and Marshall had an extensive discussion about the contents of the letter, ensuring that there was no "conflict" with Marshall's pre-sentence report, and determining that as long as "it's from a counselor who [is] board certified," there would not be any issues with admission into RDAP. (Santangelo Nov. Aff. ¶ 27.)  The two also agreed that Marshall would be sent a copy of the letter "through legal mails" so the BOP would not detect it. (Id.)  When Brettschneider joined the call, he stated that he had someone to write the letter, and just needed to "ask the person." (Id.)  Brettschneider then received details from Marshall as to the requested contents of the letter.  Marshall told Brettschneider that he "always" was in a program for drug treatment, that "I can be an outpatient or I can be an inpatient," and that he had a "drinking problem . . . or if you want to put drugs too, then whatever . . . ." (Id.)  Brettschneider then stated that he would "take care of it as soon as I get off the phone with you." (Id.)  Thirty minutes later, Brettschneider joined a second three-way call with Gallman and Marshall.  In that conversation, Brettschneider stated "he is gonna be able to do it," in an apparent reference to the individual he recruited to write the letter. (Id. ¶ 29.)  Brettschneider was temporarily disconnected from the phone call, but upon rejoining, asked Marshall "when do you need this thing by?" and if the letter was "to get [Marshall] into the program." (Id.)  Brettschneider stated on the call that the letter would be from "Shabazz's program." (Id.)

**A.99**

In November 2014, the federal penitentiary in Lewisburg received a letter signed by "Reginald Shabazz-Muhammad, CASAC CLA, Director of Program Services," detailing Marshall's purported treatment at the "Muhammed Mosque No. 7." The letter was dated November 6, 2014, was postmarked November 20, 2014, and stated that Marshall was involved in an outpatient program, was "suffering from active drug dependence, namely alcohol and marijuana," and had been "making progress gradually reducing his active substance dependence." Despite this letter, Marshall was not admitted into RDAP. When the BOP asked Shabazz-Muhammed for progress reports from Marshall's treatment, Shabazz-Muhammed stopped returning their calls. (D.E. # 118 ("Mem. in Opposition") at 4–5.)

## II.    Initial Wiretap Application on Gallman's Cell Phone

The QCDA-secured wiretap on Gallman's cell phone was initially obtained to investigate witness bribery in the QCDA's pending criminal case against Fredrick Freeman. Recorded conversations on a prison phone line between Freeman and his father led investigators to conclude that Gallman was hired to bribe Roshwon Williams, the critical witness in the case against Freeman. (Santangelo Oct. Aff. ¶¶ 6–7, 13–19.) In support of the QCDA's application to secure a wiretap on Gallman's cell phone, Detective Richard Santangelo stated that he learned that Gallman had approached Williams and stated to Williams, in sum and substance, "I need you to speak to a lawyer because we don't testify. We are black. We don't testify against one of our own black brothers. Come with me to one of my lawyers and put stuff in writing. I'll pay you." (Id. ¶ 20.) Williams rebuffed Gallman and then began cooperating with the QCDA. (Id.) Santangelo stated that Williams received three additional calls from Gallman's cell phone in the next several days. With Williams' consent, the QCDA then recorded a phone conversation between Williams and Gallman, a transcript of which was included in the wiretap application. (Id. ¶¶ 21–22.) In that

3

**A.100**

phone call, Gallman repeatedly stated that he "work[s] with a lot of lawyers," that he is a "n****

who helps n**** speak their cases," and that although he was "not a lawyer," he "worked for

lawyers." (Id. ¶ 22.)

Detective Santangelo attested that at the time of the wiretap application, it was "clear that

[Gallman] uses the [Gallman] cell phone in his efforts to bribe witnesses." (Id. ¶ 28.) He believed

a wiretap was required to determine "what other individuals [Gallman] may be contacting," "the

identity of the lawyer that [Gallman] want[ed Williams] to meet with," and "what additional

individuals may be involved in this activity, and whether the lawyer and/or others have knowledge

of the illegal nature of this activity." (Id.) Detective Santangelo also stated that a wiretap would

enable investigators to gain insights into Gallman's activities that they would be unable to derive

from physical surveillance: "For example, merely seeing [Gallman] in a lawyer's office, or

meeting with people, would not give [investigators] any insights into the nature of those meetings.

Even observing the payment of money, without the context of electronic surveillance, would not

be helpful in advancing the goals of this investigation." (Id. ¶ 30.) Finally, Detective Santangelo

stated that he believed that "it would be unsafe for the cooperating witnesses to accompany

[Gallman] anywhere, certainly not to meet with anyone Gallman has thus far refused to even

identify." (Id. ¶ 30.) As documented in the wiretap application, Gallman had an extensive criminal

history that included guilty pleas for manslaughter in the first degree and criminal possession of a

weapon in the second degree. (Id. ¶ 8.)

On October 15, 2014, Justice Robert McDonald of the Queens County Supreme Court

signed an eavesdropping warrant authorizing the interception of communications on Gallman's

cell phone "relating to the crime of Bribing a Witness." (Oct. Wiretap Order at 3.)   Justice

McDonald found that "essential evidence to the commission of [this] offense will be obtained by

4

**A.101**

intercepting the communications" on Gallman's cell phone, and that "comparable evidence essential for the prosecution" of this crime "could not be obtained by other investigative means." (Id. at 2–3.)

After securing the initial wiretap in October 2014, the QCDA heard the above-mentioned conversations between Gallman, Brettschneider and Marshall while monitoring the wiretap. On November 10, 2014, the QCDA made an application to Justice McDonald seeking continued authorization to intercept communications related to witness bribery, and requesting that he amend the wiretap order to additionally encompass communications related to falsifying business records, noting that there was now "probable cause to believe" that Gallman, Marshall, and Brettschneider "have committed, are committing, or are about to commit the crime of Falsifying Business Records in the First Degree." (Hagan Nov. Aff. ¶ 3.) Detective Santangelo's affidavit for the November 2014 wiretap application provided transcripts of the conversations that took place on November 1, 2014 between Gallman, Marshall, and Brettschneider where they agreed to generate a fraudulent letter to support Marshall's candidacy for RDAP. (Santangelo Nov. Aff. ¶¶ 27, 29.)

Justice McDonald reauthorized and amended the QCDA's wiretap application on November 10, 2014. The "Extended and Amended Eavesdropping Warrant" continued to authorize the interception of communications related to the crime of "Bribing a Witness," but also authorized the interception of communications related to the crime of "Falsifying Business Records in the First Degree and Conspiracy to commit [this] offense," (Nov. Wiretap Order at 4), a crime designated by the state of New York as eligible for wiretap investigation. See N.Y. C.P.L. § 700.05(8)(b); 18 U.S.C. § 2516(2). Conversations related to the RDAP fraud continued to be intercepted after the wiretap order was reauthorized and amended.

**A.102**

**DISCUSSION**

Brettschneider rests his motion to suppress the wiretap evidence obtained by the QCDA on three separate grounds: (1) that other less intrusive investigative procedures were not "tried or meaningfully considered" before seeking a wiretap; (2) that the November 2014 application to extend and renew the wiretap failed to establish probable cause for the commission of the "designated offense" of Falsifying Business Records in the First Degree, which requires the suppression of conversations related to the RDAP scheme; and (3) that the QCDA "misrepresented" when it learned about Brettschneider's conspiracy to submit a fraudulent letter to the BOP in order to appear compliant with New York State's statutory requirement that investigators make an application to amend an eavesdropping warrant within ten days of discovering communications that give rise to probable cause to believe that a crime not listed in the eavesdropping warrant is being committed. The Court addresses each in turn.

I.    **The October 2014 Wiretap Application met Title III's Necessity Requirement**

Brettschneider argues that all of the wiretap evidence obtained by the QCDA should be suppressed because the QCDA's October 2014 wiretap application failed to make a sufficient necessity showing as is required by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2518(1)(c).

In a federal case, "federal law governs the use of a state-issued eavesdropping warrant." United States v. Amanuel, 615 F.3d 117, 122 (2d Cir. 2010). Title III requires that wiretap applications provide a full and complete statement of the facts and circumstances relied upon by the applicant to establish probable cause, and a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C § 2518(1)(b), (c); United States v.

6

**A.103**

Rajaratnam, 719 F.3d 139, 144 (2d Cir. 2013). To satisfy the latter "necessity" requirement, the government must show that "investigative procedures less intrusive than a wiretap have been tried or are unlikely to succeed if tried." United States v. Lilla, 699 F.2d 99, 102 (2d Cir. 1983). The purpose of the necessity requirement "is not to preclude resort to electronic surveillance until all other possible means of investigation have been exhausted by investigative agents." United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990) (quoting United States v. Vazquez, 605 F.2d 1269, 1282 (2d Cir. 1979)). Instead, agents are only required to "inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." Id. The sufficiency of an applicant's necessity showing "is to be tested in a practical and commonsense fashion." Lilla, 699 F.3d at 103–04.

Brettschneider contends that the QCDA failed to sufficiently make a necessity showing because the less intrusive means of a more aggressive use of the informant coupled with surveillance was available to investigators. (D.E. # 106-2 ("Mem. in Support") at 6–7.) He argues that because Williams, who was cooperating with the QCDA at the time of the wiretap application, was invited to accompany Gallman to meet the lawyer working with Gallman, the QCDA had "a ready means of ascertaining both the attorney's identity and the extent of his criminal knowledge: they could have simply instructed [Williams] to call Gallman, ask for the lawyer's name, and then arrange a meeting with the lawyer at his office." (Mem. in Support at 9.)

When a defendant moves to suppress evidence obtained from a judicially authorized wiretap on the grounds that the Government failed to establish that ordinary investigative techniques were reasonably likely to be unsuccessful, the district court should grant "considerable deference" to the issuing court and review the wiretap application "only to determine whether the facts set forth by the Government were 'minimally adequate' to support the issuing court's order."

**A.104**

United States v. Bourne, No. 08-CR-888 (NGG), 2011 WL 4458856, at *11 (E.D.N.Y. Sept. 23, 2011) (quoting United States v. Concepcion, 579 F.3d 214, 217 (2d Cir. 2009)). Employing this standard, the Court determines that the facts set forth in the October wiretap application were sufficient for Justice McDonald to conclude that a wiretap was necessary to successfully prosecute the Freeman case.

The primary tools available to the QCDA at the time of the wiretap application were to employ physical surveillance of Gallman, to utilize Williams as an informant, and to monitor jailhouse communications. The application articulated that, "while productive at times," physical surveillance was a technique of "limited value," especially when Gallman was "conducting a meeting when the nature of the meeting is unknown." (Santangelo Oct. Aff. ¶ 29.) Employing Williams as a cooperator also provided "limited use," because to that point Gallman had been unwilling to "share with [Williams] the names of his co-conspirators," and would not discuss with Williams "his other clients or assignments," or even how Gallman had received Williams' contact information. (Id. ¶ 30.) And while Brettschneider contends that Williams simply could have been sent to a meeting with Gallman to determine the identity of the attorney, Detective Santangelo had determined that it would "be unsafe for the cooperating witnesses to accompany [Gallman] anywhere, certainly not to meet with anyone that [Gallman] has thus far refused to even identify." (Id.) And while "monitoring the jailhouse communications of Freeman ha[d] been helpful," Gallman was "very careful" about what was discussed during those calls, because he "kn[ew] the calls [we]re being monitored and recorded." (Id. ¶ 31.) Detective Santangelo's affidavit also articulated that there was "no reason to expect that [Gallman] would share any additional information with . . . an undercover officer," (id. ¶ 32), and that the use of a "search warrant for a location [was] not possible because no location ha[d] been identified to be searched," (id. ¶ 33).

8

**A.105**

Even if the QCDA had, as Brettschneider suggests, directed Williams to "ask for the lawyer's name and then arrange a meeting with the lawyer at his office," (Mem. in Support at 9), the investigation in the Freeman case would have remained incomplete. Learning the identity of the lawyer would have done little to reveal whether the lawyer had "knowledge of the illegal nature of th[e] activity." (Santangelo Oct. Aff. ¶ 28.) After imploring Williams not to testify, Gallman had offered to pay Williams to accompany him to a lawyer's office to "put stuff in writing." (Id. ¶ 20.) An attorney who conducted a meeting with Williams and Gallman and documented an affidavit or recantation might not have had reason to suspect that that the sworn statement was false or paid off. To determine if the attorney had criminal intent and was complicit in Gallman's witness bribery scheme, it would be important to monitor the conversations between the two parties. It is therefore clear to the Court that Justice McDonald was not wrong in his conclusion that a wiretap was necessary to fully investigate the Freeman case.

Moreover, Brettschneider's argument is premised on an overly myopic view of the investigation. The stated goal of the QCDA's investigation at the time of the October 2014 wiretap application was not limited to the Freeman case. Instead, it was to "identify all of the participants in, and beneficiaries of" the attempts to bribe witnesses. (Hagan Oct. Aff. ¶ 5.) There was a reasonable basis to believe that, beyond the Freeman case, Gallman was being paid "by other criminal defendants, possibly with the knowledge and assistance of criminal defense attorneys, to fix their cases as well." (Id. ¶ 2.) At the time of the wiretap application, the QCDA was not only seeking the "identity of the lawyer that [Gallman] want[ed] [Williams] to meet with," but also "what additional individuals may be involved in this activity, and whether the lawyer and/or others ha[d] knowledge of the illegal nature of [the] activity." (Santangelo Oct. Aff. ¶ 28.) Brettschneider

**A.106**

provides no argument as to how the QCDA could have uncovered the full scope of the scheme to bribe other witnesses without a wiretap.

He instead makes the unconvincing claim that the wiretap application failed to establish probable cause that Gallman was bribing witnesses in instances other than the Freeman case. The October 2014 wiretap application sufficiently demonstrated that there was probable cause to believe that Gallman's attempts to bribe witnesses extended beyond the Freeman case. Detective Santangelo's affidavit provided transcripts of conversations in which Gallman stated several times that he "work[s] with a lot of lawyers," and that he helps criminal defendants "speak their cases." (Santangelo Oct. Aff. ¶ 22.) Gallman also requested Williams come with him to meet with "one of my attorneys," which would suggest that Gallman works with more than one attorney in these types of transactions. (Id. ¶ 20.) Detective Santangelo also uncovered evidence that Gallman's "criminal activities [were] not solely limited to" the Freeman case. (Id. ¶ 24.) Specifically, a review of the prison telephone system at Rikers Island indicated that Gallman spoke to "many inmates" who were "hiring [Gallman] to perform 'work' on their cases." (Id.)    In one conversation, Gallman stated that he was not going to "beat this case" without an inmate sending him additional money. (Id.)    Finally, a detective in the QCDA anonymously called Gallman's cell phone while he was conducting physical surveillance of Gallman in the Queens County Criminal Courthouse during one of Freeman's court proceedings. (Id. ¶ 26.) The purpose of the detective's call was to ensure that the cell phone that had been making calls to the Rikers Island prison phone line in fact belonged to Gallman. When Gallman answered the call, the agent stated, "I was told to call you because I have a problem." Gallman replied, "You have the right person, I can help fix things." (Id. ¶ 26.) Considering this evidence, the Court concludes there was probable cause to believe that Gallman's witness bribery activities were not limited to the Freeman case.

# A.107

In sum, on the information provided in the wiretap application, Justice McDonald had a sufficient basis to conclude that comparable evidence could not be obtained by other investigative means both with regard to the investigation of the Freeman case itself and the investigation into other similar schemes.

## II.   The November 2014 Application Did Not Need to Separately Establish a Designated Offense

Under Title III, a court may authorize a wiretap only to investigate an offense that is enumerated in 18 U.S.C. § 2516.  18 U.S.C. § 2518(3)(a).  Section 2516(2) allows States to designate "major" state-law felonies that are "dangerous to life, limb, or property" to be investigated via a wiretap.  People v. Shapiro, 50 N.Y.2d 747, 764 (N.Y. 1980) (citing 18 U.S.C. § 2516).  New York has designated "falsifying business records in the first degree as defined in section 175.10 of the penal law," as an offense eligible for wiretap investigation, but has not listed falsifying business records in the second degree, N.Y.P.L. § 175.05, as a designated offense.  N.Y. C.P.L. § 700.05(8)(b).

Brettschneider argues that the QCDA's application on November 10, 2014 to amend and extend the October 2014 wiretap to cover the RDAP-related conversations presented "no plausible basis to suspect Gallman, Brettschneider and Marshall [were] in a conspiracy to falsify business records in the first degree" under New York Penal Law § 175.10.  (Mem. in Support at 11.) Instead, he asserts that "at best," Detective Santangelo's November 2014 application described a conspiracy to falsify business records in the second degree.  (Id. at 14.)  Because only the former is a designated offense under § 2516, Brettschneider contends that "the investigation achieved an end run around Title III's central mandate" that only "communications of designated offenses be obtained," and thus the RDAP-related conversations uncovered by the wiretap should be suppressed.  (Id. at 11.) (citations omitted).

11

**A.108**

Although it is true that Title III requires that an initial wiretap be authorized to investigate an offense covered by § 2516, "the statute recognizes that 'a law enforcement officer lawfully engaged in a search for evidence of one crime' may happen upon evidence of another crime not specified in the court's authorization order—and perhaps not specified in Section 2516 either." United States v. Rajaratnam, No. 09-CR-1185 (RJH), 2010 WL 4867402, at *3 (S.D.N.Y. Nov. 24, 2010) (quoting United States v. Masciarelli, 558 F.2d 1064, 1067 (2d Cir. 1977)). When this happens, "the public interest militates against [the officer's] being required to ignore what is in plain view." Masciarelli, 558 F.2d at 1067. As such, Title III has a separate portion of its statute, 18 U.S.C. § 2517(5), which "governs the use of evidence obtained on a wiretap 'relating to offenses other than those specified in the order of authorization or approval.'" United States v. Goffer, 721 F.3d 113, 122 (2d Cir. 2013) (quoting 18 U.S.C. § 2517(5)). Under § 2517(5), the government may utilize incidentally intercepted evidence of offenses "not listed in Section 2516," so long as the government makes a subsequent application that demonstrates that the wiretap was pursuant to an "original order [that] was lawfully obtained, that it was sought in good faith and not a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully intercepted order." Id. at 122–23 (quoting United States v. Marion, 535 F.2d 697, 700 (2d Cir. 1976)). A contrary rule would lead to the absurd result that "the government could not seize evidence allegedly related to 'non-enumerated' criminality merely because it happened to discover such evidence during the course of otherwise lawful electronic surveillance." United States v. Marcy, 777 F. Supp. 1400, 1403 (N.D. Ill. 1991).

Brettschneider does not claim that obtaining the October 2014 wiretap order was in bad faith or that the investigation into the Freeman case was a subterfuge search. And there is no plausible claim that the extended and amended order was a subterfuge to secure in bad faith

**A.109**

evidence of the RDAP scheme. The Court understands Brettschneider to be pressing a different and novel argument; namely, that there must be probable cause to support each enumerated designated offense; and if not, any interceptions regarding that unsupported offense must be suppressed. This is true under Brettschneider's theory even if there is admittedly probable cause to support another designated offense. Here the amended wiretap order authorized the continued interceptions for witness bribery, which Brettschneider concedes is a designated offense. Because the facts alleged in the wiretap application do not establish probable cause for the crime of falsifying business records in the first degree, he claims that any interceptions regarding that offense must be suppressed. He provides no authority to support this argument, and the law is to the contrary.

The Second Circuit has made clear that "an amended [wiretap] order can authorize the use of communications revealing evidence of crimes that could not have been investigated under an original order." In re Grand Jury Subpoena Served on Doe, 889 F.2d 384, 387 (2d Cir. 1989); see also United States v. Giordano, 172 F. Appx. 340, 342 (2d Cir. 2006) (holding that the court can "lawfully amend a wiretap authorization under 18 U.S.C. § 2517(5) to allow the use of evidence of crimes not specified at 18 U.S.C. § 2516"). Under § 2517(5), a judge may enter an amended wiretap order that extends to cover offenses "not listed in Section 2516, so long as there is no indication of bad faith or subterfuge by the . . . officials seeking the amended surveillance order." In re Grand Jury, 889 F.2d at 387.

In In re Grand Jury, communications related to violations of the federal tax laws, crimes not enumerated by § 2516, were intercepted during a lawful wiretap investigation of state enumerated offenses. Id. at 386. A state court judge "acting pursuant to . . . § 2517(5)" granted the investigators request to amend the wiretap order to allow the interception of communications

# A.110

related to the federal tax crimes. <u>Id.</u> The Second Circuit upheld the state judge's amended order. After acknowledging that "the federal tax offenses at issue could not properly be investigated in the first instance by a Section 2516 order," it concluded that "Congress intended that amended orders under Section 2517(5) could encompass crimes not listed in Section 2516. The Senate Report accompanying Section 2517(5) states that 'other' offenses under that section 'need not be designated offenses,' an apparent exemption from the requirement that the offense be among those designated in the Section 2516 list." <u>Id.</u> at 387 (citing S. Rep. No. 1097, 90th Cong., 2d Sess.). Moreover, as applicable here, the Circuit has recently noted that wiretap interceptions concerning non-designated offenses should not be suppressed because the "Government forthrightly discloses the probability of intercepting 'communications related to other offenses.'" <u>Goffer</u>, 721 F.3d at 123.

In re Grand Jury is directly on point. Contrary to his contention, the November 2014 wiretap order did not need to fit the RDAP-related conversations into a designated offense enumerated in § 2516.[1] Justice McDonald properly extended and amended the wiretap. There is no basis for suppression.

### III.    New York State's 10-Day Rule Does Not Apply in Federal Court

Finally, Brettschneider argues that the November 10, 2014 application to extend and amend the wiretap violated New York State's requirement that investigators must make an application to amend an eavesdropping warrant "within ten days" of discovering intercepted communications that give rise to "probable cause [] to believe that a crime not named in the warrant has been, is

---

[1] The Court notes that Justice McDonald did in fact find that the QCDA had demonstrated that there was probable cause that the co-conspirators were engaged in conspiracy to falsify business records in the first degree, an offense New York has deemed eligible for wiretap investigation pursuant to § 2516(2). However, because the RDAP-related conduct was not required to have been a designated offense in order for it to be permissibly utilized by the Government, the Court declines to evaluate Brettschneider's contention that there was only probable cause to substantiate falsifying business records in the second degree, but not in the first degree.

14

**A.111**

being, or is about to be committed." N.Y. C.P.L. § 700.65(4).  Specifically, Brettschneider contends that the November 10, 2014 wiretap application states that the QCDA first received interceptions about the RDAP conspiracy on November 1, 2014, when other documents indicate that the QCDA intercepted conversations related to the plan on October 16, 2014 and October 24, 2014.  (Mem. in Support at 14.)  In his motion papers, Brettschneider asked the Court to "apply the State law" in this case to find that "the warrant was invalid," and suppress the "communications related to the Marshall letter."  (Id. at 16–17.)

It is well settled that in a "federal case, federal law governs the use of a state-issued eavesdropping warrant." Amanuel, 615 F.3d at 122.  The federal statute has no ten-day time limit. Section 2517(5) of Title III only requires that notification of incidentally intercepted communications of crimes not mentioned in the authorizing warrant be made "as soon as practicable" in order for the communications to be disclosed at trial. 18 U.S.C. § 2517(5).  In light of this settled law, Brettschneider is no longer pressing the claim that the intercepted communications needed to have been reported to Justice McDonald "within ten days."

He now pursues a new theory.  Brettschneider contends that the notification provision of § 2516(5) requires that every conversation that was incidentally intercepted be included.  Because the QCDA's November 10, 2014 application only included transcripts of conversations that took place on November 1, 2014, he contends that the conversations on October 16, 2014 and October 24, 2014 should be suppressed.  This argument finds no support in the language of the statute or the case law interpreting it.  Section 2517(5) merely states that the contents of incidentally intercepted communications may be disclosed when authorized by a judge of competent jurisdiction.  "There is no requirement in § 2517 that the judge listen to or know about each such conversation," and there is no need for a judge to engage in a "conversation-by-conversation

# A.112

analysis." <u>United States v. Gambale</u>, 610 F. Supp. 1515, 1531 (D. Mass. 1985); <u>see also</u> Fishman & McKenna, <u>Wiretapping and Eavesdropping</u> § 16:20 ("18 U.S.C.A. § 2517(5) does not require the application to particularize and specify each conversation.").

Consistent with § 2517(5), the QCDA appropriately informed Justice McDonald of the RDAP-related fraud in its November 10, 2014 application to amend and extend the wiretap. There was no requirement that each and every conversation related to the RDAP-fraud be detailed in that application. As such, the conversations intercepted on October 16, 2014 and October 24, 2014 will not be suppressed.

<b>CONCLUSION</b>

For the reasons stated above, Brettschneider's motion to suppress the wiretap evidence is denied.

SO ORDERED.

Dated: January 2⬝, 2019
       Brooklyn, New York

                                        s/Carol Bagley Amon
                                        _____
                                        Carol Bagley Amon
                                        United States District Judge

<b>A.113</b>

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------X

**UNITED STATES OF AMERICA**

                                                   **18 CR 123 (S-1) (CBA)**

        -against-

**SCOTT BRETTSCHNEIDER,**

                      *Defendant.*

------------------------------------------------------X

## DEFENDANT SCOTT BRETTSCHNEIDER'S PRELIMINARY REQUESTS TO CHARGE

Sarita Kedia Law Office, P.C.
East 22nd Street, Suite 7B
New York, New York 10010
(212) 681-0202
skedia@kedialaw.com

*Attorney for Scott Brettschneider*

**A.114**

## **STATEMENT**

Defendant Scott Brettschneider respectfully requests that the Court include the following in its instructions to the Jury.

## **REQUEST NO. 1**

### General Charges

The defendant requests that the Court give its standard instructions, or those contained in Leonard B. Sand, John S. Siffert, Walter P. Loughlin & Steven A. Reiss, MODERN FEDERAL JURY INSTRUCTIONS CRIMINAL (2015), hereinafter ("Sand"), on the following matters:

1. Functions of the Court and Jury;

2. Indictment not Evidence;

3. Government as a Party;

4. Persons Not on Trial;

5 Statements of Court and Counsel Not Evidence;

6. Venue; and

7. Stipulations.

2

# **A.116**

## REQUEST NO. 2

## EQUALITY OF THE PARTIES

I remind you that in reaching your verdict, you are to perform your duty of finding the facts without bias or prejudice as to any party. You must remember that all parties stand as equals before a jury in the courts of the United States. You must also remember that it would be improper for you to allow any feelings you might have about the nature of the crimes charged to interfere with your decision-making process. This case is important to the defendants, who are charged with serious crimes. Equally, it is important to the government, for the enforcement of criminal laws is a matter of prime concern to the public. The fact that the prosecution is brought in the name of the United States does not entitle the government or its witnesses to any greater consideration than that accorded to any other party. By the same token, the government is entitled to no less consideration. The government and the defendant stand as equals at the bar of justice. Your verdict must be based solely on the evidence or the lack of evidence.

## REQUEST NO. 3

## PRESUMPTION OF INNOCENCE AND BURDEN OF PROOF

I instruct you that you must presume the defendant to be innocent of the crimes charged. Thus, the defendant, although accused of crimes in the indictment, began the trial with a "clean slate" - with no evidence against him. The indictment, as you already know, is not evidence of any kind. The law permits nothing but legal evidence presented before the jury in court to be considered in support of any charge against the defendant. The presumption of innocence alone, therefore, is sufficient to acquit the defendant. The burden is always upon the prosecution to prove every element of a crime charged beyond a reasonable doubt. This burden never shifts to the defendant, for the law never imposes upon the defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. The defendant is not even obligated to produce any evidence by cross-examining the government's witnesses.

It is not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt. So, what is a "reasonable doubt"? A reasonable doubt is a doubt based upon reason and common sense - the kind of doubt that would make a reasonable person hesitate to act in a matter of importance in his or her own personal life. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely or act upon it in the most important of his or her own affairs. Unless the government proves beyond a reasonable doubt that the defendant has committed each and every element of an offense charged

## A.118

in the indictment, you must find the defendant not guilty of that offense. The absence of evidence in a criminal case is a valid basis for reasonable doubt. Moreover, if you view the evidence in the case as reasonably permitting either of two conclusions - one of innocence, the other of guilt - you must of course adopt the conclusion of innocence. This does not mean that the government's burden of proof is ever less than proof beyond a reasonable doubt.

Authority: Adapted from 1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and Instructions, 12.10; and from the charge given by the Honorable Colleen McMahon in *United States v. Boykin*, S.D.N.Y., 10 Cr 391; *United States v. Bautista*, 252 F.3d 141, 145 (2d Cir. 2001).

**A.119**

## REQUEST NO. 4

## EVIDENCE – DIRECT AND CIRCUMSTANTIAL

There are two types of evidence that you may properly consider in deciding whether a defendant is guilty or not guilty. One type of evidence is called direct evidence. Direct evidence is evidence given by a witness who testifies to what she saw, heard, or observed, of her own knowledge acquired by virtue of her own senses.

Circumstantial evidence is evidence that tends to prove a disputed fact by proof of other facts. There is a simple example of circumstantial evidence that is often used in the courts. Assume that when you came into the courthouse this morning the sun was shining and it was a nice day. Assume that the courtroom blinds were drawn and you could not look outside. As you sat here, someone walked in with an umbrella that was dripping wet. Somebody else then walked in with a raincoat that was also dripping wet.

Now, you could not look outside of the courtroom to see whether or not it was raining, so you would have no direct evidence of that fact. But, on the combination of facts that I asked you to assume, it would be reasonable and logical for you to conclude that it had been raining. That is all there is to circumstantial evidence. You infer from an established fact the existence or the nonexistence of some other fact on the basis of your reason, experience and common sense. Circumstantial evidence is of no less value than direct evidence. In fact, it is a general rule that the law makes no distinction between direct and circumstantial evidence, but simply requires that before finding a

6

**A.120**

defendant guilty the jury must be satisfied of the defendant's guilt beyond a reasonable doubt from all of the evidence in the case. Circumstantial evidence may also raise a reasonable doubt as to a defendant's guilt.  A defendant's conduct, his acts, or his failure to act may refute the government's claims of criminal knowledge and intent.

Some circumstantial evidence may be susceptible to more than one inference - perhaps with one inference tending to indicate guilt and the other innocence. In such a case, in selecting any particular inference, you must keep in mind the presumption of innocence and that the prosecution has the burden of proving each defendant guilty beyond a reasonable doubt.

Authority: *United States v. Cassese*, 428 F.3d 92, 98-99 (2d Cir. 2005); *United States v. Glenn*, 312 F.3d 58, 64 & 70 (2d Cir. 2002) ("[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.") (internal quotation marks and citations omitted); *United States v. Desena*, 260 F.3d 150, 154 (2d Cir. 2001).

**A.121**

**REQUEST NO. 5**

**INFERENCE OF PARTICIPATION
FROM PRESENCE OR ASSOCIATION**

I instruct you that, as a matter of law, you may not infer that the defendant is guilty of participating in criminal conduct merely from the fact that he was present at the time the crime was being committed or even that he had knowledge it was being committed. Likewise, you may not infer that the defendant is guilty of participating in criminal conduct merely from the fact that he associated or worked with other people who were guilty of wrongdoing.

Authority: Adapted from Sand, Instr. 6-3, 6-4.

**A.122**

## **REQUEST NO. 6**

## **EVIDENCE OFFERED FOR A LIMITED PURPOSE (IF APPLICABLE)**

Some of the evidence you have heard during the trial was admitted for a limited purpose. What that means is that you can only consider the evidence for the particular purpose for which it was offered.

**A.123**

## REQUEST NO. 7

## CREDIBILITY OF WITNESSES

Now I come to one of the more important issue for all juries in any trial, the issue of credibility. You must now consider whether the witnesses were both truthful and accurate. A witness could believe that he or she was being truthful yet be mistaken and not able to recall facts accurately. Also, a witness could take the oath and still intentionally testify falsely. I am going to give you a few general instructions as to how you should go about determining whether witnesses are credible and reliable. I told you at the beginning of the trial that it was very important for you to listen and observe carefully the witnesses as they testified and to think about their testimony as they gave it.

You must now consider whether the witnesses told the truth and whether they knew what they were talking about. How do you determine that? It is really just a matter of your using your common sense, your good judgment and your experience. You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You may be guided by the appearance and conduct of the witness, or by the manner in which the witness testifies, or by the character of the testimony given. You may also weigh and determine evidence you find credible, if it is contrary to the testimony given.

Carefully scrutinize all the testimony you have heard, the circumstances under which each witness testified, and every matter in evidence that tends to show whether

# A.124

a witness is worthy of belief. Consider each witness' intelligence, motive, state of mind, and demeanor or manner while on the stand. Consider the witness' ability to observe the matters as to which he has testified, and whether he impresses you as having an accurate recollection of these matters. Consider any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness's testimony is supported or contradicted by other evidence in the case. Consider whether the witness has lied or told the truth in the past, and whether the witness has committed acts that cast doubt on his or her credibility.

Inconsistencies or discrepancies within the testimony of a witness may cause you to discredit what the witness says to you; and inconsistencies between the testimony of different witnesses may cause you to conclude that one or both are not telling the truth. But inconsistencies within a witness's testimony do not necessarily indicate that he or she is lying, and inconsistencies between witnesses do not necessarily indicate that either witness is lying. Two or more persons who witness an incident or transaction may see or hear it differently; and innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, consider whether you believe it results from innocent error or intentional falsehood.

In addition, you may consider whether a witness had any possible bias, any relationship to a party, any motive to testify falsely or any possible interest in the outcome of the case. These are simply factors that you may consider. If you find that a

witness has testified falsely as to any material fact or if you find that a witness has been previously untruthful when testifying under oath or otherwise, the law permits you to disregard the entire testimony of that witness. However, you may also accept only those parts that you believe to be truthful or which are corroborated by other independent evidence in the case.

After making your own judgment, relying on whatever factors you find it appropriate to consider, you should give the testimony of each witness such weight, if any, as you may think it deserves. It is for you, the jury, and for you alone, not the lawyers, not any of the witnesses, and not me as the judge, to decide the credibility of witnesses who appeared here and the weight that their testimony deserves.

As I told you at the beginning of the trial, you do not leave your common sense, good judgment or your life experiences behind you when you walk into the courtroom. You carry that background into the jury room during deliberations. Please remember, however, that you may not use your experience and common sense to fill in or create evidence that does not exist. You use them only to draw reasonable inference from proven fact or to weigh and evaluate the evidence provided during the trial.

Authority: Adapted from the charge of the Hon. Sonia Sotomayer in *United States v. Lech*, S.D.N.Y.. S2 94 Cr. 285-03, Tr. at 854-57 and the charge of the Hon. Colleen McMahon in *United States v. Boykin*. S.D.N.Y. 109 Cr 39.

**REQUEST NO. 8**

**WITNESS CREDIBILITY: BIAS AND HOSTILITY**

In connection with your evaluation of the credibility of the witnesses, you should specifically consider evidence of resentment or anger which some government witnesses may have towards the defendant. Evidence that a witness is biased, prejudiced or hostile towards the defendant requires you to view that witness' testimony with caution, to weigh it with care, and subject it to close and searching scrutiny.

Authority: Adapted from Sand, Instr. 7-2.

**A.127**

# REQUEST NO. 9

## WITNESS CREDIBILITY: USE OF
## COOPERATING WITNESS (IF APPLICABLE)

You have heard the testimony of cooperating witnesses who testified that they were participants in the crimes charged against the defendant. These witnesses told you that they were testifying in the hope that the government would write a letter to the witnesses' sentencing judge, which might cause the sentencing judge to sentence the witness more leniently. While the ultimate decision on sentencing rests with the judge, the witnesses would not qualify for a more lenient sentence without the government's recommendation.

The government is allowed to present testimony from witnesses who participated in the crime, and to present testimony from witnesses who are cooperating in the hope of receiving leniency in exchange for her testimony. Under our law, if the testimony of a single accomplice proves beyond a reasonable doubt that a particular defendant committed a charged crime, you may convict the defendant on the basis of that testimony alone. However, a cooperating witness's testimony is of such a nature that it must be scrutinized with great care and viewed with special caution. As always, it is for you to decide how much, if any, weight to give to these witness' testimony. You should bear in mind that a cooperating witness has an interest in this case different from that of any ordinary witness. A witness who realizes he or she may be able to obtain his or her own freedom, or receive a lighter sentence by giving testimony favorable to the

prosecution, has a motive to testify falsely. Hence, the need for caution and great care

when examining the testimony of these witnesses and in deciding what weight, if any,

to give to such testimony.

Authority: Adapted from the charge of the Hon. John M. Walker in *United States v. Chestman*, 88 Cr. 455 (JMW), Tr. at 862 and from the charge of Hon. Sonia Sotomayer in *United States v. Lech*, S.D.N.Y., S2 94 Cr. 285-03 (SS), Tr. at 857-58.

## REQUEST NO. 10

### WITNESS CREDIBILITY: NOT PROPER
### TO CONSIDER GUILTY PLEA (IF APPLICABLE)

You have heard testimony from witnesses who have pleaded guilty to charges arising out of the same facts that are at issue in this case. You may draw no conclusions or inferences of any kind about the guilt of the defendant on trial from the fact that one or more prosecution witnesses pleaded guilty, even if the witness pleaded guilty to similar charges. The decision of those witnesses to plead guilty was a decision those witnesses made about their own guilt. It may not be used by you in any way as evidence against or unfavorable to the defendant on trial here.

Authority: Adapted from Sand, Instr. 7-10.

16

**A.130**

## REQUEST NO. 11

## WITNESS CREDIBILITY: IMPEACHMENT
## BY PRIOR INCONSISTENT STATEMENTS

You have heard evidence that at some earlier time a witness has said or done something which counsel points out is inconsistent with the witness's trial testimony. Statements made by witnesses other than here in court are not evidence in this case. So why do lawyers ask witnesses if they made specific statements at some time in the past? They do it because evidence of a prior inconsistent statement might help you decide whether to believe the trial testimony of the witness.

I remind you that it is for you to decide whether the witness's prior statement actually conflicts with his trial testimony. If you decide that there is in fact a conflict, you may consider that fact in deciding how much of his or her trial testimony, if any, to believe. In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the witness had an explanation for the inconsistency; and whether that explanation appealed to your common sense.

It is your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent and, if so, how much, if any, weight to give to the inconsistent statement in determining whether to believe all or part of the witness's testimony.

Authority: Adapted from Sand, Instr. 7-19.

17

**A.131**

## **REQUEST NO. 12**

## **FALSUS IN UNUM**

If you find that any witness has testified falsely as to any material fact, the law permits you to disregard the entire testimony of that witness. Put another way, if someone lies to you about a fact that you deem important, then you can just throw out his entire testimony on the ground that someone who lies to you about one important thing can't be trusted in anything.

However, the issue of credibility need not be decided in an all-or-nothing fashion. You may accept as much of his or her testimony as you deem to be true and disregard whatever you feel is false. It is entirely up to you. This instruction applies to all witnesses—including law enforcement witnesses, accomplice/cooperating witnesses, and the other witnesses I have discussed with you.

**A.132**

# **REQUEST NO. 13**

## **MISSING WITNESS**

The law does not require the prosecution to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at trial. Nor does the law require the prosecution to produce as exhibits all papers and things mentioned in evidence. However, in judging the credibility of the witnesses who have testified and in considering the weight and effect of all evidence that has been produced, you may consider the prosecution's failure to call other witnesses or to produce other evidence shown by the evidence in the case to be in existence and to be available.

You will always bear in mind, as I stated many times in these instructions, the law never imposes on a defendant in a criminal case the burden of duty of calling any witness or producing any evidence and no adverse inferences may be drawn from his or her failure to do so.

Authority: *United States v. Mercado*, 93 Cr. 116 (E.D. Wis. 1994) (given); *United States v. Robinson*, 78 Cr. 106 (E.D. Wis. 1979) (given); Mathes & Devitt § 9.15. *See United States v. Torres*, 845 F2d. 1165, 1169 (2d Cir. 1988) (*quoting Graves v. United States*, 150 U.S. 118, 121 (1893)).

**A.133**

## **REQUEST NO. 14**

## **UNCALLED WITNESSES (IF APPLICABLE)**

You have heard evidence about a witness who has not been called to testify. The defense has argued that the witness could have given material testimony in this case and that the government was in the best position to produce this witness. If you find that this uncalled witness could have been called by the government and would have given important new testimony, and that the government was in the best position to call him, but failed to do so, you are permitted, but you are not required, to infer that the testimony of the uncalled witness would have been unfavorable to the government. In deciding whether to draw an inference that the uncalled witness would have testified unfavorably to the government, you may consider whether the witness's testimony would have merely repeated other testimony and evidence already before you.

Authority: Adapted from Sand, Instr. 6-5.

**A.134**

## REQUEST NO. 15

## CHARACTER TESTIMONY (IF APPLICABLE)

You have heard testimony that Mr. Brettschneider has a good reputation for honesty and integrity in the community where he works and lives. Along with all the other evidence you have heard, you may take into consideration what you believe about his honesty and integrity when you decide whether the government has proven, beyond a reasonable doubt, that he committed the crimes with which he has been charged. Indeed, evidence presented about a defendant's character may alone be a sufficient basis to acquit him.

Authority: Adapted from the charge given in *United States v. Black*, Dkt. No. 00 Cr. 932 (SDNY 2002) (WHP); *United States v. Han*, 230 F.3d 560, 564 (2d Cir. 2000).

21

**A.135**

# REQUEST NO. 16

## LAW ENFORCEMENT WITNESSES

You have heard the testimony of witnesses employed as law enforcement officials. The fact that a witness may be employed by the government as a law enforcement official or employee does not mean that his or her testimony is necessarily deserving of any more or any less consideration, or greater or lesser weight, than that of any other witness. As with other witnesses, you may consider whether that law enforcement witness's testimony is colored by a personal or a professional interest in the outcome of the case. It is your decision, after reviewing all of the evidence, whether to accept the testimony of the law enforcement witness and to give that testimony whatever weight, if any, you find it deserves.

Authority: Adapted from Sand, Instr. 7-16.

22

**A.136**

## REQUEST NO. 17

## EXPERT WITNESSES (IF APPLICABLE)

You have heard testimony from what we call an expert witness. Expert witnesses are witnesses who, by education or experience, have acquired learning in a science or a specialized area of knowledge. Such witnesses are permitted to give their opinions as to relevant matters in which they profess to be experts and give their reasons for their opinions. Expert testimony is presented to you on the theory that someone who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

Your role in judging credibility applies to experts as well as to other witnesses. You should consider the expert opinions that were received in evidence in this case and give them as much or as little weight as you think they deserve. If you should decide that the opinion of an expert was not based on sufficient education, experience, or data, or if you should conclude that the trustworthiness or credibility of an expert is questionable for any reason, or if the opinion of the expert was outweighed, in your judgment, by other evidence in the case, then you might disregard the opinion of the expert entirely or in part.

On the other hand, if you find the opinion of an expert is based on sufficient data, education, and experience, and the other evidence does not give you reason to

A.137

doubt his or her conclusions, you would be justified in placing great reliance on the expert's testimony.

Authority: Adapted from the charge of the Hon. Pierre N. Leval in *United States v. Mucciante*, 91 Cr. 403 (PNL) (S.D.N.Y. 1992); adapted from the charge of the Hon. Michael B. Mukasey in *United States v. Mensah*, 91 Cr. 705 (MBM) (S.D.N.Y. 1991).

**A.138**

## **REQUEST NO. 18**

## **DEFENDANT'S DECISION TO TESTIFY (IF APPLICABLE)**

The defendant in a criminal case never has any duty to testify or come forward with any evidence. This is because, as I have instructed you, the government bears the burden of proof beyond a reasonable doubt at all times, and the defendant is presumed innocent. If the defendant nonetheless chooses to testify, he is, of course, permitted to take the witness stand on his own behalf.

In this case, Mr. Brettschneider decided to testify. You should examine and evaluate his testimony just as you would the testimony of any other witness with an interest in the outcome of this case. You should not disregard or disbelieve his testimony simply because he is charged as a defendant in this case.

Authority: Adapted from Sand, Instr. 7-4, citing, inter alia, *United States v. Gaines*, 457 F.3d 238 (2d Cir. 2006); adapted from the charge in *United States v. Martin*, 525 F.2d 703 (2d Cir. 1975).

## REQUEST NO. 19

## DECISION OF DEFENDANT NOT TO TESTIFY (IF APPLICABLE)

A defendant in a criminal case has an absolute right under our Constitution not to testify. The fact that Mr. Brettschneider did not testify must not be discussed or considered by you in any way when deliberating and in arriving at your verdict. No inference of any kind may be drawn from the fact that Mr. Brettschneider decided to exercise his privilege under the Constitution and did not testify. As I stated before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or of producing any evidence.

Authority: Adapted from Kevin F. O'Malley, *et al.*, Federal Jury Practice & Instructions: Criminal (6th ed. 2008) ("O'Malley"), § 15:14.

## REQUEST NO. 20

## INDICTMENT MERELY AN ACCUSATION

As I told you at the beginning of the trial, an indictment is not evidence. An indictment is a formal method of bringing a case into court for trial and determination by a jury. It describes the charges against the defendant. The fact that a person has been indicted creates no presumption that a crime was committed and no inference of any kind may be drawn from the indictment. Under our law, any person accused of committing a crime is presumed to be innocent. Therefore, you may not consider the fact that the defendant was indicted as evidence of any guilt.

Authority: Adapted from the charge given by the Hon. Colleen McMahon in *United States v. Boykin*, S.D.N.Y., 10 Cr 391.

**A.141**

## **REQUEST NO. 21**

## **CONDUCT NOT SPECIFICALLY CHARGED**

The defendant is not on trial for any act or conduct not specifically charged in the indictment.

Authority: *United States v. Rivera*, 04 Cr. 283 (E.D. Va. 2005).

# REQUEST NO. 22

## DUTY TO DELIBERATE AND REACH A UNANIMOUS VERDICT

The government, to prevail, must prove the essential elements by the required degree of proof, as already explained in these instructions. The verdict must be unanimous with respect to the defendant. Your function is to weigh the evidence in the case and determine whether or not the defendant is guilty, solely upon the basis of such evidence.

Each juror is entitled to his or her opinion; each should, however, exchange views with his or her fellow jurors. That is the very purpose of jury deliberation – to discuss and consider the evidence; to listen to the arguments of fellow jurors; to present your individual views; to consult with one another; and to reach an agreement based solely and wholly on the evidence – if you can do so without violence to your own individual judgment. Each of you must decide the case for yourself, after consideration, with your fellow jurors, of the evidence in the case. But you should not hesitate to change an opinion which, after discussion with your fellow jurors, appears erroneous.

However, if, after carefully considering all the evidence and the arguments of your fellow jurors, you entertain a conscientious view that differs from the others, you are not to yield your conviction simply because you are outnumbered. Your final vote must reflect your conscientious belief as to how the issues should be decided. Your verdict, whether guilty or not guilty, must be unanimous.

Authority: Adapted from Sand, Instr. 9-7.

29

**A.143**

## **REQUEST NO. 22**

## **AUDIO RECORDINGS AND TRANSCRIPTS**

The government [the parties] has [have] been permitted to hand out typed documents which were prepared containing the government's [parties'] interpretation of what appears on certain of the tape recordings which have been received as evidence. Those were given to you as an aid or guide to assist you in listening to the tapes. However, they are not in and of themselves evidence. Therefore, when the tapes were played, I advised you to listen very carefully to the tapes themselves.

You alone should make your own interpretation of what appears on the tapes based on what you heard. If you think you heard something differently than appeared on the transcript then what you heard is controlling. Let me say again, you, the jury, are the sole judges of the facts.

Authority: Adapted from Sand, Instr. 5-9.

## REQUEST NO. 23

## SUMMARY CHARTS (IF APPLICABLE)

The parties have presented exhibits in the form of charts and summaries. These exhibits purport to summarize the underlying evidence that was used to prepare them and were shown to you to make the other evidence more meaningful and to aid you in considering the evidence. They are no better than the testimony or documents upon which they are based and are not themselves independent evidence. Therefore, you are to give no greater weight to these charts and summaries than you would give to the evidence on which they are based. It is for you to decide whether the charts and summaries correctly present the information contained in the testimony and in the exhibits on which they were based. You are entitled to consider the charts and summaries if you find that they are of assistance to you in analyzing and understanding the evidence.

Authority: Adapted from Sand, Instr. 5-13.

A.145

## **REQUEST NO. 24**

## **DEMONSTRATIVE AIDS**

At various times during the trial, the parties have used demonstrative aids to assist you in considering the evidence or testimony at trial. These demonstrative aids are not in evidence and you should not consider them as such. However, you may consider these aids if you find them useful in assessing the evidence or testimony.

**A.146**

## **REQUEST NO. 25**

### **RIGHT TO SEE EXHIBITS AND HAVE**
### **TESTIMONY READ DURING DELIBERATIONS**

You are about to go into the jury room and begin your deliberations. If during those deliberations you want to see any of the exhibits, they will be sent to you in the jury room upon request. If you want any of the testimony read, that can also be done. But, please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting exhibits or portions of testimony which you may want. Your requests for exhibits or testimony—in fact any communication with the court – should be made to me in writing, signed by your foreperson, and given to one of the marshals.

I will respond to any questions or requests you have as promptly as possible, either in writing or by having you return to the courtroom so I can speak with you in person. In any event, do not tell me or anyone else how the jury stands on the issue of the defendant's guilt until after a unanimous verdict is reached.

Authority: Sand Instr. 9-3.

A.147

## **REQUEST NO. 26**

## **USE OF NOTES**

If you took notes during the trial, those notes are only an aid to recollection – they are not a substitute for your recollection of the evidence in the case. Your notes are not evidence. They are not entitled to any greater weight than your actual recollection or the impression of each juror as to what the evidence actually is. If you took notes, you must not show your notes to any other juror during your deliberations. If you did not take notes during the trial, you should not be influenced by the notes of another juror, but instead rely upon your own recollection of the evidence. The fact that a particular juror has taken notes does not entitle that juror's views to any greater weight. If, during deliberations, you have any doubt as to any of the testimony, you will be permitted to request that the official transcript be read to you.

Authority: Adapted from Sand, Instr. 1-3.

**A.148**

## REQUEST NO. 27

## COMMUNICATION WITH COURT AND VERDICT FORM

You should by your own vote select one of your members to sit as your foreperson. The foreperson will send out any notes, and when the jury has reached a verdict, he or she will notify the marshal outside your door that the jury has reached a verdict, and when you come into open court, the foreperson will be asked to state what the verdict is. Again, notes should be signed and should include the date and time they were sent. They should also be as clear and precise as possible. Any notes from the jury will become part of the record in this case. So please be as clear and specific as you can be in any notes you send.

We have prepared a verdict form for you to use in recording your decisions. After you have reached a verdict, the foreperson should fill in the verdict sheet, sign it noting the date and time, and then give a note to the marshal outside your door stating that you have reached a verdict. Do not specify what the verdict is in your note. Instead, the foreperson should retain the verdict sheet, and hand it to me in open court when you are all called in. I will stress again that each of you must be in agreement with the verdict that is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

**A.149**

## REQUEST NO. 28

## COUNT ONE - CONSPIRACY, GENERALLY

A conspiracy to commit a crime is an entirely separate and different offense from the substantive crime that may be the objective of the conspiracy. The essence of the crime of conspiracy is an agreement or understanding to violate other laws. Thus, to prove a conspiracy charge, there is no need to prove that the crime or crimes that were the objective of the conspiracy were actually committed. You may, however, consider whether or not the crime or crimes that were the objective of the conspiracy were or were not completed in determining whether or not there existed a conspiracy to commit those crimes.

The defendant is charged in Count One with participating in a conspiracy to violate section 1001(a) of Title 18 of the United States Code. The conspiracy statute, Section 371 of Title 18 of the United States Code,  provides as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose and one or more of such persons do any act to effect the object of the conspiracy, each [is guilty of a crime].

## **REQUEST NO. 29**

## **COUNT ONE – ELEMENTS OF CONSPIRACY**

In order to sustain its burden of proof with respect to the allegation of conspiracy charged in Count One, the government must separately prove beyond a reasonable doubt the following three elements:

<u>First</u>, the existence of the conspiracy charged – that is, the existence of an agreement or understanding to violate laws of the United States that make it a crime to make materially false statements to a government agency;

<u>Second</u>, that the defendant knowingly and willfully became a member of that conspiracy;

<u>Third</u>, that one of the conspirators knowingly committed at least one overt act in furtherance of the conspiracy during the life of the conspiracy; and

<u>Fourth</u>, that the overt act which you find to have been committed, if any, was committed to further some objective of the conspiracy.

Now let us separately consider each of the four elements.

Authority: Adapted from Sand, Inst. 19-3, 19-8.

**REQUEST NO. 30**

**COUNT ONE – EXISTENCE OF THE CONSPIRACY**

The first element that the government must prove beyond a reasonable doubt is that two or more persons entered the unlawful agreement charged in the indictment.

In order for the government to satisfy this element, you need not find that the alleged members of the conspiracy met together and entered into any express or formal agreement.  Similarly, you need not find that the alleged conspirators stated, in words or writing, what the scheme was, its object or purpose, or every precise detail of the scheme or the means by which its object or purpose was to be accomplished. What the government must prove is that there was a mutual understanding – that is, a meeting of the minds – between two or more people to cooperate with each other to accomplish an unlawful act.

You may, of course, find that the existence of an agreement to disobey or disregard the law has been established by direct proof.  However, since conspiracy is, by its very nature, characterized by secrecy, you may also infer its existence from the circumstances of this case and the conduct of the parties involved.

In a very real sense, then, in the context of conspiracy cases, actions often speak louder than words. In this regard, you may, in determining whether an agreement existed here, consider the actions and statements of all of those you find to be participants as proof that a common design existed on the part of the persons charged to act together to accomplish an unlawful purpose. Conversely, you may consider the

38

**A.152**

defendant's or an alleged co-conspirators failure to act as evidence that no agreement existed or that the defendant did not have the same understanding as his alleged co-conspirators.

Authority: Sand, Instr. 19-4; *United States v. Sperling*, 506 F.2d 1323, 1342 (2d Cir. 1975).

**A.153**

## REQUEST NO. 31

## COUNT ONE – MEMBERSHIP IN THE CONSPIRACY

The second element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that the defendant unlawfully, knowingly and willfully participated in the conspiracy with the specific intent to commit the offense that was the object of the conspiracy – in this case, making materially false, fictitious and fraudulent statements and representations regarding Richard Marshall's history of substance and alcohol abuse and treatment in a letter to a BOP employee in an effort to assist Marshall in fraudulently gaining entry into the Residential Drug Abuse Program at the U.S. Penitentiary Lewisburg.

If you are satisfied that the conspiracy charged in the Indictment existed, you must next ask yourselves who the members of that conspiracy were. In deciding whether the defendant whom you are considering was, in fact, a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the conspiracy.  Did he participate in it with knowledge of its unlawfulness, its unlawful purpose and with the specific intention of furthering its objective?

An act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidently. An act is done willfully if it is done with an intention to do something the law forbids, that is, with a bad purpose to disobey the law.

40

**A.154**

In that regard, it has been said that in order for a defendant to be deemed a participant in a conspiracy, he must have had a stake in the venture or its outcome. You are instructed that, while proof of a financial interest in the outcome of a scheme is not essential, if you find that the defendant had such an interest, that is a factor which you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the Indictment. Of course, you may also consider the lack of evidence that the defendant had any stake in the outcome of the scheme charged in reaching your determination whether the government has proved beyond a reasonable doubt his membership in the charged conspiracy.

As I mentioned a moment ago, before the defendant can be found to have been a conspirator, you must first find that he knowingly joined in the unlawful agreement or plan. The key question, therefore, is whether the defendant joined the conspiracy with an awareness of the aims and purposes of the unlawful agreement.

It is important for you to note that the defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements and the reasonable inferences which may be drawn from them.

I want to caution you that a defendant's mere presence at the scene of the alleged crime does not, by itself, make him a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may know, or be friendly with, a criminal, without being a criminal himself.

41
**A.155**

I also want to caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient. Moreover, the fact that the acts of the defendant, without knowledge, merely happen to further the objectives of the conspiracy does not make the defendant a member.  More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the conspiracy's objectives and with the intention of aiding in the accomplishment of those unlawful ends. In other words, you may not infer that the defendant is guilty of participating in criminal conduct merely because he associated with other conspirators at the time the crime was being committed, even if he had knowledge that it was being committed. Therefore, it is impermissible to infer guilt from mere presence or association.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering the illegal undertaking. He thereby becomes a knowing and willing participant in the unlawful agreement — that is to say, a conspirator.

Authority: Sand, Instr. 19-6; *United States v. Richards*, 302 F.3d 58, 69 (2d Cir. 2002); *United States v. Podlog*, 35 F.3d 699, 705 (2d Cir. 1994).

42

**A.156**

## REQUEST NO. 32

## COUNT ONE – OVERT ACTS

The third element in the crime of conspiracy is the requirement of an overt act.

To sustain its burden of proof with respect to the conspiracy charged in Count One, the government must show beyond a reasonable doubt that at least one overt act was committed in furtherance of the conspiracy by at least one of the co-conspirators at or about the time of the conspiracy set forth in the Indictment in the Eastern District of New York.

The purpose of the overt act requirement is that there must have been something more than a mere agreement; some overt step or action must have been taken by at least one of the conspirators in furtherance of the conspiracy.

Paragraphs 2(a)-2(I) of the Indictment sets forth the overt acts that were taken in furtherance of the conspiracy. They read as follows:

(a) On or about October 16, 2014, Gallman and Marshall discussed the Letter during a telephone call;

(b) On or about October 24, 2016, Brettschneider, Gallman and Marshall discussed the Letter during a telephone call;

(c) On or about November 1, 2014, Brettschneider, Gallman and Marshall discussed the Letter during two telephone calls;

(d) On or about November 6, 2014, Reginald Shabazz-Muhammad ("Shabazz-Muhammad") falsely stated in the Letter that Marshall had been enrolled in a treatment program through Muhammad Mosque No. 7 between October 2003 and January 2010;

(e) On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that Marshall was suffering from "active drug dependence, namely alcohol and marijuana" when he enrolled in RDAP;

(f) On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that while enrolled in the treatment program, Marshall was "gradually reducing his active substance dependence";

(g) On or about November 6, 2014, Shabazz-Muhammad signed the Letter falsely purporting to be the Director of Program Services at the Ministry of Health and Human Services, Muhammad Mosque No. 7;

(h) On or about November 14, 2014, Brettschneider and Marshall discussed the Letter during a telephone call;

(i) On or about November 20, 2014, Shabazz-Muhammad caused the Letter to be deposited in the mail and sent to a BOP employee at USP Lewisburg;

(j) On or about November 23, 2014, Brettschneider and Marshall discussed the Letter during a telephone call;

(k) On or about December 6, 2014, Brettschneider, Gallman and Marshall discussed the Letter during a telephone call; and

(l) On or about December 6, 2014, Brettschneider, Gallman, Marshall and Shabazz-Muhammad, during a telephone call, discussed creating false treatment program progress reports to supplement the Letter.

Authority: Sand, Instr. 19-7.

**A.159**

## REQUEST NO. 33

### FOURTH ELEMENT – COMMISSION OF
### OVERT ACT IN FURTHERANCE OF THE CONSPIRACY

The fourth and final element which the government must prove beyond a reasonable doubt is that the overt act was committed for the purpose of carrying out the unlawful agreement. In order for the government to satisfy this element, it must prove, beyond a reasonable doubt, that at least one overt act was knowingly and willfully done by at least one conspirator in furtherance of some object or purpose of the conspiracy, as charged in the Indictment.

Authority: Sand, Instr. 19-8.

**A.160**

**REQUEST NO. 34**

**COUNT TWO - GENERAL INSTRUCTIONS**

You will observe that Count Two of the indictment charges that the defendant knowingly and willfully made materially false, fictitious or fraudulent statements or representations in a matter within the jurisdiction of the executive branch of the United States government.

The relevant statute on this subject is section 1001(a) of Title 18 of the United States Code. It provides in relevant part that:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious or fraudulent statement or representation . . . shall be [guilty of a crime].

Authority: Sand, Instr. 36-01.

47

**A.161**

## REQUEST NO. 35

## COUNT TWO - ELEMENTS OF THE OFFENSE

In order to prove the defendant guilty of the crime charged in Count Two of the indictment, the government must prove five elements beyond a reasonable doubt. The elements that the government must prove are as follows:

First, on or about the date specified in the indictment, the defendant made a statement or representation;

Second, this statement or representation was material;

Third, the statement or representation was false, fictitious or fraudulent;

Fourth, the false, fictitious or fraudulent statement was made knowingly and willfully; and

Fifth, the statement or representation was made in a matter within the jurisdiction of the government of the United States.

Authority: Sand, Instr. 36-13.

**A.162**

## REQUEST NO. 36

## COUNT TWO - STATEMENT OR REPRESENTATION

The first element that the government must prove beyond a reasonable doubt is that the defendant made a statement or representation. In this regard, the government need not prove that the defendant physically made or otherwise personally prepared the statement in question. It is sufficient if the defendant knowingly caused the false statement charged in the indictment to have been made. Under this statute, there is no distinction between written and oral statements.

Authority: Sand, Instr. 36-10.

**A.163**

**REQUEST NO. 37**

**COUNT TWO - MATERIALITY**

The second element the government must prove beyond a reasonable doubt is that the defendant's statement or representation was material. A statement or representation is material if it is capable of influencing the decision of the government agency or government official to which it was addressed. Accordingly, whether the false statements or representations in this case were material turns on their capacity to influence the Bureau of Prisons.

Authority: Sand, Instr. 36-11; *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012); *United States v. Coplan*, 70. F.3d 46, 79 (2d Cir. 2012).

**A.164**

## **REQUEST NO. 39**

## **COUNT TWO - FALSE, FICTITIOUS OR FRAUDULENT STATEMENT**

The third element that the government must prove beyond a reasonable doubt is that the statement or representation was false, fictitious or fraudulent. A statement or misrepresentation is "false" or "fictitious" if it was untrue when made and known at the time to be untrue by the person making it or causing it to be made. A statement or representation is "fraudulent" if it was untrue when made and was made or caused to be made with the intent to deceive the government agency to which it was submitted.

Authority: Sand, Instr. 36-12.

**A.165**

## REQUEST NO. 40

## COUNT TWO -  KNOWING AND WILLFUL CONDUCT

The fourth element which the government must prove beyond a reasonable doubt is that the defendant acted knowingly and willfully. As I previously instructed you, an act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidently. An act is done willfully if it is done with an intention to do something the law forbids, that is, with a bad purpose to disobey the law.

Authority: Sand, Instr. 36-13.

**A.166**

## REQUEST NO. 41

## COUNT TWO - MATTER WITHIN THE
## JURISDICTION OF THE UNITED STATES GOVERNMENT

As I have told you, the fifth element with respect to Count Two is that the statements or representations be made with regard to a matter within the jurisdiction of the government of the United States. I charge you that the Bureau of Prisons is an agency within the executive branch of the United States government.

Authority: Sand, Instr. 36-14.

**A.167**

## <u>CONCLUSION</u>

Mr. Brettschneider respectfully reserves the right to submit additional or modified requests at or near the close of evidence.

Dated:      New York, New York
            March 11, 2019

                              Respectfully submitted,

                                    /s/

                              Sarita Kedia
                              Sarita Kedia Law Offices, P.C.
                              5 East 22nd Street, Suite 7B
                              New York, New York 10010
                              (212) 681-0202
                              skedia@kedialaw.com

                              *Attorney for Scott Brettschneider*

**A.168**

MEG:AS/LKG
F.#2015R01691

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    18 CR 123 (S-1)(CBA)

        - against -

SCOTT BRETTSCHNEIDER,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE GOVERNMENT'S REQUESTS TO CHARGE

                                RICHARD P. DONOGHUE
                                United States Attorney
                                Eastern District of New York
                                271 Cadman Plaza East
                                Brooklyn, New York 11201

Lindsay K. Gerdes
Andrey Spektor
Assistant U.S. Attorneys
        (Of Counsel)

<u>TABLE OF CONTENTS</u>

**Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**Preliminary Statement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

**Request No. 1: General Requests** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

**Request No. 2: Knowledge and Intent** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Request No. 3: Co-Conspirator Statements and Liability** . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Request No. 4: Aiding and Abetting** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

**Request No. 5: Count Two: Making False Statements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

Purpose of the Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Elements of the Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

First Element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

Second Element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

Third Element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fourth Element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

Fifth Element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

**Request No. 6: Count One: Conspiracy to Make False Statements** . . . . . . . . . . . . . . . . . . .14

Overt Acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

**Request No. 7: Interviews of Witnesses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

**Request No. 8: All Available Witnesses and Evidence Need Not Be Produced** . . . . . . . . . . 20

**Request No. 9: Uncalled Witnesses Equally Available** . . . . . . . . . . . . . . . . . . . . . . . . . . .21

**Request No. 10: Other Persons Not On Trial** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

**Request No. 11: Basing Verdict On Sympathy Is Impermissible.** . . . . . . . . . . . . . . . . . . . . .23

**Request No. 12: Punishment Should Not Be Considered** . . . . . . . . . . . . . . . . . . . . . . . . . .24

i

**A.170**

**Request No. 13: Evidence Obtained Pursuant To Lawful Procedures/Investigative Techniques**. . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

**Request No. 14: Transcripts of Recordings**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

ii

**A.171**

PRELIMINARY STATEMENT

   Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the government requests that the Court include the following instructions in its charge to the jury.   In addition, the government requests leave to offer amended or additional instructions as may become appropriate during the course of the trial.   Finally, the government requests that the Court provide the attached special verdict sheet to the jury.   <u>See</u> Exhibit A.

**A.172**

REQUEST NO. 1

<u>GENERAL REQUESTS</u>

The government requests that the Court charge the jury in its usual manner on the following subjects:

1.        The Role of the Court and the Duties of the Jury;

2.        Equality of the Parties Before the Court;

3.        Jury Communications with Lawyers and the Court;

4.        "And" Means "Or";

5.        Presumption of Innocence;

6.        Dates Approximate;

7.        Burden of Proof and Reasonable Doubt;

8.        Circumstantial Evidence and Direct Evidence;

9.        Function of the Indictment and What is Not Evidence;

10.        Permissible Inferences Drawn from the Evidence;

11.        Stipulations and Objections;

12.        Redacted Exhibits Appropriate (if applicable):

13.        Credibility of Witnesses;

14.        No Inference to Be Drawn from the Defendant's Failure to Testify (if applicable);

15.        Deliberations;

16.        Right to See Exhibits and Have Testimony Read During Deliberations;

17.        Questioning Wisdom of Law; and

18.        Venue.

2

**A.173**

REQUEST NO. 2

<u>KNOWLEDGE AND INTENT</u>

During these instructions on the elements of the crimes charged, you will hear me use the words "knowingly," "willfully," and "intentionally" from time to time.

A person acts "knowingly" when he acts intentionally and voluntarily, and not because of ignorance, mistake, accident or carelessness.   Whether a defendant acted knowingly may be proven by his conduct and by all of the facts and circumstances surrounding the case.

"Willfully" means to act with knowledge that one's conduct is unlawful and with the intent to do something the law forbids, that is to say with the bad purpose to disobey or to disregard the law.   The defendant's conduct was not "willful" if it was due to negligence, inadvertence, or mistake.

A person acts "intentionally" when he acts deliberately and purposefully.   That is, a defendant's acts must have been the product of his conscious, objective decision rather than the product of a mistake or accident.

These issues require you to make a determination about a defendant's state of mind, something that can rarely be proved directly.   A wise and careful consideration of all the circumstances before you may, however, permit you to make a determination as to a defendant's state of mind.   Indeed, in your everyday affairs, you are frequently called upon to determine a

3

**A.174**

person's state of mind from his or her words and actions in given circumstances.   You are asked

to do the same here.

<u>Authority</u>

Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>,
Instructions 3A-1, 3A-3 and 3A-4 and <u>United States v. Dervishaj</u>,
13-CR-668 (ENV) (E.D.N.Y. Apr., 2016).

4

**A.175**

REQUEST NO. 3

<u>CO-CONSPIRATOR STATEMENTS AND LIABILITY</u>

As I will instruct you, the defendant in this case is charged with a conspiracy to make false statements.   You will recall that I have admitted into evidence against the defendant the acts and statements of other individuals because these acts and statements were committed by people who the government charges were confederates or coconspirators of the defendant on trial.

The reason for allowing this evidence to be received against the defendant has to do with the nature of the crime of conspiracy.   A conspiracy is often referred to as a partnership in crime.   Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy.

Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy in furtherance of the common purpose of the conspiracy, are deemed, under the law, to be the acts of all of the members, and all of the members are responsible for such acts, declarations, statements, and omissions.   If you find beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment, then any acts done or statements made in furtherance of that conspiracy by another person also found by you to have been a member of that conspiracy may be considered against the defendant.   This is so even if such acts were done and statements were made in the defendant's absence and without his knowledge.

However, before you may consider the statements or acts of a co-conspirator in deciding the issue of a defendant's guilt, you must first determine that the acts and statements

5

**A.176**

were made during the existence, and in furtherance of, the unlawful scheme.

<u>Authority</u>

Adapted from jury charge given in <u>United States v. Krivoi</u>, 18-CR-100 (ENV) (E.D.N.Y. Nov. 2018).

6

**A.177**

REQUEST NO. 4

<u>AIDING AND ABETTING</u>

The indictment alleges that the defendant aided and abetted the commission of a crime, namely making false statements.   Aiding and abetting is defined under federal law in Title 18, United States Code, Section 2 which provides in pertinent part the following: Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures the commission of a crime is punishable as a principal.   Under the aiding and abetting statute it is not necessary for the government to show that the defendant himself physically committed the crime with which he is charged in order for you to find the defendant guilty.

A person who aids or abets another to commit an offense is just as guilty of that offense as if he committed it himself.   Accordingly, you may find the defendant guilty of the offense charged if you find beyond a reasonable doubt that the government has proven that another person actually committed the offense with which the defendant is charged and that the defendant aided or abetted that person in the commission of the offense.   As you can see, the first requirement is that you find that another person has committed the crime charged.

Obviously, no one can be convicted of aiding and abetting the criminal act of another if no crime was committed by the other person in the first place.   But if you do find that a crime was committed, then you must consider whether the defendant aided or abetted the commission of that crime.

In order to aid or abet another to commit a crime, it is necessary that the defendant willfully and knowingly associated himself in some way with the crime and that he participated in the crime by doing some act to help make the crime succeed.   To establish that the defendant participated in the commission of the crime, the government must prove that the

7

**A.178**

defendant engaged in some affirmative conduct or overt act for the specific purpose of bringing about that crime.

Participation in a crime is willful if done voluntarily and intentionally and with the specific intent to do something which the law forbids or with the specific intent to fail to do something the law requires to be done.   That is to say with a bad purpose either to disobey or disregard the law.   The mere presence of the defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed or merely associating with others who are committing a crime is not sufficient to establish aiding and abetting.   One who has no knowledge that a crime is being committed or is about to be committed but inadvertently does something that aids in the commission of that crime is not an aider and abettor.   An aider and abettor must know that the crime is being committed and act in a way which is intended to bring about the success of the criminal venture.

<u>Authority</u>

Adapted from jury charge in <u>United States v. Krivoi</u>, 18-CR-100
(ENV) (E.D.N.Y. Nov. 2018).

8

**A.179**

REQUEST NO. 5

<u>COUNT TWO</u>
(Making False Statements)

As I mentioned, the defendant is charged in two counts.   In the first count, he is

charged with conspiring to cause false statements to be made to the Bureau of Prisons, also

known as the BOP, and, in the second count, he is charged with the substantive crime of actually

causing those false statements to be made.   Even though the conspiracy count is charged first in

the indictment, it will be easier for you to understand the law as it relates to these charges if I

first instruct you on the law pertaining to the substantive crime of making false statements.

The second count of the indictment reads in relevant part as follows:

On or about November 20, 2014, within the Eastern District of
New York and elsewhere, the defendant SCOTT
BRETTSCHNEIDER, also known as "Mighty Whitey," together
with others, did knowingly and willfully make one or more
materially false, fictitious and fraudulent statements and
representations, in a matter within the jurisdiction of the executive
branch of the Government of the United States, to wit: the BOP, in
that the defendant falsely stated that (a) Richard Marshall
("Marshall") had been enrolled in a treatment program through
Muhammad Mosque No. 7 between October 2003 and January
2010; (b) Marshall was suffering from "active drug dependence,
namely alcohol and marijuana" when he enrolled in that program;
and (c) while enrolled in the program, Marshall was "gradually
reducing his active substance dependence," when, in fact, as the
defendant then and there well knew and believed, Marshall had
never been enrolled in a treatment program through Muhammad
Mosque No. 7, Marshall was not suffering from "active drug
dependence" in October 2003, and Marshall was not abusing drugs
or alcohol during the time period stated in the Letter.

You will observe that the indictment charges that the defendant knowingly and

willfully made a materially false, fictitious or fraudulent statement or representation.   In this

case, the government contends that the evidence shows that the November 2014 letter to Dr.

9

**A.180**

Diana Banks contained a false statement, and that the defendant caused those statements to be made.   This count is also charged under an aiding-and-abetting theory.   I have already instructed you on aiding-and-abetting, and you should refer to those instructions.   In short, the defendant can be found guilty of making a false statement if he aided and abetted another person to make a false statement.

I will now instruct you on the law as it pertains to making a false statement.   The relevant statute is section 1001(a)(2) of Title 18 of the United States Code.   It provides:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious or fraudulent statement or representation . . . shall be [guilty of a crime].

Purpose of the Statute (Sand Inst. 36-2)

The purpose of Section 1001 is to protect the authorized functions of the various governmental departments from any type of misleading or deceptive practice and from the adverse consequences which might result from such deceptive practices.   To establish a violation of section 1001, it is necessary for the government to prove certain essential elements—which I will soon explain to you—beyond a reasonable doubt.   But it is not necessary for the government to prove that the government agency was, in fact, misled as a result of the defendant's action.   It does not matter that the agency was not misled, should you find that the act occurred.   This circumstance would not excuse or justify a false, fictitious or fraudulent statement made, willfully and knowingly about a matter within the jurisdiction of the government of the United States.

10

**A.181**

<u>Elements of the Offense</u> (Sand Inst. 36-9)

   In order to prove the defendant guilty of Count Two, making a false statement, the government must establish beyond a reasonable doubt that:

   First, on or about the date specified, the defendant made a statement or representation, caused such a statement to be made, or aided and abetted in the making of the statement;

   Second, that the statement or representation was material;

   Third, the statement or representation was false, fictitious or fraudulent;

   Fourth, the false, fictitious or fraudulent statement was made knowingly and willfully; and

   Fifth, the statement or representation was made in a matter within the jurisdiction of the government of the United States.

<u>First Element</u>

   The first element that the government must prove beyond a reasonable doubt is that the defendant, or a person he aided and abetted, made a statement or representation.   In this regard, the government need not prove that the defendant physically made or otherwise personally prepared the statement in question.   It is sufficient if the defendant caused the statement charged in the indictment to have been made, or aided and abetted another person who caused it to be made.   Under this statute, there is no distinction between written and oral statements.   Additionally, the government need not prove that all of the statements charged in the indictment were false.   Although the indictment refers to multiple statements, the defendant is guilty of the crime of making a false statement if just one of the statements or representations is false, fictitious or fraudulent, so long as the other elements I will explain to you are satisfied.

11

**A.182**

Second Element

        The second element the government must prove beyond a reasonable doubt is that the defendant's statement or representation, or the statement or representation of a person he aided and abetted, was material.   A fact is material if it was capable of influencing the government's decisions or activities.   However, proof of actual reliance on the statement by the government is not required.

Third Element

        The third element that the government must prove beyond a reasonable doubt is that the statement or representation was false, fictitious or fraudulent.   A statement or representation is "false" or "fictitious" if it was untrue when made, and known at the time to be untrue by the person making it or causing it to be made.   A statement or representation is "fraudulent" if it was untrue when made and was made or caused to be made with the intent to deceive the government agency to which it was submitted.

Fourth Element

        The fourth element which the government must prove beyond a reasonable doubt is that the defendant acted knowingly and willfully.   An act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidently.   An act is done willfully if it is done with an intention to do something the law forbids, that is, with a bad purpose to disobey the law.

Fifth Element

        As I have told you, the fifth element is that the statement be made with regard to a matter within the jurisdiction of the government of the United States.   I instruct you that the

12

**A.183**

Bureau of Prisons, or BOP, as you heard it called during trial, is a department of the executive branch of the United States government.

There is no requirement that the statement be actually given to the BOP.   All that is necessary is that you find that it was contemplated that the statement was to be utilized in a matter which was within the jurisdiction of the government of the United States.   To be within the jurisdiction of a department or agency of the United States government means that the statement must concern an authorized function of that department or agency.   To put it more simply, the crime is complete once a false statement is sent to the BOP—regardless of whether it is received—so long as the other elements I have just instructed you on are also satisfied.

<u>Authority</u>

Adapted from Sand, <u>Modern Federal Jury Instructions</u>, Inst. 36-1, 36-2, 36-9 through 36-14. <u>See also</u> <u>United States v. Candella</u>, 487 F.2d 1223, 1227 (2d Cir. 1973); <u>United States v. Smith</u>, 740 F.2d 734, 736 (9th Cir. 1984) ("An offense under 18 U.S.C. § 1001 is complete when the false statement is submitted. There is no requirement that the government actually receive or rely on the statement before the offense is completed.").

13

**A.184**

REQUEST NO. 6

<u>COUNT ONE</u>
(Conspiracy to Make False Statements)

The first count of the indictment charges the defendant with conspiring with

others to make false statements to the BOP.   The charge states in relevant part:

> In or about and between October 2014 and January 2015, both
> dates being approximate and inclusive, within the Eastern District
> of New York and elsewhere, the defendant SCOTT
> BRETTSCHNEIDER, also known as "Mighty Whitey," together
> with others, did knowingly and willfully conspire to make one or
> more materially false, fictitious and fraudulent statements and
> representations, in a matter within the jurisdiction of the executive
> branch of the Government of the United States, to wit: the Bureau
> of Prisons ("BOP"), in that the defendant agreed to make false
> statements and representations regarding Richard Marshall's
> history of substance and alcohol abuse and treatment history in a
> letter to a BOP employee in an effort to assist Marshall in
> fraudulently gaining entry into the Residential Drug Abuse
> Program ("RDAP") at United States Penitentiary Lewisburg ("USP
> Lewisburg") (the "Letter"), when, in fact, as the defendant then
> and there well knew and believed, such statements and
> representations were false, contrary to Title 18, United States
> Code, Section 1001(a)(2).

The relevant statute on this subject is Title 18, United States Code, Section 371.

It provides: "If two or more persons conspire … to commit any offense against the United

States … , and one or more of such persons do any act to effect the object of the conspiracy, each

[is guilty of an offense against the United States]."

A conspiracy to commit a crime is an entirely separate and different offense from

the underlying crime that the alleged conspirators intend to commit.   Forming a conspiracy—a

partnership for criminal purposes—is itself unlawful.   At the heart of the crime of conspiracy is

an agreement or understanding by two or more persons to violate the law.   Thus, if a conspiracy

exists, even if it should fail to achieve its purpose, it is punishable as a crime.   Consequently, for

# A.185

a defendant to be guilty of conspiracy, there is no need to prove that any of the conspirators actually succeeded in these criminal goals.    Indeed, you may find the defendant guilty of the crime of conspiracy to commit an offense against the United States even though the substantive crime that was the object of the conspiracy was not actually committed.   This is because collective criminal activity poses a greater threat to the public's safety and welfare than individual conduct, and increases the likelihood of success of a particular criminal venture.

In order for a defendant to be guilty of a conspiracy to violate federal law, the government must prove beyond a reasonable doubt, first, that such a conspiracy existed; second, that at some point the defendant knowingly and willfully joined and participated in the conspiracy; and third, that at least one overt act in furtherance of the conspiracy was knowingly and willfully committed by at least one member of the conspiracy.

With respect to the first element, a "conspiracy" is an agreement among two or more persons to achieve an unlawful object, in this case, submitting a false statement to the BOP. To show a conspiratorial agreement, the government is not required to prove that two or more people entered into a solemn pact, but only that two or more persons explicitly or implicitly came to an understanding to achieve the specified unlawful object, whether or not they were successful.   Keep in mind that conspiracy is, by its very nature, characterized by secrecy, so in addition to direct evidence, you may also infer its existence from the circumstances of this case and the conduct of the parties involved.   Also, it is not necessary for the government to prove that the conspiracy lasted throughout the entire period alleged (October 2014 through January 2015), but only that it existed for some time within that period.

With respect to the second element—that the defendant knowingly and willfully joined and participated in the conspiracy—I have already defined those terms for you, and you

# A.186

should refer to my earlier instructions.   In short, a defendant enters into a conspiracy "knowingly and willfully" if he joins and participates in the conspiracy with knowledge of, and the intent to further, its unlawful object.   It is not necessary, however, that a defendant be fully informed of all the details of the conspiracy, or all of its participants.   He may not know more than one other member of the conspiracy, or more than one of its objects.   He may have joined the conspiracy at any time in its duration, and may not have received any benefit in return. However, mere association by a defendant with a conspirator does not itself make the defendant a member of the conspiracy even if he knows of the conspiracy.   In other words, knowledge is not enough; the defendant himself must intentionally participate in the conspiracy with the purpose of helping to achieve at least one of its unlawful objects.

But the extent or duration of a defendant's participation has no bearing on the issue of a defendant's guilt.   A conspirator's liability is not measured by the extent or duration of his participation.   Indeed, each member may perform separate and distinct acts and may perform them at different times.   Some conspirators play major roles, while others play minor parts in the scheme.   An equal role is not what the law requires.   In fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.

Finally, with respect to the third element—that some member of the conspiracy, not necessarily the defendant, knowingly and willfully committed an overt act in furtherance of the conspiracy—an "overt act" is any action intended to help achieve the object of the conspiracy.   An overt act need not itself be a criminal act, but it must contribute to furthering the conspiracy.   The indictment alleges the following overt acts:

(a)     On or about October 16, 2014, Gallman and Marshall discussed the Letter during a telephone call;

16

**A.187**

(b)      On or about October 24, 2014, Brettschneider, Gallman and Marshall discussed the Letter during a telephone call;

(c)      On or about November 1, 2014, Brettschneider, Gallman and Marshall discussed the Letter during two telephone calls;

(d)      On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that Marshall had been enrolled in a treatment program through Muhammad Mosque No. 7 between October 2003 and January 2010;

(e)       On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that Marshall was suffering from "active drug dependence, namely alcohol and marijuana" when he enrolled in RDAP;

(f)      On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that while enrolled in the treatment program, Marshall was "gradually reducing his active substance dependence";

(g)      On or about November 6, 2014, Shabazz-Muhammad signed the Letter falsely purporting to be the Director of Program Services at the Ministry of Health and Human Services, Muhammad Mosque No. 7;

(h)      On or about November 14, 2014, Brettschneider and Marshall discussed the Letter during a telephone call;

(i)      On or about November 20, 2014, Shabazz-Muhammad caused the Letter to be deposited in the mail and sent to a BOP employee at USP Lewisburg;

(j)      On or about November 23, 2014, Brettschneider and Marshall discussed the Letter during a telephone call;

17

# A.188

(k)     On or about December 6, 2014, Brettschneider, Gallman and Marshall discussed the Letter during a telephone call; and

(l)     On or about December 6, 2014, Brettschneider, Gallman, Marshall and Shabazz-Muhammad, during a telephone call, discussed creating false treatment program progress reports to supplement the Letter.

The government is not required to prove all of the overt acts that I just read to you, or that any particular overt act was committed at precisely the time alleged in the indictment.   Nor do you have to agree on the same overt act.   It is sufficient if each of you is convinced beyond a reasonable doubt that at least one overt act occurred, and that it occurred at or about the time and place stated.

It is not a defense to a conspiracy charge that the object of the conspiracy could not be achieved because of circumstances that the conspirators did not know about.   Thus, you may find the defendant guilty of conspiracy even though it was impossible to carry out the plan successfully.

> Adapted from Sand, Modern Federal Jury Instructions, Inst. 19-1, 19-3S, 19-4, 19-6, 19-7, 19-10.1. See also United States v. Kozeny, 667 F.3d 122, 131-32 (2d Cir. 2011) ("[T]he government may plead one set of overt acts in the indictment and prove a different set of overt acts at trial without prejudice to the defendant. . . . [A]lthough proof of at least one overt act is necessary to prove an element of the crime, which overt act among multiple such acts supports proof of a conspiracy conviction is a brute fact and not itself an element of the crime.   The jury need not reach unanimous agreement on which particular overt act was committed in furtherance of the conspiracy." (internal citation omitted)).

**A.189**

REQUEST NO. 7

<u>INTERVIEWS OF WITNESSES</u>

There was testimony at trial that the attorneys for the government interviewed witnesses when preparing for, and during the course of, the trial. You should not draw any unfavorable inference from that testimony.   To the contrary, the attorneys were obliged to prepare this case as thoroughly as possible and might have been derelict in the performance of their duties if they failed to interview witnesses before this trial began and as necessary throughout the course of the trial.

<u>Authority</u>

Adapted from jury charge in <u>United States v. Young Taek Lee</u>, 93 CR 1072 (ILG) (E.D.N.Y.).

19

**A.190**

REQUEST NO. 8

<u>ALL AVAILABLE WITNESSES AND EVIDENCE NEED NOT BE PRODUCED</u>

Although the government bears the burden of proof and although reasonable doubt can arise from the lack of evidence, the law does not require the government to call as witnesses all persons who may have been present at any time, or place involved in the case, or may appear to have some knowledge of the matters at issue in this trial. Nor does the law require the government to produce as exhibits all papers and things mentioned during the course of the trial.

<u>Authority</u>

Jury charge given in <u>United States v. Mitchell</u>, 18 CR 344 (CBA) (E.D.N.Y.)

20

**A.191**

REQUEST NO. 9

UNCALLED WITNESSES EQUALLY AVAILABLE

There are several persons whose names you have heard during the course of the trial but who did not appear here to testify, and one or more of the attorneys has referred to their absence from the trial.   I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses.   Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called.   Their absence should not affect your judgment in any way.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Authority

Sand, Modern Federal Jury Instructions, Inst. 6-7. See also United States v. Bahna, 68 F.3d 19, 22 (2d Cir. 1995) ("When a witness equally available to both sides is not called by either, the trial court may in its discretion give one of two charges: (1) the court may instruct the jury that no unfavorable inference can be drawn against either side; or (2) the court may instruct the jury that under the circumstances the jury may draw an unfavorable inference against both sides.")

21

A.192

REQUEST NO. 10

<u>OTHER PERSONS NOT ON TRIAL</u>

You heard evidence about the involvement of other individuals in the crimes charged in the indictment. You may not draw any inference, favorable or unfavorable, toward the government or the defendant on trial from the fact that a certain person or people are not on trial before you.   Your concern is solely the defendant on trial before you.   That another individual is not on trial before you is not a matter of concern to you.   You should not speculate as to why another individual is not on trial.   The fact that only one defendant is on trial before you should not control or influence your verdict.   You must only consider whether the government has proven beyond a reasonable doubt that the defendant is guilty of a crime.

<u>Authority</u>

Adapted from jury charge given in <u>United States v. Krivoi</u>, 18-CR-100 (ENV) (E.D.N.Y. Nov. 2018).

22

**A.193**

REQUEST NO. 11

<u>BASING VERDICT ON SYMPATHY IS IMPERMISSIBLE</u>

Under your oath as jurors you are not to be swayed by sympathy for one side or the other.   You are to be guided solely by the evidence in this case, and the crucial question that you must ask yourselves as you sift through the evidence is: Has the government proven the guilt of the defendant beyond a reasonable doubt?

If you have a reasonable doubt as to the defendant's guilt, you must find the defendant not guilty.   But on the other hand, if you should find that the government has met its burden of proving the defendant's guilt beyond a reasonable doubt, you should not hesitate because of sympathy or any other reason to render a verdict of guilty.

It is for you alone to decide whether the government has proven that the defendant is guilty of the crimes charged solely on the basis of the evidence and under the law as I charge you.   Once you let fear or prejudice or bias or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

Your verdict will be determined by the conclusion that you reach, no matter who it helps or hurts.   It would be improper for you to allow any feelings that you might have about the nature of the crimes charged against the defendant to influence you in any way.

<u>Authority</u>

Adapted from jury charge given in <u>United States v. Gershman</u> <u>et</u> <u>al.</u>, 16-CR-553 (S-4)(BMC) (E.D.N.Y Aug. 2018) and Sand, <u>Modern Federal Jury Instructions</u>, Instruction No. 2-12.

23

**A.194**

REQUEST NO. 12

## PUNISHMENT SHOULD NOT BE CONSIDERED

You cannot allow a consideration of the possible punishment that may be imposed upon the defendant if convicted to influence your verdict in any way.   The duty of imposing any sentence rests exclusively with me.   Your duty is to weigh the evidence in the case and to determine whether the government has proven every element beyond a reasonable doubt solely upon such evidence and upon the law without being influenced by any assumption, conjecture, sympathy or inference not warranted by the facts.

### Authority

Adapted from jury charge given in United States v. Krivoi, 18-CR-100 (ENV) (E.D.N.Y. Nov. 2018).

24

**A.195**

REQUEST NO. 13

EVIDENCE OBTAINED PURSUANT TO LAWFUL PROCEDURES / INVESTIGATIVE TECHNIQUES

There is no legal requirement that the government use any specific investigative techniques or pursue every investigative lead to prove its case.   Law enforcement techniques are not your concern.   Your concern is to determine whether or not, based upon all the evidence presented in the case, the government has proven that the defendant is guilty beyond a reasonable doubt.

The government has offered evidence in the form of recordings of telephone calls and text messages.   The so-called wiretap that allowed law enforcement to obtain these communications was authorized by a judge, and was perfectly lawful.   The government had the right to use such a wiretap in this case.   In short, law enforcement techniques must not be your concern.

Authority

Adapted from jury charge given in United States v. Krivoi, 18-CR-100 (ENV) (E.D.N.Y. Nov. 2018) and United States v. Gershman et al., 16-CR-553 (S-4)(BMC) (E.D.N.Y Aug. 2018).

25

**A.196**

REQUEST NO. 14

<u>TRANSCRIPTS OF RECORDINGS</u>

During the course of the trial, you were shown transcripts of the oral conversations captured on the wiretap to assist you in listening to them.   These transcripts are not in and of themselves evidence and should only be used as an aide in listening to the recordings themselves.   You should rely on what you hear on the recordings as evidence.   If you perceived any variation between what you were able to hear and what was written in the transcripts, you should be guided solely by the recordings and not by the transcripts.

<u>Authority</u>

Adapted from the jury charge given in <u>United States v. Alexander</u>,
15-CR-635 (CBA) and <u>United States v. Moore</u>, 13-CR-487 (CBA)

A.197

<u>CONCLUSION</u>

The United States respectfully requests that the Court include the foregoing

charges in its instructions to the jury.

Dated:  Brooklyn, New York
        March 11, 2019

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Lindsay K. Gerdes
Andrey Spektor
Assistant United States Attorneys
        (Of Counsel)

27

**A.198**

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF NEW YORK

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                                    )   CASE NO.: 12-CR-14
                                     )
6        VS.                         )
                                     )
7   RICHARD MARSHALL,                )
                      Defendant.     )
8   _____ )

9

10              **TRANSCRIPT OF PROCEEDINGS**
        **BEFORE THE HONORABLE FREDERICK J. SCULLIN, JR.**
11             **FRIDAY, AUGUST 8, 2014**
                **ALBANY, NEW YORK**

12

13  **FOR THE GOVERNMENT:**
            Office of the United States Attorney
14          By:  Daniel Hanlon, AUSA
            445 Broadway, Room 214
15          Albany, New York  12207

16

17  **FOR THE DEFENDANT:**
            Scott Brettschneider PC
18          By:  Scott Brettschneider, Esq.
            626 RXR Plaza, West Tower, 6th Floor
19          Uniondale, New York  11556

20

21

22

23          **THERESA J. CASAL, RPR, CRR, CSR**
             Federal Official Court Reporter
24            445 Broadway, Room 509
              Albany, New York  12207

25

*USA v. Marshall – 12-CR-14*

```
 1                    (Court commenced at 10:04 AM.)
 2              THE CLERK:  Today is August 8, 2014.  In the
 3   matter of the United States of America versus Richard
 4   Marshall, case number 12-CR-14.  We are here for sentencing.
 5   May we have appearances for the record?
 6              MR. HANLON:  Daniel Hanlon on behalf of the United
 7   States.  Good morning, your Honor.
 8              THE COURT:  Good morning.
 9              MR. BRETTSCHNEIDER:  Scott Brettschneider on
10   behalf of Richard Marshall.  Good morning, your Honor.
11              THE COURT:  Good morning.  And Mr. Marshall.
12              THE DEFENDANT:  Good morning, your Honor.
13              THE COURT:  As you are aware, this matter is on
14   for sentencing this morning.
15              THE DEFENDANT:  Yes.
16              THE COURT:  I have received a presentence
17   investigation report from Probation.  It's my understanding
18   that you have reviewed this with your attorney, is that
19   correct?
20              THE DEFENDANT:  Yes, your Honor.
21              THE COURT:  And you have no objection to its
22   factual content or its calculations, Counsel?
23              MR. BRETTSCHNEIDER:  That is correct, your Honor.
24              THE COURT:  And the Government has no objection?
25              MR. HANLON:  No objection, your Honor.
```

**A.200**

*USA v. Marshall – 12–CR–14*

1          THE COURT:  I will adopt the factual information

2    and the Guideline applications that are contained in that

3    report then.

4          As I stated, the Court has reviewed that

5    thoroughly and I've also reviewed the plea agreement,

6    submissions by counsel, the memoranda from both counsel,

7    reviewed the Sentencing Guidelines and other factors under

8    the federal statutes, and I'm prepared now to go forward

9    with the sentencing.

10          Counsel, do you wish to be heard before I impose

11    sentencing?

12          MR. BRETTSCHNEIDER:  Briefly, your Honor.

13          THE COURT:  All right.

14          MR. BRETTSCHNEIDER:  Your Honor, I've known

15    Richard Marshall for 20 years and I know a great deal of the

16    members of his family who are sitting in the audience today.

17          THE COURT:  I should note for the record, I have a

18    number of letters that you provided to me from, I assume,

19    many of the people here today.

20          MR. BRETTSCHNEIDER:  That is correct, your Honor.

21    I think it's important, your Honor, that in determining the

22    future outcome of anyone who has been charged with a serious

23    crime, sometimes a good indicator is how well that person

24    does on pretrial supervision.  And I think during the period

25    of time that Mr. Marshall has been out on pretrial

*USA v. Marshall - 12-CR-14*

```
 1   supervision, it's been two-and-a-half years, he started out
 2   as somebody who was limited to basically the Southern
 3   District of New York, he was monitored by a GPS bracelet.
 4   Within six months, I got a call from the Probation Officer
 5   that was supervising him saying that he was somebody who was
 6   doing terrific, that his reporting was unblemished and they
 7   took the bracelet off.  And during that period of time,
 8   Mr. Marshall has been working at Big City Auto.  I have a
 9   letter that I believe that I've submitted to the Court from
10   one of his supervisors indicating that he is about to -- if
11   he's allowed to keep his job -- to become a sales manager
12   for Big City.  Certainly, it looks like that in the
13   two-and-a-half years that Mr. Marshall has been at that
14   company, they value him as an employee, they look to him for
15   leadership and, knowing his personality, I know he is a
16   natural leader, somebody who people genuinely are attracted
17   to and who people like.
18           And the Court also would note in my memorandum
19   that Mr. Marshall's had a great deal of financial problems
20   and that his house has been in foreclosure for the past six
21   years.  He's staying afloat and he still has two of his
22   children living there with him.  Certainly, although they
23   are young adults, if Mr. Marshall goes to jail, they would
24   have to relocate.
25           I think the fact that he's been out for
```

**A.202**

*USA v. Marshall - 12-CR-14*

1   two-and-a-half years and, again, you know, as a defense

2   attorney who has worked during the past, you know, quarter

3   of a century as a defense attorney and sees where we've come

4   with Sentencing Guidelines, I think it's important to note

5   that there are some occasions where Courts take risks of

6   people, and now that Congress has allowed judges to take

7   risks of certain individuals, I think Mr. Marshall is

8   certainly worthy of that risk, not just based on my words,

9   but his actions during pretrial supervision.  And

10  certainly -- what I suggested to the Court was a period of

11  home confinement, along with Probation would certainly --

12  would still hold some weight if Mr. Marshall ever violated

13  that, knowing that at that point in time he would go to

14  jail.

15          I think whatever the Court would sentence

16  Mr. Marshall to, if it was a jail component, he'd lose his

17  job, he'd lose his house, he'd lose the momentum that he

18  has, and somebody who's 52 years old, the chances of going

19  in and finding another company that's willing to take a risk

20  on somebody his age, the fact that he's coming from jail, is

21  slim.  And, you know, I was reading, you know, the --

22  Mr. Hanlon told me he was gonna object to the Smarter

23  Sentencing Act, and I was reading the intent behind it

24  and -- because I thought maybe I would have to argue it

25  today -- but it looks like there might be some real

*USA v. Marshall - 12-CR-14*

1    incentive to go along with what I think, you know, members

2    of both parties are saying, which is, you know what?  The

3    answer isn't always jail.  The cost and the ramifications

4    that it takes upon an individual by incarcerating them, for

5    whatever length of time, it may be wiser to take another

6    avenue, an alternative avenue.

7            So, on behalf of Mr. Marshall, your Honor, I

8    think, based on all the factors, the fact that he always

9    worked, he always had some type of occupation, at least

10   during the 20 years that I've known him, because I've been

11   to the places where he's worked, I've been to the liquor

12   store where he used to work, I've been to the carwash, I've

13   been to the sporting goods store, he always -- he's not

14   somebody who just, you know, decided he's gonna get a job

15   when he got arrested.  And if the Court looks at his

16   criminal history, I mean for the most part, except for when

17   he was 19 and 20 years old, and one marijuana arrest in

18   2007, he's basically led a clean life.

19           So, based on all these factors, your Honor, I'm

20   gonna ask for an alternative sentence, one which has a home

21   confinement along with a probation period.

22           THE COURT:  Mr. Marshall, do you wish to say

23   anything yourself?

24           THE DEFENDANT:  Yes, your Honor.  Sorry for my

25   actions and participation in this.  I'm sorry to put my

*USA v. Marshall - 12-CR-14*

1  family through this.  All my kids are back here, my mother,

2  my aunt, my uncle, all my sisters and my brother.  I'm sorry

3  for the way I acted and havin' my kids see that,

4  embarrassin' myself and them and embarrassin' this Court.

5  You know, I would hate to lose my home and drag my kids

6  through findin' somewhere to stay at.  And you know, if the

7  Court can give me a chance, you know, when I was on home

8  arrest before, I never had a problem, reported, never

9  violated, never dirty urine or nothin', work six days a

10  week.  I'm just tryin' to keep myself together now with the

11  help of my kids.  And if you can grant me that wish, I can

12  prove my point to them and myself.

13        THE COURT:  All right.  Mr. Marshall, you were

14  facin' 20 years in prison based upon your involvement in

15  this drug conspiracy, you know that.

16        THE DEFENDANT:  I understand.

17        THE COURT:  It begs the question -- obviously, you

18  were involved with drugs and sellin' drugs back in your 20s,

19  then there's a long gap of time here where you're not

20  arrested, but in 2007, I find you again dealin' drugs and it

21  was marijuana, but it was manufactured or charged with

22  initially and you pled to possession on it.  Were you

23  involved with drugs durin' that period of time?  Sellin',

24  usin' or -- and just not caught?  Or did you fall out of it

25  and all of a sudden saw some way to get back into it for

*USA v. Marshall - 12-CR-14*

1   some reason?  It doesn't make any sense.  Now you're

2   involved with a heavy drug conspiracy.  So it doesn't make

3   sense that you weren't somehow involved durin' that period

4   of time.  Your attorney refers to you bein' clean.  It

5   doesn't make any sense at all.

6          You have been doin' the right things since you've

7   been arrested on this charge, which you should be doin'.

8   When you're facin' sentencing, it's amazing the people that

9   see the light when they're facin' sentencing.  But you've

10  done the right thing and you can do the right thing, I'm

11  convinced of that.  And I'm convinced that the Government,

12  in their wisdom, has moved to help you on this because

13  20 years would not be right.  But you've got to pay the

14  price of your involvement here.  There are consequences.  At

15  your age, to get involved in somethin' like this is

16  ridiculous, you knew that goin' in.  You knew what you were

17  doin' all that period of time.

18          The Court is gonna fashion, I think, a sentence

19  which I think is appropriate and not greater than necessary,

20  but appropriate.

21          Mr. Hanlon, do you wish to add anything to your

22  sentencing memorandum?

23          MR. HANLON:  No, your Honor.  If it's okay, I'll

24  rely on my papers.

25          THE COURT:  All right.  So, Mr. Marshall, the

*USA v. Marshall - 12-CR-14*

1   Court finds that the total offense level is 25, your

2   criminal history category is 1, given the fact you've not

3   been arrested in all this period of time, the Guideline

4   range then is 57 to 71 months.  It would be a 20-year

5   sentence because of your past involvement, but you are

6   eligible for the safety valve and, therefore, I am going to

7   apply the safety valve and impose a sentence in accordance

8   with the applicable Guideline range there.  You meet the

9   criteria also for the anticipated two-level reduction to the

10  Sentencing Guidelines that's comin' about in November and

11  I'm gonna apply that because otherwise you would be eligible

12  for that.  That reduces your total offense level to 23, a

13  range of 46 to 57 months.  I am gonna even go a little

14  further based upon the Government's representation of your

15  conduct and so forth.

16           So, upon your plea of guilty to Count 1 of the

17  indictment, and on the motion of the Government, it is the

18  judgment of this Court that you are hereby committed to the

19  custody of the Bureau of Prisons for a term of 36 months.

20  That is a substantial break.

21           I'm gonna recommend that while you're there you be

22  allowed to participate in substance abuse treatment

23  programs, whatever is available.  You seem to have gotten

24  control of that yourself, but I think it's important because

25  it is a lifetime issue that you get involved further.

**A.207**

*USA v. Marshall - 12-CR-14*

1         Now, I'm gonna also impose a period of supervised

2 release for five years.  And durin' that period of time, the

3 Court will be supervising your conduct.  Now you know how

4 that works.

5         THE DEFENDANT:  Yes, your Honor.

6         THE COURT:  The standard conditions will apply.

7 Again, you will be evaluated for whether or not a substance

8 abuse treatment program is appropriate.  If so, you have to

9 comply with the direction of Probation in that regard.  And

10 during the time of your supervised release, you're not to

11 use alcohol, you're to avoid any illegal substances, you

12 will be subjected to drug treatment.  In so far as you have

13 the ability to pay the cost of a drug treatment program, you

14 will be required to pay the cost.

15         There is a special assessment of $100 due at this

16 time.  I will not impose any other costs or fines.

17         You may have a right to appeal this sentence, but

18 you waived any right to appeal a sentence of 240 months or

19 less in your plea agreement.  But discuss that with your

20 attorney.  Any notice of appeal must be filed within 14

21 days.

22         Is it your desire to request to surrender or to go

23 today?

24         MR. BRETTSCHNEIDER:  Surrender, your Honor.

25         THE COURT:  Okay.  I'll direct you surrender to

*USA v. Marshall - 12-CR-14*

1   the institution designated by the Bureau of Prisons by

2   September 23, 2014, at 2:00 PM.  You'll have to find out

3   from the Marshal's office which institution is so

4   designated.

5           MR. BRETTSCHNEIDER:  Your Honor, could the Court

6   recommend someplace in the northeast?

7           THE COURT:  Near home?

8           MR. BRETTSCHNEIDER:  Yeah.

9           THE COURT:  I will so recommend.

10          MR. BRETTSCHNEIDER:  Thank you.

11          THE COURT:  All right.  Good luck to you.  This is

12  your last chance, I know that.

13          THE DEFENDANT:  All right.

14          THE COURT:  All right.

15              (This matter adjourned at 10:18 AM.)

16                  - - - - -

17

18

19

20

21

22

23

24

25

1              CERTIFICATION OF OFFICIAL REPORTER

2

3

4              I, THERESA J. CASAL, RPR, CRR, CSR, Official

5     Realtime Court Reporter, in and for the United States

6     District Court for the Northern District of New York, do

7     hereby certify that pursuant to Section 753, Title 28,

8     United States Code, that the foregoing is a true and correct

9     transcript of the stenographically reported proceedings held

10    in the above-entitled matter and that the transcript page

11    format is in conformance with the regulations of the

12    Judicial Conference of the United States.

13

14             Dated this 11th day of September, 2017.

15

16             **s/ Theresa J. Casal**
               _____

17             THERESA J. CASAL, RPR, CRR, CSR

18             FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

# DRAFT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
UNITED STATES OF AMERICA,

     -against-

SCOTT BRETTSCHNEIDER,

          Defendant.

-------------------------------------------------x

U _ MAR 28 2019

BROOKLYN OFFICE

**DRAFT JURY
INSTRUCTIONS**
18-CR-123 (CBA)

**AMON, United States District Judge:**

Ladies and Gentlemen of the Jury:

Now it is my responsibility to instruct you on the law.  Your duty is to follow

these instructions.  First, I will describe the general rules that govern the duty of a

jury in a criminal case.  Second, I will instruct you as to the legal elements of the

crimes charged in the Indictment.  Finally, I will give you some general instructions

about your deliberations.

## 1.  <u>Role of the Court and Jury</u>

You should not be concerned about the wisdom of any rule of law that I state.

Regardless of any opinion that you may have on what the law may be or should be,

it would be a violation of your oaths as jurors to base your verdict upon any view of

the law other than that given to you in the instructions of the Court.  You have the

**A.211**

important responsibility to judge the facts, and you alone are the judges of the facts—not counsel, and not I.

I express no opinion to you whether the defendant is guilty or not guilty. Nothing I have said or done should be used by you in determining whether a defendant is guilty or not guilty. You will decide the case solely on the evidence before you and the law.

Your recollection of the evidence governs, not that of counsel.

You are the sole judges of the credibility—that is, the believability—of all witnesses and the weight of all evidence, consistent with the instructions of this Court.

## 2. Equality of the Parties Before the Court

The fact that this prosecution is brought in the name of the United States does not entitle the government to any greater consideration than any other litigant. By the same token, it is entitled to no less consideration. No party is entitled to sympathy or favor. You must carefully and impartially consider all the evidence, follow the law as I state it, and reach a just verdict, regardless of the consequences.

## 3. Burden of Proof and Presumption of Innocence

The defendant has pled not guilty, thereby placing in issue each element of the crime charged in the indictment.

2

**A.212**

The government has the burden of proving guilt beyond a reasonable doubt with respect to each element of the crime the defendant is charged with committing. This burden never shifts throughout the trial. The defendant does not have to prove his innocence and need not submit any evidence at all.

The defendant is presumed to be innocent, and that presumption of innocence remains with the defendant throughout the trial and must be considered by you in your deliberations.

The defendant in a criminal case never has any duty to testify or come forward with any evidence. This is because, as I have told you, the burden of proof beyond a reasonable doubt remains on the government at all times, and the defendant is presumed innocent. You may draw no inference whatsoever from the fact that the defendant did not take the witness stand. You must not consider the fact that the defendant did not testify. [**OR**: In this case, the defendant did testify, and you should examine and evaluate the defendant's testimony just as you would the testimony of any witness.]

I have said that the government must prove a defendant's guilt beyond a reasonable doubt. The question naturally is what is a reasonable doubt? The words almost define themselves. It is a doubt based upon reason and common sense. It is a doubt that a reasonable person has after carefully weighing all the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of

3

**A.213**

importance in his or her personal life. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs. A reasonable doubt is not a doubt that arises out of a whim; it is not a doubt based upon speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty. And it is not sympathy.

In a criminal case, the burden is at all times on the government to prove guilt beyond a reasonable doubt. The law does not require that the government prove guilt beyond all possible doubt; proof beyond a reasonable doubt is sufficient to convict. This burden never shifts to the defendant, which means that it is always the government's burden to prove each of the elements of the crime charged beyond a reasonable doubt.

If, after fair and impartial consideration of all of the evidence, you have a reasonable doubt about the guilt of the defendant, based on the evidence or lack of evidence, it is your duty to acquit the defendant. On the other hand, if, after fair and impartial consideration of all the evidence, you are satisfied of the defendant's guilt beyond a reasonable doubt, you should vote to convict the defendant.

4. **Weighing the Evidence**

In deciding whether to find that the defendant is guilty or not guilty of the crime alleged in the indictment, you must weigh all the evidence before you. You

4

**A.214**

are the sole judges of the credibility of the witnesses and the weight their testimony deserves.

## 5. **Types of Evidence**

The evidence upon which you are to decide what the facts are comes in several forms:   First, the sworn testimony of witnesses, both on direct and cross-examination, and regardless of who called the witness.   Second, exhibits that have been received by the Court in evidence.   Finally, testimony or facts to which all the lawyers have agreed or stipulated.

Certain things are not evidence and are to be disregarded by you in deciding what the facts are:

A.    The indictment is not evidence against the defendant; it is merely the government's accusation in writing.  It is entitled to no weight in your judgment of the facts.

B.    As I have said before, arguments or statements of lawyers and characterizations of the arguments of other lawyers are not evidence.

C.    Questions alone put to the witnesses are not evidence.

D.    Objections to the questions or to offered exhibits are not evidence.

E.    Anything said or done by the Court is not evidence. And,

F.    Obviously, anything you may have seen or heard outside the courtroom is not evidence.

**A.215**

If evidence was received for a limited purpose, you must consider it for that purpose only. Your verdict must be based solely upon the evidence developed at trial or the lack of evidence.

### a.    Direct & Circumstantial Evidence

There are, generally speaking, two types of evidence from which you may find the truth as to the facts. One is direct evidence—such as the testimony of an eyewitness or physical evidence. The other is indirect or circumstantial evidence—evidence of facts and circumstances from which it is reasonable to infer or deduce connected facts that reasonably follow in common experience.

A simple example would be the following: You come to court on a day when the weather is clear and dry. After some hours in the courtroom, a person enters through the rear door wearing a raincoat and shaking a wet umbrella. Without your ever looking outside, you might infer from these circumstances that while you were sitting in court, it had rained outdoors.

That is all there is to circumstantial evidence. You infer on the basis of reason and experience and common sense from an established fact the existence or the nonexistence of some other fact.

There is no distinction between the weight to be given to either direct or circumstantial evidence. No greater degree of certainty is required of circumstantial evidence than of direct evidence.

6

**A.216**

### b.    Inferences

Counsel, in summing up, have asked you to draw certain inferences from the evidence in this case.  Any inferences you draw must be reasonably based on the evidence, and you may infer only such facts as your reason and common sense lead you to believe follow from the evidence.  You are not to engage in speculation based on matters that are not in evidence.

### c.  Wiretap Evidence

The government has offered evidence in the form of telephone calls and text messages that were recorded pursuant to a court-authorized surveillance, commonly referred to as a wiretap order.  The government has the right to use conversations and text messages obtained from the wiretap in this case.

To assist with your listening to the conversations from the wiretap, you were shown transcripts of the conversations during the trial.  These transcripts are not in and of themselves evidence and were only used as an aide in listening to the recordings themselves.  You should rely on what you heard on the recordings as evidence.  If you perceived any variation between what you were able to hear and what was written in the transcripts, you should be guided solely by the recordings and not by the transcripts.

**A.217**

## 6. **All Available Evidence Need Not be Produced**

Although the government bears the burden of proof, and although a reasonable doubt can arise from the lack of evidence, the law does not require the government to call as witnesses all persons who may have been present at any time or place involved in the case, or may appear to have some knowledge of the matter in issue at this trial. Nor does the law require the government to produce as exhibits all papers and things mentioned during the course of the trial.

## 7. **Witnesses**

You should carefully scrutinize all the testimony given, the circumstances under which each witness testified, and every matter in evidence that tends to indicate whether a witness is or is not worthy of belief. Consider each witness's appearance, conduct, intelligence, motive, state of mind, demeanor, and manner while on the stand. Consider the witness's ability to observe the matters as to which the witness testified, and whether the witness impresses you as having an accurate recollection of these matters. Consider particularly the relationship each witness bears to either side of the case. You should also consider the manner in which each witness may benefit in some way, including financially, from the outcome of the case, and the extent to which, if at all, the testimony of each witness is supported or contradicted by other evidence in the case.

8

**A.218**

Inconsistencies or discrepancies in the testimony of a witness, or between the testimonies of different witnesses, may or may not cause you to discredit a witness's testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently, and innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, consider whether it pertains to a matter of importance or to an unimportant detail, and whether it results from innocent error or intentional falsehood.

If you believe that a witness has willfully given false testimony with respect to a material matter, you may disregard the witness's testimony in whole or in part. But a witness may have been mistaken or may have lied about part of the testimony, and be accurate about another part.

### a. Law Enforcement Witnesses

You have heard testimony from law enforcement officers. The fact that a witness may be employed by the government as a law enforcement official does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness. It is for you to decide, after weighing all the evidence and in light of the instructions I have given you about the factors relevant to determining the credibility of any witness, whether to accept the testimony of a law enforcement witness and what weight, if any, it deserves.

9

**A.219**

## 8.   Objections

It is the duty of the attorneys on each side of a case to object when the other side offers testimony or other evidence that the attorney honestly believes is not properly admissible.  You should not hold it against an attorney or the attorney's client, meaning either the defendant or the government, because the attorney has made objections or because of anything else the attorney may have said or done.

When the Court has sustained an objection to a question addressed to a witness, you must disregard the question entirely, and may draw no inferences from the wording of it, or speculate about what the witness would have said if he or she had been permitted to answer the question.

## 9.   Irrelevance of Possible Punishment

The question of possible punishment of the defendant is of no concern to the jury and should not, in any sense, enter into or influence your deliberations.  The duty of imposing a sentence rests exclusively with the Court.  Your function is to weigh the evidence in the case and to determine whether or not the defendant is guilty beyond a reasonable doubt, solely on the basis of such evidence.  Under your oaths as jurors, you cannot allow a consideration of the punishment that may be imposed upon a defendant, if he is convicted, to influence your verdict in any way, or in any sense enter into your deliberations.

**A.220**

## 10. Dates Approximate

The Indictment charges "on or about" and "in or about and between" certain dates. The proof need not establish with certainty the exact date of the alleged offenses. It is sufficient if the evidence establishes beyond a reasonable doubt that an offense was committed on a date reasonably near the dates alleged.

## 11. Substantive Charges

I will now instruct you on the legal elements of the crimes charged in the Indictment. That is to say, I will now instruct you on the specific elements that the government must prove beyond a reasonable doubt to warrant a finding of guilt in this case on the crimes charged.

The defendant is formally charged by Indictment. The Indictment is a charge or accusation and is not evidence. The defendant is not on trial for any act or conduct not specifically charged in the indictment.

## Count Two: Making False Statements

The indictment charges the defendant with two counts. In the first count, he is charged with conspiring to cause false statements to be made to the Bureau of Prisons, also known as "the BOP," and, in the second count, he is charged with actually causing those false statements to be made. Even though the conspiracy count is charged first in the indictment, it will be easier for you to understand the

11

**A.221**

law as it relates to these charges if I first instruct you on the law on the second count—the substantive crime of making false statements.

In relevant part, the second count of the indictment states:

> On or about November 20, 2014, within the Eastern District of New York, the defendant Scott Brettschneider, also known as "Mighty Whitey," together with others, did knowingly and willfully make one or more materially false, fictious, and fraudulent statements and representations, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the BOP, in that the defendant[] falsely stated that (a) Richard Marshall had been enrolled in a treatment program through Muhammed Mosque No. 7 between October 2003 and January 2010; (b) Marshall was suffering from "active drug dependence, namely alcohol and marijuana" when he enrolled in that program; and (c) while enrolled in the program, Marshall was "gradually reducing his active substance dependence," when, in fact, as the defendant[] then and there well knew and believed, Marshall had never been enrolled in a treatment program through Muhammed Mosque No. 7, Marshall was not suffering from "active drug dependence" in October 2003, and Marshall was not abusing drugs or alcohol during the time period stated in the letter.
>
> (Title 18, United States Code, Sections 1001(a)(2), 2 and 3551 et seq.)

The relevant statute that the defendant is charged with violating is Section 1001 of Title 18 of the United States Code, which states in pertinent part that:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully

**A.222**

> . . . makes any materially false, fictious or fraudulent
> statement or representation . . . shall be [guilty of a crime.]

In order for you to find the defendant guilty of the crime charged in Count 2, the government must prove each of the following elements beyond a reasonable doubt:

**FIRST**, that on or about the date specified, the defendant made a statement or representation or caused such a statement to be made;

**SECOND**, that the statement or representation was material;

**THIRD**, the statement or representation was false, fictitious or fraudulent;

**FOURTH**, the false, fictitious, or fraudulent statement was made knowingly and willfully; and

**FIFTH**, the statement or representation was made in a matter within the jurisdiction of the government of the United States.

First Element: Defendant Made a Statement or Representation

The first element that the government must prove beyond a reasonable doubt is that the defendant made a statement or representation. In this regard, the government need not prove that the defendant physically made or otherwise personally prepared the statement in question. It is sufficient if the defendant caused the statement charged in the indictment to have been made. Under this statute, there is no distinction between written and oral statements.

**A.223**

Second Element: Materiality

The second element the government must prove beyond a reasonable doubt is that the defendant's statement or representation was material. A fact is material if it was capable of influencing the government's decisions or activities. However, proof of actual reliance on the statement by the government is not required. It is not necessary for the government to prove that a government agency was, in fact, misled as a result of the defendant's action.

Third Element: Statement Must Be False, Fictitious or Fraudulent

The third element that the government must prove beyond a reasonable doubt is that the statement or representation was false, fictitious, or fraudulent. A statement or representation is "false" or "fictitious" if it was untrue when made, and known at the time to be untrue by the person making it or causing it to be made. A statement or representation is "fraudulent" if it was untrue when it was made or caused to be made with the intent to deceive the government agency to which it was submitted.

Additionally, the government does not need to prove all of the statements charged in the indictment were false, fictitious, or fraudulent. Although the indictment refers to multiple statements, the defendant is guilty of the crime of making a false statements if just one of the statements or representations is false, fictitious, or fraudulent, so long as the other elements of the crime are satisfied. However, the jury must be unanimous in determining that any one of the statements

14

**A.224**

listed in the indictment is false. It would not be sufficient for six of you to find that statement one is false, and six of you to find that statement two is false. All of you must agree on the same statement.

## Fourth Element: Knowing and Willful

The fourth element which the government must prove beyond a reasonable doubt is that the defendant acted knowingly and willfully. An act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidentally. An act is done willfully if it is done with the intention to do something the law forbids, that is, with a bad purpose to disobey the law.

## Fifth Element: Within the Jurisdiction of the US Government

As I have told you, the fifth element is that the statement be made with regard to a matter within the jurisdiction of the government of the United States. I instruct you that the Bureau of Prisons, or BOP, is an agency within the executive branch of the United States government.

## **Aiding and Betting**

In connection with the crime charged in Count Two, the government must prove that the defendant either personally committed the forbidden conduct or that he "aided and abetted" another in doing so.

The aiding and abetting statute, Section 2 of Title 18 of the United States Code, provides as follows:

15

**A.225**

> (a)    Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> (b)    Whoever willfully causes an act to be done, which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

You should be aware that, under the law, when one person engages in criminal activity, another person is criminally liable for such criminal activity when, acting with the mental culpability required for the commission of the crime, he solicits, requests, commands, importunes, or intentionally aids such person to engage in the crime charged. Thus, the guilt of the defendant may be established without proof that he personally did every act constituting the offense charged. In other words, every person who willfully participates in the commission of a crime may be found guilty of that offense. Participation is willful if done voluntarily and intentionally.

In order to aid and abet another to commit a crime, it is necessary that the defendant, with the knowledge and intent required to commit the underlying offense, willfully associated himself in some way with the criminal venture and willfully participated in it as he would in something he wishes to bring about, that is to say, that the defendant willfully sought by some act or omission of his to make the criminal venture succeed.

You, of course, must not find the defendant guilty **unless** you find beyond a reasonable doubt that every element of the crime of making a false statement, as

16

**A.226**

defined in these instructions, was committed by some person or persons and that the defendant aided and abetted the commission of such crime.

Mere association with the perpetrators, even with knowledge that a crime is being committed, is not sufficient to establish that a defendant aided and abetted the crime, unless you find beyond a reasonable doubt that the defendant was a knowing participant.

To determine whether the defendant aided or abetted the commission of the crime with which he is charged, ask yourself these questions:

Did he participate in the crime as something he wished to bring about?

Did he associate himself with the criminal venture knowingly and intentionally?

Did he seek by his actions to make the criminal venture succeed?

If he did, then the defendant is an aider and abettor and therefore guilty of the crime of making a false statement charged in Count Two. If, on the other hand, your answers to these questions are "no," then the defendant is not guilty as an aider and abettor.

## Count One: Conspiracy to Make False Statements

The first count of the indictment charges the defendant with conspiring with others to make false statements to the BOP. The charge states in relevant part:

> In or about and between October 2014 and January 2015, both dates being approximate and inclusive, within the

17

**A.227**

Eastern District of New York and elsewhere, the defendant[] Scott Brettschneider, also known as "Mighty Whitey," together with others, did knowingly and willfully conspire to make one or more materially false, fictitious, and fraudulent statements and representations, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the Bureau of Prisons ("BOP"), in that the defendant agreed to make false statements and representations regarding Richard Marshall's history of substance and alcohol abuse and treatment history in a letter to a BOP employee in an effort to assist Marshall in fraudulently gaining entry into the Residential Drug Abuse Program ("RDAP") at United States Penitentiary Lewisburg ("USP Lewisburg") (the "Letter"), when, in fact, as defendant then and there well knew and believed, such statements and representations were false, contrary to Title 18, United States Code, Section 1001(a)(2).

The relevant statute on conspiracy is Title 18 of the United States Code, Section 371.  It provides:

> If two or more persons conspire . . . to commit any offense against the United States . . . , and one or more of such persons do any act to effect the object of the conspiracy, each [is guilty of an offense against the United States.]

A conspiracy to commit a crime is an entirely separate and different offense from the underlying crime that the alleged conspirators intend to commit.  Forming a conspiracy—a partnership for criminal purposes—is itself unlawful.  The essence of the crime of conspiracy is an agreement or understanding by two or more persons to violate the law.  A conspiracy, even if it should fail of its purpose, is nevertheless a

18

**A.228**

crime, and therefore it is not necessary for the government to prove the commission of any substantive offense for you to find the defendant guilty of conspiracy.

In order to prove the defendant guilty of conspiring to make a false statement, the government must establish three elements beyond a reasonable doubt:

**FIRST**, that the conspiracy existed;

**SECOND**, that at some point the defendant knowingly and willfully joined and participated in the conspiracy; and

**THIRD**, that at least one overt act in furtherance of the conspiracy was knowingly and willfully committed by at least one member of the conspiracy.

First Element: Existence of a Conspiracy

With respect to the first element, a "conspiracy" is an agreement among two or more persons to achieve an unlawful object, in this case, the submission of a materially false, fraudulent or fictitious letter to the Bureau of Prisons. To show a conspiratorial agreement, the Government is not required to prove that two or more people entered into a solemn pact, but only that two or more persons explicitly or implicitly came to an understanding to achieve the specified unlawful object, whether or not they were successful. Also, it is not necessary for the Government to prove that the conspiracy lasted throughout the entire period alleged, that is October 2014 through January 2015, but only that it existed for some time within that period.

**A.229**

<u>Second Element: Knowingly or Willfully Joined a Conspiracy</u>

With respect to the second element—that the defendant knowingly and willfully joined and participated in the conspiracy—the terms "knowingly" and "willfully" carry the same meaning here as they did in my earlier instructions about these terms. An act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidentally. An act is done willfully if it is done with the intention to do something the law forbids, that is, with a bad purpose to disobey the law. A defendant enters into a conspiracy "knowingly and willfully" if he joins and participates in the conspiracy with knowledge of, and the intent to further, its unlawful object. It is not necessary, however, that a defendant be fully informed of all the details of the conspiracy, or all of its participants. He may not know more than one other member of the conspiracy, or more than one of its objects. He may have joined the conspiracy at any time in its duration, and may not have received any benefit in return.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, while others play minor parts in the scheme. An equal role is not what the law requires. In

20

**A.230**

fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.

I want to caution you, however, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may know, or be friendly with, a criminal, without being a criminal himself. Mere similarity of conduct or the fact that they may have assembled together and discussed common aims and interests does not necessarily establish membership in the conspiracy.

I also want to caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering the illegal undertaking. He thereby becomes a knowing and willing participant in the unlawful agreement—that is to say, a conspirator.

**A.231**

<u>Third Element: Overt Act in Furtherance of the Conspiracy</u>

Finally, with respect to the third element—that some member of the conspiracy, not necessarily the defendant, knowingly and willfully committed an overt act in furtherance of the conspiracy—an "overt act" is any action intended to help achieve the object of the conspiracy. An overt act need not itself be a criminal act, but it must contribute to furthering the conspiracy. The indictment alleges the following overt acts:

(a) On or about October 16, 2014, Gallman and Marshall discussed the Letter during a telephone call;

(b) On or about October 24, 2016, Brettschneider, Gallman and Marshall discussed the Letter during a telephone call;

(c) On or about November 1, 2014, Brettschneider, Gallman and Marshall discussed the Letter during two telephone calls;

(d) On or about November 6, 2014, Reginald Shabazz-Muhammad falsely stated in the Letter that Marshall had been enrolled in a treatment program through Muhammad Mosque No. 7 between October 2003 and January 2010;

(e) On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that Marshall was suffering from "active drug dependence, namely alcohol and marijuana" when he enrolled in RDAP;

**A.232**

(f) On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that while enrolled in the treatment program, Marshall was "gradually reducing his active substance dependence";

(g) On or about November 6, 2014, Shabazz-Muhammad signed the Letter falsely purporting to be the Director of Program Services at the Ministry of Health and Human Services, Muhammad Mosque No. 7;

(h) On or about November 14, 2014, Brettschneider and Marshall discussed the Letter during a telephone call;

(i) On or about November 20, 2014, Shabazz-Muhammad caused the Letter to be deposited in the mail and sent to a BOP employee at USP Lewisburg;

(j) On or about November 23, 2014, Brettschneider and Marshall discussed the Letter during a telephone call;

(k) On or about December 6, 2014, Brettschneider, Gallman and Marshall discussed the Letter during a telephone call; and

(1) On or about December 6, 2014, Brettschneider, Gallman, Marshall and Shabazz-Muhammad, during a telephone call, discussed creating false treatment program progress reports to supplement the Letter.

The government is not required to prove all of the overt acts that I just read to you, or that any particular overt act was committed at precisely the time alleged in the indictment.

23

**A.233**

## 12. <u>Closing Instructions</u>

Remember, it is your recollection of the evidence that governs.

If you wish to have some part of the testimony repeated, you may make that request. I will call you into court and have the court reporter read those portions of the testimony you desire to hear. You can have anything read back to you. I suggest, however, that you be specific in your requests to avoid hearing something that you do not need to assist you in your deliberations. I will also send into the jury room the exhibits admitted into evidence.

If in the course of your deliberations you wish for further help on the law, or if you wish to hear any further explanation about the law, you may send me a note telling me what you would like. I will provide you with a copy of my jury instructions. You must consider the instructions as a whole and not single out any one instruction as stating the law.

If you wish during your deliberations to communicate with the Court, you may send a note by the marshal. No member of the jury should ever attempt to communicate with the Court by any means other than a signed writing; and the Court will never communicate with any member of the jury on any subject touching on the merits of the case, other than in writing or orally here in open court.

**A.234**

Bear in mind also that you are never to reveal to any person—not even in open court—how the jury stands, numerically or otherwise, on the question of the guilt or the innocence of the defendant until after you have reached a unanimous verdict.

You are entitled to your own opinions, but you should exchange views with your fellow jurors and listen carefully to each other. Do not hesitate to change your opinion if you become convinced that another person is correct. But you must each make your own decision.

I will send you a verdict form that will list a space for you to mark off your verdict for each charge in the indictment, either guilty or not guilty. Any verdict you reach must be unanimous. That means that the verdict, whether guilty or not guilty, must be agreed upon by all of you.

When you reach a verdict, send me a note saying that you have reached a verdict, but do not state in the note what your verdict is.

The verdict sheet is in no way intended to indicate how you should decide the facts of the case.

Traditionally, Juror Number 1 serves as foreperson. If, however, Juror Number 1 does not wish to serve as foreperson, when you go to the jury room to begin considering the evidence in this case, I suggest that you first select another member of the jury to act as your foreperson.

**A.235**

In conclusion, let me advise you that your oath sums up your duty, and that is: without fear or favor to any person, you will well and truly try the issues before these parties according to the evidence given to you in this court and the laws of the United States.

**A.236**

COURT EXHIBIT
2
CR18-123

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
UNITED STATES OF AMERICA,

       -against-

SCOTT BRETTSCHNEIDER,

               Defendant.
--------------------------------------------------x

**FINAL JURY
INSTRUCTIONS**
18-CR-123 (CBA)

**AMON, United States District Judge:**

Ladies and Gentlemen of the Jury:

      Now it is my responsibility to instruct you on the law.  Your duty is to follow these instructions.  First, I will describe the general rules that govern the duty of a jury in a criminal case.  Second, I will instruct you as to the legal elements of the crimes charged in the Indictment.  Finally, I will give you some general instructions about your deliberations.

**1.  <u>Role of the Court and Jury</u>**

      You should not be concerned about the wisdom of any rule of law that I state.  Regardless of any opinion that you may have on what the law may be or should be, it would be a violation of your oaths as jurors to base your verdict upon any view of the law other than that given to you in the instructions of the Court.  You have the

1

**A.237**

important responsibility to judge the facts, and you alone are the judges of the facts—not counsel, and not I.

I express no opinion to you whether the defendant is guilty or not guilty. Nothing I have said or done should be used by you in determining whether a defendant is guilty or not guilty. You will decide the case solely on the evidence before you and the law.

Your recollection of the evidence governs, not that of counsel.

You are the sole judges of the credibility—that is, the believability—of all witnesses and the weight of all evidence, consistent with the instructions of this Court.

## 2. <u>Equality of the Parties Before the Court</u>

The fact that this prosecution is brought in the name of the United States does not entitle the government to any greater consideration than any other litigant. By the same token, it is entitled to no less consideration. No party is entitled to sympathy or favor. Indeed, under your oaths as jurors, you are not to be swayed by sympathy for one side or the other. You must carefully and impartially consider all the evidence, follow the law as I state it, and reach a just verdict, regardless of the consequences.

**A.238**

### 3. Burden of Proof and Presumption of Innocence

The defendant has pled not guilty, thereby placing in issue each element of the crimes charged in the indictment.

The government has the burden of proving guilt beyond a reasonable doubt with respect to each element of the crimes the defendant is charged with committing. This burden never shifts throughout the trial. The defendant does not have to prove his innocence and need not submit any evidence at all.

The defendant is presumed to be innocent, and that presumption of innocence remains with the defendant throughout the trial and must be considered by you in your deliberations.

The defendant in a criminal case never has any duty to testify or come forward with any evidence. This is because, as I have told you, the burden of proof beyond a reasonable doubt remains on the government at all times, and the defendant is presumed innocent. You may draw no inference whatsoever from the fact that the defendant did not take the witness stand. You must not consider the fact that the defendant did not testify.

I have said that the government must prove a defendant's guilt beyond a reasonable doubt. The question naturally is what is a reasonable doubt? The words almost define themselves. It is a doubt based upon reason and common sense. It is a doubt that a reasonable person has after carefully weighing all the evidence. It is

3

**A.239**

a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs. A reasonable doubt is not a doubt that arises out of a whim; it is not a doubt based upon speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty. And it is not sympathy.

In a criminal case, the burden is at all times on the government to prove guilt beyond a reasonable doubt. The law does not require that the government prove guilt beyond all possible doubt; proof beyond a reasonable doubt is sufficient to convict. This burden never shifts to the defendant, which means that it is always the government's burden to prove each of the elements of the crimes charged beyond a reasonable doubt.

If, after fair and impartial consideration of all of the evidence, you have a reasonable doubt about the guilt of the defendant, based on the evidence or lack of evidence, it is your duty to acquit the defendant. On the other hand, if, after fair and impartial consideration of all the evidence, you are satisfied of the defendant's guilt beyond a reasonable doubt, you should vote to convict the defendant.

**A.240**

## 4. Weighing the Evidence

In deciding whether to find that the defendant is guilty or not guilty of the crimes alleged in the indictment, you must weigh all the evidence before you. You are the sole judges of the credibility of the witnesses and the weight their testimony deserves.

## 5. Types of Evidence

The evidence upon which you are to decide what the facts are comes in several forms: First, the sworn testimony of witnesses, both on direct and cross-examination, and regardless of who called the witness. Second, exhibits that have been received by the Court in evidence. Finally, testimony or facts to which all the lawyers have agreed or stipulated.

Certain things are not evidence and are to be disregarded by you in deciding what the facts are:

A.  The indictment is not evidence against the defendant; it is merely the government's accusation in writing. It is entitled to no weight in your judgment of the facts.

B.  As I have said before, arguments or statements of lawyers and characterizations of the arguments of other lawyers are not evidence.

C.  Questions alone put to the witnesses are not evidence.

D.  Objections to the questions or to offered exhibits are not evidence.

**A.241**

E.     Anything said or done by the Court is not evidence. And,

F.     Obviously, anything you may have seen or heard outside the courtroom
is not evidence.

If evidence was received for a limited purpose, you must consider it for that
purpose only.  Your verdict must be based solely upon the evidence developed at
trial or the lack of evidence.

### a.     Direct & Circumstantial Evidence

There are, generally speaking, two types of evidence from which you may
find the truth as to the facts.  One is direct evidence—such as the testimony of an
eyewitness or physical evidence.  The other is indirect or circumstantial evidence—
evidence of facts and circumstances from which it is reasonable to infer or deduce
connected facts that reasonably follow in common experience.

A simple example would be the following:  You come to court on a day when
the weather is clear and dry.  After some hours in the courtroom, a person enters
through the rear door wearing a raincoat and shaking a wet umbrella.  Without your
ever looking outside, you might infer from these circumstances that while you were
sitting in court, it had rained outdoors.

That is all there is to circumstantial evidence.  You infer on the basis of reason
and experience and common sense from an established fact the existence or the
nonexistence of some other fact.

**A.242**

There is no distinction between the weight to be given to either direct or circumstantial evidence. No greater degree of certainty is required of circumstantial evidence than of direct evidence.

### b.    Inferences

Counsel, in summing up, have asked you to draw certain inferences from the evidence in this case. Any inferences you draw must be reasonably based on the evidence, and you may infer only such facts as your reason and common sense lead you to believe follow from the evidence. You are not to engage in speculation based on matters that are not in evidence.

### c.  Wiretap Evidence

The government has offered evidence in the form of telephone calls and text messages that were recorded pursuant to a court-authorized surveillance, commonly referred to as a wiretap order. The government has the right to use conversations and text messages obtained from the wiretap in this case.

To assist with your listening to the conversations from the wiretap, you were shown transcripts of the conversations during the trial. These transcripts are not in and of themselves evidence and were only used as an aide in listening to the recordings themselves. You should rely on what you heard on the recordings as evidence. If you perceived any variation between what you were able to hear and

**A.243**

what was written in the transcripts, you should be guided solely by the recordings and not by the transcripts.

### d. Investigative Techniques

There is no legal requirement that the government use any specific investigative techniques or pursue every investigative lead to prove its case. Law enforcement techniques are not your concern. Your concern is to determine whether or not, based upon all the evidence presented in the case, the government has proven that the defendant is guilty beyond a reasonable doubt.

## 6. __All Available Evidence Need Not be Produced__

Although the government bears the burden of proof beyond a reasonable doubt, the law does not require the government to call as witnesses all persons who may have been present at any time or place involved in the case, or may appear to have some knowledge of the matter in issue at this trial. Nor does the law require the government to produce as exhibits all papers and things mentioned during the course of the trial. Of course, as I have said here, the government bears the burden of proof beyond a reasonable doubt, and such reasonable doubt can arise from the lack of evidence.

## 7. __Witnesses__

You should carefully scrutinize all the testimony given, the circumstances under which each witness testified, and every matter in evidence that tends to

8

**A.244**

indicate whether a witness is or is not worthy of belief. Consider each witness's appearance, conduct, intelligence, motive, state of mind, demeanor, and manner while on the stand. Consider the witness's ability to observe the matters as to which the witness testified, and whether the witness impresses you as having an accurate recollection of these matters. Consider particularly the relationship each witness bears to either side of the case. You should also consider the manner in which each witness may benefit in some way, including financially, from the outcome of the case, and the extent to which, if at all, the testimony of each witness is supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimonies of different witnesses, may or may not cause you to discredit a witness's testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently, and innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, consider whether it pertains to a matter of importance or to an unimportant detail, and whether it results from innocent error or intentional falsehood.

If you believe that a witness has willfully given false testimony with respect to a material matter, you may disregard the witness's testimony in whole or in part. But a witness may have been mistaken or may have lied about part of the testimony, and be accurate about another part.

9

**A.245**

There was testimony at trial that the attorneys for the government interviewed witnesses when preparing for, and during the course of, the trial.  It is permissible for attorneys to interview witnesses before trial.

### a. Law Enforcement Witnesses

You have heard testimony from law enforcement officers.  The fact that a witness may be employed by the government as a law enforcement official does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.  It is for you to decide, after weighing all the evidence and in light of the instructions I have given you about the factors relevant to determining the credibility of any witness, whether to accept the testimony of a law enforcement witness and what weight, if any, it deserves.

## 8.   Objections

It is the duty of the attorneys on each side of a case to object when the other side offers testimony or other evidence that the attorney honestly believes is not properly admissible.  You should not hold it against an attorney or the attorney's client, meaning either the defendant or the government, because the attorney has made objections or because of anything else the attorney may have said or done.

When the Court has sustained an objection to a question addressed to a witness, you must disregard the question entirely, and may draw no inferences from

**A.246**

the wording of it, or speculate about what the witness would have said if he or she had been permitted to answer the question.

## 9.   Irrelevance of Possible Punishment

The question of possible punishment of the defendant is of no concern to the jury and should not, in any sense, enter into or influence your deliberations. The duty of imposing a sentence rests exclusively with the Court. Your function is to weigh the evidence in the case and to determine whether or not the defendant is guilty beyond a reasonable doubt, solely on the basis of such evidence. Under your oaths as jurors, you cannot allow a consideration of the punishment that may be imposed upon a defendant, if he is convicted, to influence your verdict in any way, or in any sense enter into your deliberations.

## 10. Dates Approximate

The Indictment charges "on or about" and "in or about and between" certain dates. The proof need not establish with certainty the exact date of the alleged offenses. It is sufficient if the evidence establishes beyond a reasonable doubt that an offense was committed on a date reasonably near the dates alleged.

## 11. Substantive Charges

I will now instruct you on the legal elements of the crimes charged in the Indictment. That is to say, I will now instruct you on the specific elements that the

**A.247**

government must prove beyond a reasonable doubt to warrant a finding of guilt in this case on the crimes charged.

The defendant is formally charged by Indictment. The Indictment is a charge or accusation and is not evidence. The defendant is not on trial for any act or conduct not specifically charged in the indictment.

## Count Two: Making False Statements

The indictment charges the defendant with two counts. In the first count, he is charged with conspiring to cause false statements to be made to the Bureau of Prisons, also known as "the BOP," and, in the second count, he is charged with actually causing those false statements to be made. Even though the conspiracy count is charged first in the indictment, it will be easier for you to understand the law as it relates to these charges if I first instruct you on the law on the second count—the substantive crime of making false statements.

In relevant part, the second count of the indictment states:

> On or about November 20, 2014, within the Eastern District of New York, the defendant Scott Brettschneider, also known as "Mighty Whitey," together with others, did knowingly and willfully make one or more materially false, fictitious, and fraudulent statements and representations, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the BOP, in that the defendant[] falsely stated that (a) Richard Marshall had been enrolled in a treatment program through Muhammed Mosque No. 7 between October 2003 and January 2010; (b) Marshall was suffering from "active drug dependence, namely alcohol

12

**A.248**

and marijuana" when he enrolled in that program; and (c) while enrolled in the program, Marshall was "gradually reducing his active substance dependence," when, in fact, as the defendant[] then and there well knew and believed, Marshall had never been enrolled in a treatment program through Muhammed Mosque No. 7, Marshall was not suffering from "active drug dependence" in October 2003, and Marshall was not abusing drugs or alcohol during the time period stated in the letter.

(Title 18, United States Code, Sections 1001(a)(2), 2 and 3551 et seq.)

The relevant statute that the defendant is charged with violating is Section 1001 of Title 18 of the United States Code, which states in pertinent part that:

[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious or fraudulent statement or representation . . . shall be [guilty of a crime.]

In order for you to find the defendant guilty of the crime charged in Count 2, the government must prove each of the following elements beyond a reasonable doubt:

**FIRST**, that on or about the date specified, the defendant made a statement or representation or caused such a statement to be made;

**SECOND**, that the statement or representation was material;

**THIRD**, the statement or representation was false, fictitious or fraudulent;

**FOURTH**, the false, fictitious, or fraudulent statement was made knowingly and willfully; and

**A.249**

**FIFTH**, the statement or representation was made in a matter within the jurisdiction of the government of the United States.

First Element: Defendant Made a Statement or Representation

The first element that the government must prove beyond a reasonable doubt is that the defendant made a statement or representation. In this regard, the government need not prove that the defendant physically made or otherwise personally prepared the statement in question. It is sufficient if the defendant knowingly and willfully caused the statement charged in the indictment to have been made. Under this statute, there is no distinction between written and oral statements.

Second Element: Materiality

The second element the government must prove beyond a reasonable doubt is that the defendant's statement or representation was material. A fact is material if it has a natural tendency to influence or is capable of influencing the government's decisions or activities. However, proof of actual reliance on the statement by the government is not required. It is not necessary for the government to prove that a government agency was, in fact, misled as a result of the defendant's action.

Third Element: Statement Must Be False, Fictitious or Fraudulent

The third element that the government must prove beyond a reasonable doubt is that the statement or representation was false, fictitious, or fraudulent. A statement or representation is "false" or "fictitious" if it was untrue when made, and known at

14

**A.250**

the time to be untrue by the person making it or causing it to be made. A statement or representation is "fraudulent" if it was untrue when it was made or caused to be made with the intent to deceive the government agency to which it was submitted.

Additionally, the government does not need to prove all of the statements charged in the indictment were false, fictitious, or fraudulent. Although the indictment refers to multiple statements, the defendant is guilty of the crime of making a false statement if just one of the statements or representations is false, fictitious, or fraudulent, so long as the other elements of the crime are satisfied. However, the jury must be unanimous in determining that any one of the statements listed in the indictment is false. For example, it would not be sufficient for six of you to find that statement one is false, and six of you to find that statement two is false. All of you must agree on the same statement.

Fourth Element: Knowing and Willful

The fourth element which the government must prove beyond a reasonable doubt is that the defendant acted knowingly and willfully. An act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidentally. An act is done willfully if it is done with the intention to do something the law forbids, that is, with a bad purpose to disobey the law.

**A.251**

<u>Fifth Element: Within the Jurisdiction of the US Government</u>

As I have told you, the fifth element is that the statement be made with regard to a matter within the jurisdiction of the government of the United States. I instruct you that the Bureau of Prisons, or BOP, is an agency within the executive branch of the United States government.

## Aiding and Abetting

In connection with the crime charged in Count Two, the government must prove that the defendant either personally committed the forbidden conduct or that he "aided and abetted" another in doing so.

The aiding and abetting statute, Section 2 of Title 18 of the United States Code, provides as follows:

> (a)   Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b)   Whoever willfully causes an act to be done, which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

You should be aware that, under the law, when one person engages in criminal activity, another person is criminally liable for such criminal activity when, acting with the mental culpability required for the commission of the crime, he solicits, requests, commands, importunes, or intentionally aids such person to engage in the crime charged. Thus, the guilt of the defendant may be established without proof

16

**A.252**

that he personally did every act constituting the offense charged. In other words, every person who willfully participates in the commission of a crime may be found guilty of that offense. Participation is willful if done voluntarily and intentionally.

In order to aid and abet another to commit a crime, it is necessary that the defendant, with the knowledge and intent required to commit the underlying offense, willfully associated himself in some way with the criminal venture and willfully participated in it as he would in something he wishes to bring about, that is to say, that the defendant willfully sought by some act or omission of his to make the criminal venture succeed.

You, of course, must not find the defendant guilty **unless** you find beyond a reasonable doubt that every element of the crime of making a false statement, as defined in these instructions, was committed by some person or persons and that the defendant aided and abetted the commission of such crime.

Mere association with the perpetrators, even with knowledge that a crime is being committed, is not sufficient to establish that a defendant aided and abetted the crime, unless you find beyond a reasonable doubt that the defendant was a knowing participant.

To determine whether the defendant aided or abetted the commission of the crime with which he is charged, ask yourself these questions:

Did he participate in the crime as something he wished to bring about?

17

**A.253**

Did he associate himself with the criminal venture knowingly and intentionally?

Did he seek by his actions to make the criminal venture succeed?

If he did, then the defendant is an aider and abettor and therefore guilty of the crime of making a false statement charged in Count Two. If, on the other hand, your answers to these questions are "no," then the defendant is not guilty as an aider and abettor.

## Count One: Conspiracy to Make False Statements

The first count of the indictment charges the defendant with conspiring with others to make false statements to the BOP. The charge states in relevant part:

> In or about and between October 2014 and January 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant[] Scott Brettschneider, also known as "Mighty Whitey," together with others, did knowingly and willfully conspire to make one or more materially false, fictitious, and fraudulent statements and representations, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the Bureau of Prisons ("BOP"), in that the defendant agreed to make false statements and representations regarding Richard Marshall's history of substance and alcohol abuse and treatment history in a letter to a BOP employee in an effort to assist Marshall in fraudulently gaining entry into the Residential Drug Abuse Program ("RDAP") at United States Penitentiary Lewisburg ("USP Lewisburg") (the "Letter"), when, in fact, as defendant then and there well knew and believed, such statements and representations

18

**A.254**

were false, contrary to Title 18, United States Code, Section 1001(a)(2).

The relevant statute on conspiracy is Title 18 of the United States Code, Section 371. It provides:

> If two or more persons conspire . . . to commit any offense against the United States . . . , and one or more of such persons do any act to effect the object of the conspiracy, each [is guilty of an offense against the United States.]

A conspiracy to commit a crime is an entirely separate and different offense from the underlying crime that the alleged conspirators intend to commit. Forming a conspiracy—a partnership for criminal purposes—is itself unlawful. The essence of the crime of conspiracy is an agreement or understanding by two or more persons to violate the law. A conspiracy, even if it should fail of its purpose, is nevertheless a crime, and therefore it is not necessary for the government to prove the commission of any substantive offense for you to find the defendant guilty of conspiracy.

In order to prove the defendant guilty of conspiring to make a false statement, the government must establish three elements beyond a reasonable doubt:

**FIRST**, that the conspiracy existed;

**SECOND**, that at some point the defendant knowingly and willfully joined and participated in the conspiracy; and

**THIRD**, that at least one overt act in furtherance of the conspiracy was knowingly and willfully committed by at least one member of the conspiracy.

**A.255**

First Element: Existence of a Conspiracy

With respect to the first element, a "conspiracy" is an agreement among two or more persons to achieve an unlawful object, in this case, the submission of a materially false, fraudulent or fictitious letter to the Bureau of Prisons. To show a conspiratorial agreement, the Government is not required to prove that two or more people entered into a solemn pact, but only that two or more persons explicitly or implicitly came to an understanding to achieve the specified unlawful object, whether or not they were successful. Also, it is not necessary for the Government to prove that the conspiracy lasted throughout the entire period alleged, that is October 2014 through January 2015, but only that it existed for some time within that period.

Second Element: Knowingly or Willfully Joined a Conspiracy

With respect to the second element—that the defendant knowingly and willfully joined and participated in the conspiracy—the terms "knowingly" and "willfully" carry the same meaning here as they did in my earlier instructions about these terms. An act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidentally. An act is done willfully if it is done with the intention to do something the law forbids, that is, with a bad purpose to disobey the law. A defendant enters into a conspiracy "knowingly and willfully" if he joins and participates in the conspiracy with knowledge of, and the intent to further, its unlawful object. In that regard, it has been said that in order for a defendant to be

20

**A.256**

deemed a participant in a conspiracy he must have had a stake in the venture or its outcome. This may, but need not necessarily be, a financial interest in the scheme. If you find that a defendant had such an interest, that is a factor which you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the Indictment.

It is not necessary that a defendant be fully informed of all the details of the conspiracy, or all of its participants. He may not know more than one other member of the conspiracy, or more than one of its objects. He may have joined the conspiracy at any time in its duration, and may not have received any benefit in return.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.

I want to caution you, however, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may know, or be friendly with, a criminal, without being a criminal himself. Mere similarity of conduct or the fact that they may have assembled together and discussed

common aims and interests does not necessarily establish membership in the conspiracy.

I also want to caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant, without knowledge of the fraudulent nature of the scheme, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering the illegal undertaking. He thereby becomes a knowing and willing participant in the unlawful agreement—that is to say, a conspirator.

Third Element: Overt Act in Furtherance of the Conspiracy

Finally, with respect to the third element—that some member of the conspiracy, not necessarily the defendant, knowingly and willfully committed an overt act in furtherance of the conspiracy—an "overt act" is any action intended to help achieve the object of the conspiracy. An overt act need not itself be a criminal

22

**A.258**

act, but it must contribute to furthering the conspiracy. The indictment alleges the following overt acts:

(a) On or about October 16, 2014, Gallman and Marshall discussed the Letter during a telephone call;

(b) On or about October 24, 2014, Brettschneider, Gallman and Marshall discussed the Letter during a telephone call;

(c) On or about November 1, 2014, Brettschneider, Gallman and Marshall discussed the Letter during two telephone calls;

(d) On or about November 6, 2014, Reginald Shabazz-Muhammad falsely stated in the Letter that Marshall had been enrolled in a treatment program through Muhammad Mosque No. 7 between October 2003 and January 2010;

(e) On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that Marshall was suffering from "active drug dependence, namely alcohol and marijuana" when he enrolled in RDAP;

(f) On or about November 6, 2014, Shabazz-Muhammad falsely stated in the Letter that while enrolled in the treatment program, Marshall was "gradually reducing his active substance dependence";

(g) On or about November 14, 2014, Brettschneider and Marshall discussed the Letter during a telephone call;

23

**A.259**

(h) On or about November 20, 2014, Shabazz-Muhammad caused the Letter to be deposited in the mail and sent to a BOP employee at USP Lewisburg;

(i) On or about November 23, 2014, Brettschneider and Marshall discussed the Letter during a telephone call;

(j) On or about December 6, 2014, Brettschneider, Gallman and Marshall discussed the Letter during a telephone call; and

(k) On or about December 6, 2014, Brettschneider, Gallman, Marshall and Shabazz-Muhammad, during a telephone call, discussed creating false treatment program progress reports to supplement the Letter.

The government is not required to prove all of the overt acts that I just read to you, or that any particular overt act was committed at precisely the time alleged in the indictment.

## 12. Closing Instructions

Remember, it is your recollection of the evidence that governs.

If you wish to have some part of the testimony repeated, you may make that request. I will call you into court and have the court reporter read those portions of the testimony you desire to hear. You can have anything read back to you. I suggest, however, that you be specific in your requests to avoid hearing something that you do not need to assist you in your deliberations. I will also send into the jury room the exhibits admitted into evidence.

24

**A.260**

If in the course of your deliberations you wish for further help on the law, or if you wish to hear any further explanation about the law, you may send me a note telling me what you would like. I will provide you with a copy of my jury instructions. You must consider the instructions as a whole and not single out any one instruction as stating the law.

If you wish during your deliberations to communicate with the Court, you may send a note by the marshal. No member of the jury should ever attempt to communicate with the Court by any means other than a signed writing; and the Court will never communicate with any member of the jury on any subject touching on the merits of the case, other than in writing or orally here in open court.

Bear in mind also that you are never to reveal to any person—not even in open court—how the jury stands, numerically or otherwise, on the question of the guilt or the innocence of the defendant until after you have reached a unanimous verdict.

You are entitled to your own opinions, but you should exchange views with your fellow jurors and listen carefully to each other. Do not hesitate to change your opinion if you become convinced that another person is correct. But you must each make your own decision.

I will send you a verdict form that will list a space for you to mark off your verdict for each charge in the indictment, either guilty or not guilty. Any verdict you

25

**A.261**

reach must be unanimous. That means that the verdict, whether guilty or not guilty, must be agreed upon by all of you.

When you reach a verdict, send me a note saying that you have reached a verdict, but do not state in the note what your verdict is.

The verdict sheet is in no way intended to indicate how you should decide the facts of the case.

Traditionally, Juror Number 1 serves as foreperson. If, however, Juror Number 1 does not wish to serve as foreperson, when you go to the jury room to begin considering the evidence in this case, I suggest that you first select another member of the jury to act as your foreperson.

In conclusion, let me advise you that your oath sums up your duty, and that is: without fear or favor to any person, you will well and truly try the issues before these parties according to the evidence given to you in this court and the laws of the United States.

**A.262**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

**UNITED STATES OF AMERICA**

                                                    **18 CR 123 (CBA)**

        -against-


**SCOTT BRETTSCHNEIDER, et al.,**

                        *Defendants.*

-----------------------------------------------------X


### MEMORANDUM OF LAW IN SUPPORT OF
### <u>SCOTT BRETTSCHNEIDER'S RULE 29 & RULE 33 MOTION</u>


Sarita Kedia
Sarita Kedia Law Offices, P.C.
5 East 22nd Street, Suite 7B
New York, New York 10010
(212) 681-0202
skedia@kedialaw.com

*Attorney for Scott Brettschneider*


# A.263

# **TABLE OF CONTENTS**

STATEMENT ......................................................................................................... 1

PROCEDURAL HISTORY .................................................................................... 1

LEGAL STANDARD ............................................................................................. 1

FACTUAL BACKGROUND .................................................................................. 2

ARGUMENT .......................................................................................................... 6

I.     BRETTSCHNEIDER'S CONVICTIONS FOUNDER ON THE
MATERIALITY REQUIREMENT ................................................................... 6

   A.  THE GOVERNMENT FAILED TO PROVE THE MATERIALITY OF
SHABAZZ'S MISSTATEMENTS ................................................................ 7

   B.  IN THE ABSENCE OF A MATERIAL MISSTATEMENT,
BRETTSCHNEIDER'S CONVICTIONS MUST FALL ............................... 10

II.    ALTERNATIVELY, THE COURT SHOULD  ORDER A NEW TRIAL IN
THE INTEREST OF JUSTICE ....................................................................... 11

CONCLUSION ..................................................................................................... 12

**A.264**

## STATEMENT

Defendant Scott Brettschneider submits this memorandum in support of his motion under Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure.

## PROCEDURAL HISTORY

In April of this year, Mr. Brettschneider stood trial on an indictment that charged him with making a false statement (18 U.S.C. § 1001(a)(2)) and conspiring to make a false statement (18 U.S.C. § 371). S1 Indictment, ECF No. 74, ¶¶ 1-3. He moved for a judgment of acquittal at the conclusion of the government's case-in-chief and renewed the motion upon the close of evidence. Tr. 680-83, 734. The Court denied the motion "without prejudice to [further briefing]" on the sufficiency of the evidence. Tr. 735. On April 5, the jury convicted Mr. Brettschneider on both counts.

## LEGAL STANDARD

Rule 29 provides that, on a defendant's motion, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The rule "imposes a heavy burden on the defendant, whose conviction must be affirmed 'if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In passing on the sufficiency of the government's proof, a court must view the evidence in the light most favorable to the verdict, "crediting every [reasonable] inference the jury may have drawn in favor of the government." *United States v. Eppolito*,

**A.265**

543 F.3d 25, 45 (2d Cir. 2008). The court may not, however, embrace "specious inferences;" nor may it permit a conviction to stand upon the constitutionally infirm basis "that the defendant is probably guilty." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal quotation marks and citations omitted).

## FACTUAL BACKGROUND

The Indictment's substantive and conspiracy counts arose from a single set of facts. According to the prosecution, Brettschneider, a criminal defense attorney, had assisted the "effort[s]" of a federal inmate and former client named Richard Marshall to "fraudulently gain[]" admission into the BOP's "Residential Drug Abuse Program ("RDAP")." Indictment ¶ 1.

The crux of the government's case was a November 2014 letter from Reginald Shabazz-Muhammad ("Shabazz") to the "[R]DAP coordinator" at Marshall's prison facility. Tr. 46, 49. "[A] licensed substance abuse counselor" who occasionally moonlighted as a paralegal in Brettschneider's office, Shabazz informed the BOP official that Marshall had been "enrolled" in a drug and alcohol treatment program at the "Mohammad Mosque No.7" from "October 2003 thru [sic] January 2010."  GX 2b. During that period, Shabazz claimed, the volunteers who conducted the program

> assessed and clinically determined that Mr. Marshall was suffering from active drug dependence, namely alcohol and marijuana. By his own admission[,] his active drug dependence had impaired his judgment and functioning causing him to experience progressive negative consequences in his life. To alleviate his condition[,] Mr. Marshall recognized he needed the help and support of drug treatment intervention services.

2

# A.266

*Id.*

The government demonstrated that the information in Shabazz's letter contradicted Marshall's own representations to the probation officer who had prepared the September 2013 presentence report in his underlying drug case. According to the probation officer, Marshall had "denied a[] history of excessive alcohol use" and disclaimed any "marijuana . . . use in the past ten years." *See* GX 15 at ¶ 95. The officer went on to note that Marshall's last brush with drug treatment had come in the late 1980s, when the parole board ordered him to attend an "outpatient" program in Queens. GX 15 at ¶ 96; *see also id.* at ¶ 85 (noting that Marshall's last stint on parole had ended in July 1989).

Although Marshall's claim to abstinence was likely false – a knowledgeable colleague of Brettschneider testified that Marshall had been a habitual alcohol and marijuana user (*see* Tr. 692-93) – there was no reason to doubt the accuracy of the presentence reports' statements concerning Marshall's drug treatment history.

The evidence tying Brettschneider to Shabazz's letter came through conversations captured on a wiretap that state investigators had obtained in an unrelated investigation. Marshall was first intercepted discussing a plan to finagle his way into RDAP with the wiretap investigation's target, Charles Gallman, in mid-October 2014. By the end of that month, the pair were in contact with Brettschneider, who had been Marshall's attorney in the underlying drug case. A series of conversations between

Brettschneider, Marshall and Gallman between late October and early December 2014

established the following sequence of events:

- Marshall asked Brettschneider to help him find a drug treatment provider who was willing to inform the BOP that Marshall had participated in a "program" during the "year . . . prior to [his] arrest" in February 2012. GX 21-t 6:16-23

- Brettschneider referred Marshall's request to Shabazz who, on November 20, 2014, dispatched his letter. GX 22-t; GX 23-t.

- Upon receiving a copy of Shabazz's letter, a frustrated Marshall reported back to Brettschneider that the missive was useless because it failed to make representations concerning his treatment in "2011." GX 30-t 5:30-36.

- Brettschneider and Shabazz subsequently refused Marshall's repeated requests for "notes" from fictional treatment sessions with Marshall in 2011. *Id.* at 4:21-5:34.

Testimony and documentary evidence concerning the RDAP admission policies,

together with records from Marshall's incarceration, placed the wiretap recordings into

context. Prosecution witness Kit Hoffman, BOP "Psychology Treatment Programs

Coordinator for the Northeast Region" (Tr. 29), explained that inmates who apply for

admission to RDAP undergo a two-step admission process, consisting of an "initial

screening" followed by a "clinical interview [with]" their facility's "RDAP coordinator."

Tr. 36. The eligibility standards for the program are "strict" and inflexible: among other

things, there must be "document[ed]" proof of the inmate's substance abuse during the

"*12 months prior to* [his] *arrest.*" Tr. 37 (emphasis supplied); *see id.* (Hoffman explains that

4

**A.268**

the 12-month rule reflects the DSM-V's judgment that "if there's been no substance use for 12 months then the substance use disorder is [] in remission").

Hoffman identified two avenues for satisfying the 12-month requirement. For most RDAP-eligible inmates, the PSR supplied the requisite evidence of pre-arrest substance abuse. Tr. 37. Inmates with inadequate PSRs could still gain admission to RDAP, but they faced bureaucratic hurdles. To establish RDAP eligibility through sources "outside" the PSR, Hoffman explained, the BOP needed "documentation" on the inmate's substance abuse *during* "the year prior to the [his] arrest." Tr. 38.

BOP regulations corroborated Hoffman's account. According to the relevant "Program Statement" (Tr. 62), the "collateral" evidence that an inmate may present to establish his RDAP eligibility includes:

- Documentation to support a substance use disorder *within the 12-month period before the inmate's arrest* on his or her current offense.

- Documentation from a probation officer, parole officer, social service professional, etc., who has information that verifies the inmate's problem with substance(s) *within the 12-month period before the inmate's arrest* on his or her current offense.

- Documentation from a substance abuse treatment provider or medical provider who diagnosed and treated the inmate for a substance abuse disorder *within the 12-month period before the inmate's arrest* on his or her current offense.

- Multiple convictions (two or more) for Driving Under the Influence (DUI) or Driving While Intoxicated (DWI) in the 5 years prior to his or her most recent arrest.

BOP Program Statement No. P5330.11 at ch. 2, p. 12 (emphasis supplied).[1]

The 12-month rule had, the jury learned, stymied Marshall's RDAP application. Citing the information in Marshall's PSR, BOP officials had ruled him RDAP-ineligible at the conclusion of his initial screening on October 3, 2014. GX 4 at p.4-5. Shabazz's letter – which was examined sometime in early December – did not alter the initial determination. On December 10, 2014, the letter was dropped into Marshall's file with a terse "Administrative Note" that read:

> Document received that did not meet criteria of one year before his arrest, 2/12. Document not acceptable.

GX 4 at p. 2.

## ARGUMENT

## POINT I

### BRETTSCHNEIDER'S CONVICTIONS FOUNDER ON THE MATERIALITY REQUIREMENT

In order to secure a § 1001(a)(2) conviction, the Government must prove, *inter alia*, that the defendant intentionally made, or caused someone else to make, a "*materially* false, fictitious, or fraudulent statement" to a government agency. *United States v. Coplan*, 703 F.3d 46, 78 (2d Cir. 2012) (emphasis supplied). A statement is material if it has "a natural tendency to influence, or [be] capable of influencing, the decision of the

---

[1]     Relevant pages from the Program Statement, which was admitted into evidence as "Defense Exhibit A" at trial (Tr. 62), are appended to this Memorandum as an Attachment.

decision-making body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)). The government fell well short of meeting its burden in this case.

## A. THE GOVERNMENT FAILED TO PROVE THE MATERIALITY OF SHABAZZ'S MISSTATEMENTS

Ascertaining the materiality of a statement entails "the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?' and (b) 'what decision was the agency trying to make?'" *Gaudin*, 515 U.S. at 509. The answers to these preliminary inquiries frame "the ultimate question[:] . . . whether the statement was material to the decision." *Id.*

The analysis is relatively straightforward in this case. The relevant statement, contained in Shabazz's November 2014 letter, was the claim that Marshall had received treatment for "active [] dependence[ on] alcohol and marijuana" from "October 2003 thru [sic] January 2010." Tr. 276. The "decision," *Gaudin*, 515 U.S. at 509, was whether Marshall suffered from a "substance abuse problem in the year prior to his [February 2012] arrest." Tr. 52, 67. If so, the October 3, 2014, determination of Marshall's RDAP-ineligibility would be reversed. *See* Tr. 54. If not, that determination would stand. *Id.*

The determination stood. Tr. 55. As Marshall learned in early December 2014, Shabazz's letter was, for all intents and purposes, a nullity. For one thing, the missive's date – "November 6, 2014" (Tr. 72) – meant it was not created during the "12-month period before the inmate's arrest." BOP Program Statement No. P5330.11 at ch. 2, p.

12; *see* Tr. 66 (Dr. Hoffman confirms that "treatment records" offered to establish RDAP eligibility must be contemporaneous). In addition, Shabazz's assertion of an "active [drug] dependence" extended only through "January 2010," once again missing the crucial 12-month period by over a year. Tr. 67.

These shortcomings made Marshall's application a nonstarter; he simply "could not" be admitted into the program on the strength of Shabazz's representations. *Id.* Far from "influencing" the BOP, then, the letter's "natural tendency" was to sink into the bureaucratic oblivion of Marshall's file. *Gaudin*, 515 U.S. at 509.

The government proffered two justifications for hauling the document back into the light of day. First, it argued that Shabazz's letter was "something" that BOP officials could have "taken into consideration" in determining Marshall's RDAP eligibility. Tr. 681-82. Barring that, the government hazarded that the letter would at least "distract[]" BOP officials from their "duties." Tr. 681. Neither of these rationales has the slightest bearing on the question of materiality.

The government's first argument mixes conjecture with equivocation in equal parts. Hoffman contributed the first ingredient when he opined that a BOP official "*could* consider" the Shabazz letter as "corroborative" of "some [other] documentation that was done *at the time*" of the asserted diagnosis. Tr. 69 (emphasis supplied). In other words, Shabazz's letter *may have mattered* if it were accompanied by valid, contemporaneous proof that Marshall had abused drugs or alcohol during the year prior to his arrest. True or not, discourses on "purely theoretical" decisions or "metaphysical

8

**A.272**

possibilit[ies]" do not establish the "capability to influence" that is the sine qua non of materiality. *United States v. Litvak*, 808 F.3d 160, 173 (2d Cir. 2015). The prosecution's burden demanded "evidence of an actual decision" – not a hypothetical one – "that was reasonably capable of being influenced by [Shabazz's] misstatements." *Id.* at 172. (emphasis deleted).

The government's second argument draws a false equivalency between consideration and influence. The fallacy lies in the distinction between facts that "may have be[come] *relevant*" and the facts that were "capable of influencing" the "actual decision" before the government agency. *Id.* at 172, 174. In this case, the latter were set out in BOP Program Statement No. P5330.11. Whether a BOP official considered Shabazz's letter or not, the regulations precluded it from impacting Marshall's RDAP eligibility. *See* Tr. 72 (Hoffman acknowledges that an RDAP coordinator's "discretion" could only be exercised within "the confines of the program statement regulations"). Shabazz's assertions were, therefore, immaterial.

The prosecutors' second argument – that the letter "distracted" BOP officials – simply misreads the case law on materiality. The confusion centers on Second Circuit decisions that have affirmed the "materiality" of false statements on the basis that they were "'capable of distracting *government investigators'* attention away from' a critical matter." *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012) (quoting *United States v. Stewart*, 433 F.3d 273, 318 (2d Cir. 2006)) (emphasis supplied). Contrary to the government's surmise, these cases do not expand the definition of materiality to include

misstatements that may have been "distracting" in the colloquial sense. They simply articulated how *Gaudin*'s formulation applies to government agencies tasked with making decisions concerning *what* (or *whom*) to investigate. Where such agencies are concerned, misstatements calculated to alter the course of an investigation have "a natural tendency to influence, or [be] capable of influencing, the decision of the [government] decisionmaking body to which [they are] addressed." *United States v. Carrasquillo*, 239 F. App'x 634, 635 (2d Cir. 2007) (*quoting Gaudin*, 515 U.S. at 509).

*Gaudin*, then, supplies the rule of decision in this case. In the absence of a misstatement "capable of influencing" Marshall's RDAP eligibility, the government failed to prove materiality. *Id.*

## B. IN THE ABSENCE OF A MATERIAL MISSTATEMENT, BRETTSCHNEIDER'S CONVICTIONS MUST FALL

The government's failure to establish materiality topples both of Brettschneider's convictions. Because materiality constitutes "an essential element" of a "section 1001" offense, *United States v. Ballistrea*, 101 F.3d 827, 835 (2d Cir. 1996), Brettschneider's conviction on Count Two is a dead letter. *See Litvak*, 808 F.3d at 172-73 (tossing out a § 1001 conviction on the basis of the prosecution's feeble materiality showing). The conspiracy conviction is also fatally compromised because the government relied upon the supposed materiality of Shabazz's statements to establish that Brettschneider "willfully joined and participated" in the "submission of a *materially* false . . . letter to the [BOP]." Tr. 874; *see* Tr. 741 (government in summation urges the jury to infer

Brettschneider's intent from Shabazz's assertions, arguing "that [the] whole point" of the letter was to "influence the BOP's [RDAP] decision"); *cf. United States v. Hanlon*, 548 F.2d 1096, 1101 (2d Cir. 1977) (observing that the state of mind necessary to prove conspiracy is generally established according to the "'old adage [that a]ctions speak louder than words'").

## POINT II

### ALTERNATIVELY, THE COURT SHOULD
### ORDER A NEW TRIAL IN THE INTEREST OF JUSTICE

Unlike Rule 29, which contemplates relief from a verdict only in the absence of "competent, satisfactory and sufficient evidence," Rule 33 invests the Court with "broad discretion" to order a new trial when, after an "objective evaluation" of "all facts and circumstances," it is convinced that "letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted); *see United States v. Davidson*, 308 F. Supp. 2d 461, 465 (S.D.N.Y. 2004) (McMahon, J.) ("When considering a new trial motion under Rule 33 of the Federal Rules of Criminal Procedure, the Court sits as a proverbial thirteenth juror, and may consider the evidence in whatever light seems most persuasive to it— which may or may not be most favorable to the Government."). To the extent the Court concludes that the government made a marginally sufficient showing of materiality – or that Brettschneider's conspiracy conviction may stand even in the absence of a

materiality showing – this Court should "vacate [the] judgment and grant a new trial in the interest of justice." Fed. R. Crim. P. 33(a).

## **CONCLUSION**

For the reasons set forth above, the Court should grant Brettschneider's motion, set aside the verdict and enter a judgment acquitting Brettschneider on all counts.

Dated:  New York, New York
    May 15, 2019

         Respectfully submitted,

          /s/

         Sarita Kedia
         Sarita Kedia Law Offices, P.C.
         5 East 22nd Street, Suite 7B
         New York, New York 10010
         (212) 681-0202
         skedia@kedialaw.com

         *Attorney for Scott Brettschneider*

On the brief:

  Sarita Kedia, Esq.
  Jonathan Savella, Esq.

# ATTACHMENT

Excerpt from BOP Program Statement No. P5330.11 12

**A.277**

Further, the RDAP unit must be solely for RDAP participants, as required by 18 U.S.C. § 3621(e). Inmates living on the RDAP unit must be: waiting for admission into the program; participating in the program; or RDAP completers. Whenever possible, there should be more inmates who are participating in or who have completed RDAP in the treatment unit than those waiting to enter treatment. Any compromise of this defined unit purity will invalidate eligibility for early release of all inmates on the unit.

**2.5.7. Urine Surveillance**. Urine surveillance is a regular component of effective treatment programming. Urine surveillance provides information to staff on an RDAP participant's abstinence, coping mechanisms, and honesty. The Bureau's urine surveillance procedures allow for random testing, suspect testing, and testing after returning from a furlough. Therefore, inmates in the RDAP are subjected to the same urine surveillance procedures as the general population.

On rare occasions there may be a clinical reason to test individual program participants or the entire population of the program. On these infrequent occasions, and with the permission of the Regional Psychology Programs Coordinator, staff may use program funds for urinalysis testing. However, this is to be an extremely rare event and is the only situation where Drug Abuse Program funds may be used for urinalysis testing.

**2.5.8. RDAP Program Admission**. **§ 550.53(c)  *Application to RDAP.* Inmates may apply for the RDAP by submitting requests to a staff member (ordinarily, a member of the unit team or the Drug Abuse Program Coordinator).**

**(d)  *Referral to RDAP.*  Inmates will be identified for referral and evaluation for RDAP by unit or drug treatment staff.**   Typically, inmates are identified for referral to the RDAP by psychology staff or unit management staff.

(1)  **Referral to DAPC**.  Upon completion of the Psychology Intake Screening, the psychologist will refer inmates with a substance use history and an interest in treatment to the institution's DAPC. The DAPC will further screen the inmate for the RDAP or for referral to the non-residential drug abuse program or the drug education course.

Inmates may also apply for the program by submitting an *Inmate Request to Staff* form to the DAPC.

(2)  **Screening**.  Upon assignment of a RDAP referral by the DAPC, the DTS will review an inmate's Central File and other collateral sources of documentation to determine if:

- There is sufficient time remaining on the inmate's sentence, ordinarily 24 months.
- There is documentation available to verify the inmate's use of specific drugs, including alcohol.
- There is verification that can establish a pattern of substance abuse or dependence.

**A.278**

- There has been consultation with the Education Department (see Section 2.4.5) and evidence is documented that the inmate cannot participate in the program; e.g., has a cognitive impairment or learning disability that precludes participation or is unable to participate in the program in the language in which it is conducted.
- The inmate can complete all of the components of the RDAP; e.g., is able to participate in community transition drug abuse treatment.

When seeking independent verification, examples of other collateral documentation that may be used include:

- Documentation to support a substance use disorder within the 12-month period before the inmate's arrest on his or her current offense.
- Documentation from a probation officer, parole officer, social service professional, etc., who has information that verifies the inmate's problem with substance(s) within the 12-month period before the inmate's arrest on his or her current offense.
- Documentation from a substance abuse treatment provider or medical provider who diagnosed and treated the inmate for a substance abuse disorder within the 12-month period before the inmate's arrest on his or her current offense.
- Multiple convictions (two or more) for Driving Under the Influence (DUI) or Driving While Intoxicated (DWI) in the 5 years prior to his or her most recent arrest.

The DTS will document a summary of the information gathered from the review and enter it into PDS.

NOTE:  Recreational, social, or occasional use of alcohol and/or other drugs that does not rise to the level of excessive or abusive drinking does not provide the required verification of a substance use disorder.  Any verifying documentation of alcohol or other drug use must indicate problematic use; i.e., consistent with the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Health Disorders (DSM) criteria.

(3)  **No Verifying Documentation**.  In the event there is *no* verifying documentation in the inmate's Presentence Investigation Report or other official documentation in the Central File, the DTS will meet with the inmate.  The DTS will tell the inmate there is no verifying documentation and offer him or her the following information:

> As there is no substantiating documentation for a substance use diagnosis, you have the following options:
>
> 1. You may volunteer for the non-residential drug abuse program.
>
> 2. You may seek documentation from a substance abuse treatment provider where you previously received treatment.  This document must have been written at the time services were provided and must demonstrate that a substance use diagnosis